**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRITTANY BAKER,**<br>Plaintiff;<br><br>**v.**<br><br>**HORIZON FEDERAL CREDIT UNION, JUSTIN HOWARD, MICHAEL PATTERSON,**<br>Defendants | **Case No. 4:26-CV-2426**<br><br>**Jury Trial Demanded**<br><br>Filed Electronically |

**COMPLAINT**

**AND NOW** comes Plaintiff, Brittany Baker, by and through her counsel, Strokoff & Cowden, P.C., and hereby brings this action against Defendants Horizon Federal Credit Union, Justin Howard, and Michael Patterson for violations of Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "CFPA,") 12 U.S.C. § 5481 *et seq;* the Sarbanes-Oxley Act of 2002 (the "SOX"), 15 U.S.C. § 7201 *et seq.;* and misrepresentation, alleging in support thereof as follows:

## PARTIES

1. Plaintiff Brittany Baker ("Ms. Baker") is an adult individual, and at all times relevant to this Complaint, was a resident of Union County in the Commonwealth of Pennsylvania with address at 213 South 4th Street, Mifflinburg, PA 17844.

2. Defendant Horizon Federal Credit Union ("Horizon") is a federal credit union with headquarters at 330 Pine Street, Suite 400, Williamsport, PA 17701 and with operations in 11 counties in central Pennsylvania.

3. Defendant Justin Howard ("Howard") is an adult individual with business address at 330 Pine Street, Suite 400, Williamsport, PA 17701.

4. At all times relevant to this Complaint, Defendant Howard served as Defendant Horizon's Chief Executive Officer ("CEO").

5. In his role as CEO, Defendant Howard served as Ms. Baker's supervisor.

6. Defendant Michael Patterson ("Patterson") is an adult individual with business address at 330 Pine Street, Suite 400, Williamsport, PA 17701.

7. At all times relevant to this Complaint, Defendant Patterson served as Defendant Horizon's Chief Branding Officer.

8. In addition to his role as Chief Branding Officer, Defendant Patterson was Defendant Horizon's chief manager of human resource functions and operations.

9. Defendant Patterson collaborated with Defendant Howard in decisions regarding Ms. Baker's employment with Defendant Horizon, including but not limited to Ms. Baker's termination.

10. Defendant Howard made or gave final approval for all decisions regarding Ms. Baker's employment status and terms and conditions of employment.

## PROCEDURAL HISTORY AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. The preceding averments are incorporated by reference as if fully set forth.

12. On or about June 11, 2025, Ms. Baker filed a timely complaint with the United States Occupational Safety and Health Administration ("OSHA"). (A copy of Ms. Baker's OSHA complaint is attached hereto as **Exhibit A**).

13. Ms. Baker's OSHA complaint alleged that Defendants retaliated against her for engaging in protected whistleblowing activity, in violation of the CFPA and the SOX. 12 U.S.C. § 5567; 18 U.S.C. § 1514A. (**Exhibit A**).

14. OSHA assigned Investigator Stephen Fitzgerald ("Investigator Fitzgerald") to investigate Ms. Baker's complaint. (OSHA Case No. 301055479). (**Exhibit A**).

15. On June 26, 2025, Ms. Baker submitted a chronological listing of protected activities and adverse responses to Investigator Fitzgerald. (A copy of Ms. Baker's June 26, 2026 submission[1] is attached hereto as **Exhibit B**).

16. On July 31, 2025, Ms. Baker amended her complaint. (A copy of Ms. Baker's amended OSHA complaint is attached hereto as **Exhibit C**).

17. Defendant Horizon provided Investigator Fitzgerald with a position statement dated August 21, 2025. Ms. Baker submitted a rebuttal dated September 5, 2025, and Horizon

---

[1] Ms. Baker also shared several hundred documents with Investigator Fitzgerald to aid his investigation. They are not appended to **Exhibit B**.

submitted a surrebuttal dated October 1, 2025. (An aggregated copy of the aforesaid submissions is attached hereto as **Exhibit D**).

18. On January 30, 2026, 233 days after Ms. Baker filed her OSHA complaint, OSHA issued its decision. (A copy of OSHA's January 30, 2026, decision is attached hereto as **Exhibit E**).

19. OSHA concluded that there was no reasonable cause to find that Defendants violated the SOX and CFPA and dismissed Ms. Baker's complaint. (**Exhibit E**).

20. On February 5, 2026, Ms. Baker filed timely objections to OSHA's decision and requested a hearing before an Administrative Law Judge ("ALJ"). (A copy of Ms. Baker's objections and request for hearing is attached hereto as **Exhibit F**).

21. On February 24, 2026, the United States Department of Labor's Office of Administrative Law Judges ("OALJ") accepted Ms. Baker's request and assigned the matter to the Honorable Drew A. Swank, ALJ ("ALJ Swank") for telephonic hearing.

22. On June 11, 2026, the parties, among other things, jointly requested the proceedings to be held in-person.

23. By Order dated June 24, 2026, ALJ Swank declined to hold an in-person hearing, rather, the proceedings would be conducted virtually.

24. Pursuant to 12 U.S.C. § 5567(c)(4)(D) and18 U.S.C. § 1514A(b)(1)(B), Ms. Baker now exercises her right to remove this matter to this Honorable Court for *de novo* review.

**JURISDICTION AND VENUE**

25. The preceding averments are incorporated as if set forth in full.

26. This Honorable Court has jurisdiction over Ms. Baker's CFPA claim under 12 U.S.C. § 5567(c)(4)(D) (establishing a private cause of action for *de novo* review in federal district court if the Secretary of Labor does not issue a final order within 210 days after a CFPA complaint is filed) (the CFPA's "kick out" provision).

27. This Honorable Court also has jurisdiction over Ms. Baker's SOX claim under 18 U.S.C. § 1514A(b)(1)(B) (establishing a private cause of action for *de novo* review in federal district court if the Secretary of Labor does not issue a final order within 180 days after a SOX complaint is filed) (the SOX's "kick out" provision).

28. This Honorable Court may properly exercise supplemental jurisdiction over Ms. Baker's claim of misrepresentation pursuant to 28 U.S.C. § 1367 (relating to supplemental jurisdiction).

29. Venue is proper because all parties reside within the Middle District of Pennsylvania, and a substantial part of the events or omissions giving rise to the instant action occurred therein. *See* 28 U.S.C. § 1391(b).

## BACKGROUND

30. The preceding averments are incorporated as if set forth in full.

31. Ms. Baker began working for Defendant Horizon in or about February 2022, as Director of Retail Delivery.[2]

32. While serving as Director of Retail Delivery, Ms. Baker began noticing and promptly correcting minor compliance issues.

---

[2] Initially, Ms. Baker's first-level supervisor was Defendant Horizon's Chief Experience Officer ("CXO"), Denise Lariviere. Defendant Howard was Ms. Baker's second-level supervisor.

33. Ms. Baker informed Defendant Howard and CXO Lariviere of the aforesaid minor compliance issues.

34. On September 26, 2022, CXO Lariviere completed Ms. Baker's first performance evaluation for the period May 1, 2022, through August 31, 2022. (A copy of Ms. Baker's performance evaluation completed September 26, 2022, is attached hereto as **Exhibit G**).

35. CXO Larivere gave Ms. Baker an exemplary evaluation, scoring an average of "4 – Exceeds Expectations" out of a five-point scale. (**Exhibit G**).

36. CXO Lariviere wrote, "Employees from across the organization have commented on how much they appreciate and respect [Ms. Baker] for the support she provides them and willingness to help whenever necessary to get jobs done." (**Exhibit G**).

37. Effective September 1, 2022, Ms. Baker transferred to the position of Director of Lending ("DOL").

38. Ms. Baker continued to report to CXO Lariviere.

39. Over the following months, Ms. Baker continued to identify and correct regulatory compliance issues, informing Defendant Howard and CXO Lariviere of same.

40. Through the end of 2022, Ms. Baker informed Defendant Howard and CXO Lariviere that many of the compliance issues were attributable to actions or inactions taken or authorized by her supervisor, CXO Lariviere.

41. On January 19, 2023, CXO Lariviere completed Ms. Baker's performance evaluation for the period September 1, 2022, to December 31, 2022, and assigned Ms. Baker a score of 3.8 out of 5, down from her previous evaluation score of 4.0. (A copy of Ms. Baker's performance evaluation completed January 19, 2023, is attached hereto as **Exhibit H**).

42. It is believed and averred that Ms. Baker's internal compliance reporting was a contributing factor in the reduction of her performance rating.

43. Throughout 2023, Ms. Baker identified a number of lapsed loan applications, in violation of regulations promulgated by the Consumer Financial Protection Bureau ("CFPB") pursuant to the CFPA.

44. Ms. Baker informed Defendant Howard and CXO Lariviere of the non-compliant lapsed loan applications.

45. Ms. Baker again repeated that the violations stemmed from actions or inactions taken or authorized by her supervisor, CXO Lariviere.

46. Ms. Baker's internal reports implicating CXO Lariviere had a negative impact on her working relationship with CXO Lariviere.

47. On June 6, 2023, CXO Lariviere delivered Ms. Baker's performance evaluation for the period January 1, 2023, to April 30, 2023, assigning Ms. Baker a score of 3.7 out of 5, down from her previous scores of 3.8 and 4.0. (A copy of Ms. Baker's performance evaluation delivered to her on June 6, 2023, is attached hereto as **Exhibit I**).

48. It is believed and averred that Ms. Baker's internal reports of regulatory non-compliance were a contributing factor in her lower performance ratings.

49. Defendant Howard did not investigate Ms. Baker's reports of CXO Lariviere's compliance violations.

50. From mid-2023 through the remainder of the year, Ms. Baker continued to identify and correct compliance issues, but she made fewer internal reports to Defendant Howard and CXO Lariviere.

51. On September 28, 2023, CXO Lariviere completed Ms. Baker's performance evaluation for the period May 1, 2023, to August 31, 2023, assigning Ms. Baker a score of 4.35 out of 5, an increase from her previous score of 3.7. (A copy of Ms. Baker's performance evaluation completed September 28, 2023, is attached hereto as **Exhibit J**).

52. In or about November 2023, Defendant Horizon removed lending duties and responsibilities from CXO Lariviere's position and created a new position entitled Chief Lending Officer ("CLO").

53. Ms. Baker was promoted to the CLO position, effective January 1, 2024.

54. On February 6, 2024, CXO Lariviere completed Ms. Baker's performance evaluation for the period September 1, 2023 to December 31, 2023, assigning Ms. Baker a rating of 4.3 out of 5. (A

copy of Ms. Baker's performance evaluation completed February 6, 2024, is attached hereto as **Exhibit K**).

55. It is believed and therefore averred that Ms. Baker's reduction in internal reports of non-compliance/compliance risk was a contributing factor in her increased scores.

56. After her promotion to the CLO position, Ms. Baker reported to and was under the direct supervision and control of Defendant Howard.

57. As CLO, Ms. Baker held a position equal/lateral to CXO Lariviere and was thus no longer evaluated by CXO Lariviere.

58. Ms. Baker resumed identifying, correcting, and making internal reports of individual compliance violations/compliance risks as they occurred in 2024.

## MS. BAKER'S WHISTLEBLOWING ACTIVITY AND DEFENDANTS' RETALIATION

59. The preceding averments are incorporated as if set forth in full.

60. Back in July 2023, Defendant Horizon had created a Member Engagement Center to address credit union member inquiries and needs.

61. The Member Engagement Center was intended to be a hub to receive and process external member inquiries and needs for all of Defendant Horizon's branch locations.

62. Defendant Horizon contracted with RingCentral, a corporate entity that provides, among other services, a call recording program.

63. Defendant Horizon intended to use the call recording program at its Member Engagement Center to, *inter alia*, obtain additional information to address credit union member inquiries and needs.

64. Defendant Horizon's use of the call recording program captures and saves, among other things, credit union members' Personally Identifying Information ("PII") and confidential financial information.

65. Any external/internal call to/from Defendant Horizon's Member Engagement Center could contain credit union member PII or confidential financial information.

66. All external and internal calls are recorded.

67. It is believed and averred that the information obtained through the call recording program would be saved

electronically and made available online to managers and other employees at Defendant Horizon.

68. In or about August 2023, Defendant Howard approved and commenced the use of RingCentral's call recording program for use by Defendant Horizon's Member Engagement Center.

69. In an August 23, 2023 leadership team meeting, Ms. Baker recommended that Defendant Horizon adopt the necessary policies and procedures required to secure and prevent disclosure of credit union members' PII and confidential financial information. (A copy of Defendant Horizon's Leadership Meeting Minutes, dated August 23, 2023, is attached hereto as **Exhibit L**).

70. Federal laws and regulations require institutions that capture PII and confidential financial information, such as Defendant Horizon, to promulgate, implement, and maintain regulatorily-compliant policies addressing the security of credit union member PII and confidential financial information.

71. Federal laws and regulations also require institutions like Defendant Horizon that use call recording programs to inform callers that they are being recorded.[3]

72. Managers and other employees of Defendant Horizon had access to the recorded information by logging into a website.

73. It is believed and averred that any device with an internet connection could gain access to call recordings and other confidential information stored as part of the call recording program.

74. On April 24, 2024, Defendant Horizon's leadership team again discussed the need to establish regulatorily-compliant policies and procedures relevant to the call recording program. (A copy of Defendant Horizon's Leadership Meeting Minutes, dated April 24, 2024, is attached hereto as **Exhibit M**).

75. During the April 24, 2024 leadership team meeting, Ms. Baker raised concerns about Defendant Horizon's lack of

---

[3] Ms. Baker also understood these requirements to overlap with state and federal wiretapping laws.

regulatorily-compliant policies and procedures relevant to the call recording program.

76. After April 2024, Defendant Howard and CXO Lariviere repeatedly assured Ms. Baker that Defendant Horizon had promulgated and implemented regulatorily-compliant policies and procedures relating to the call recording program.

77. Defendant Horizon is required annually to truthfully certify compliance with the Payment Card Industry Data Security Standard ("PCI DSS").[4]

78. Governmental agencies utilize PCI DSS certifications as indicators of an institution's compliance with more stringent Federal regulations.[5]

---

4 The PCI DSS is a data security industry standard. Financial institutions must comply with the PCI DSS in order to issue Visa, MasterCard, American Express, etc., debit/credit cards and to store payment information from the same. *See, e.g.*, *About Us*, PCI SECURITY STANDARDS COUNCIL, https://www.pcisecuritystandards.org/about_us/(last visited July 31, 2026).

5 *See, e.g.*, *Statement of the Federal Trade Commission, FTC v. LifeLock*, FED. TRADE COMM'N, https://www.ftc.gov/system/files/documents/public_statements/896143/151217lifelockcommstmt.pdf (December 17, 2015); *FTC To Study Credit Card Industry Data Security Auditing*, FED. TRADE COMM'N, https://www.ftc.gov/news-events/news/press-releases/

79. Inability to truthfully certify PCI DSS compliance is a significant indicator of non-compliance with Federal laws and regulations.

80. Defendant Howard completed three evaluations of Ms. Baker's performance throughout 2024, assigning her an average score of 3.23 on a five-point scale. (An aggregated copy of Ms. Baker's 2024 performance evaluations is attached hereto as **Exhibit N**).

81. It is believed and averred that Ms. Baker's resumption of internal reports of non-compliance/compliance risk were contributing factors in Defendant Howard's reduction of her 2024 performance scores.

82. It is believed and averred that Defendant Horizon submitted inaccurate/non-compliant PCI DSS certifications in 2023 and 2024.

83. In early 2025, Ms. Baker became responsible for Defendant Horizon's PCI DSS certification.

---

2016/03/ftc-study-credit-card-industry-data-security-auditing (March 7, 2016).

84. When she assumed PCI DSS certification responsibilities, Ms. Baker discovered that Defendant Horizon did not have the requisite policies and procedures.

85. By email dated January 28, 2025, Ms. Baker corrected and internally reported new instances of non-compliance/compliance risk, including Defendant Horizon's non-compliance with PCI DSS, to Defendant Howard. (A copy of Ms. Baker's email is attached hereto as **Exhibit O**).

86. It is believed and averred that the aforesaid instances of non-compliance/compliance risk, including non-compliance with PCI DSS, were caused by CXO Lariviere.

87. Defendant Howard did not investigate Ms. Baker's internal reports implicating CXO Lariviere.

88. Ms. Baker completed and submitted a truthful PCI DSS certification in early February indicating that Defendant Horizon had not installed or maintained all of the requisite policies and procedures relating to the storage, access, security, and retention of data including card holder data and other PII.

89. Defendant Howard listed Ms. Baker's compliance concerns as a subject for discussion during Defendant Horizon's

February 4, 2025, senior management meeting. (A copy of Defendant Howard's agenda-setting email is attached hereto as **Exhibit P**).

90. Ms. Baker reported during the leadership meeting that she had submitted the PCI DSS certification indicating the areas of Horizon's non-compliance.

91. After Defendant Horizon's February 4, 2025 leadership meeting, Defendant Howard enabled the use of the call recording program at Horizon's Lock Haven branch.

92. Between February 4 and March 3, 2025, Ms. Baker identified and internally reported an additional six (6) regulatory violations caused by CXO Lariviere.

93. Ms. Baker's internal reports implicating CXO Lariviere continued to have a negative impact on their working relationship.

94. Defendants took no action to protect Ms. Baker in accordance with Defendant Horizon's Whistleblower Policy. (A copy of Defendant Horizon's Whistleblower Policy in effect at the time of Ms. Baker's termination is attached hereto as **Exhibit Q**).

95. On March 3, 2025, Ms. Baker emailed Defendant Howard, writing, among other things, that she would no longer be complicit in Defendant Horizon's and Defendant Howard's failure to correct or address CXO Lariviere's repeated regulatory violations when Ms. Baker's "neck was on the line" vis-à-vis regulatory oversight. (A copy of Ms. Baker's March 3, 2025, email is attached hereto as **Exhibit R**).

96. As CLO, Ms. Baker bore the risk of all lending, privacy, and security practice violations caused by CXO Lariviere, such as violations involving income falsification, loan fraud, negative amortization, credit union governance failures, and systematic failure to disclose adverse credit decisions.

97. On March 4, 2025, Defendant Howard told Ms. Baker she would be better suited working elsewhere and offered to write a letter of recommendation for her.

98. During a meeting with Ms. Baker on March 7, 2025, Defendant Howard told her of his new initiative to recruit an external candidate to fill a new position recombining the CLO and CXO roles, i.e., Ms. Baker would no longer be the CLO and she would not be considered for the new position. (A copy of notes taken

during the March 7, 2025 meeting, with additions made on March 21, 2025, is attached hereto as **Exhibit S**).

99. Defendant Howard told Ms. Baker that if he did not remove Ms. Baker and CXO Lariviere from their positions, it would "take the credit union down and he needs to consider all the other employees." (**Exhibit S**).

100. Defendant Howard presented Ms. Baker with three "options": continue through the core conversion process and receive a severance package once the conversion was completed; accept a demotion; or "voluntarily" separate from employment with Defendant Horizon. (**Exhibit S**).

101. Ms. Baker was integral to the completion of Defendant Horizon's core conversion project expected to conclude in July 2025.[6]

102. Ms. Baker declined to choose any of the options offered by Defendant Howard during the March 7, 2025 meeting.

---

6 *See* **Exhibit T**, *infra.*

103. Between March 12 and March 20, 2025 Ms. Baker discovered, corrected, and internally reported approximately five (5) additional lending practice violations caused by CXO Lariviere.

104. On or about March 17, 2025, CXO Lariviere took a leave of absence. She never returned to Horizon.

105. At 8:37 a.m. on March 20, 2025, Ms. Baker submitted an external report to the FTC. (Report No 185192465).

106. In her FTC report, Ms. Baker reported that credit union member PII and confidential financial information was being transmitted via unsecured email.

107. At 9:01 a.m. on March 20, 2025, Defendant Howard again presented Ms. Baker with the same options to choose an unfavorable change to her position. (A copy of Defendant Howard's letter is attached hereto as **Exhibit T**).

108. Ms. Baker again declined to elect the imposition of any of the unfavorable personnel actions.

109. On or about March 27, 2025, Ms. Baker made a counteroffer to assume the newly recombined CXO role.

110. Defendant Howard declined her counteroffer.

111. By email to Defendant Howard, dated April 3, 2025, Ms. Baker expressed feeling that his ultimatum "appear[ed] to be retaliation due to the excessive and pervasive issues related to compliance and consistency as I outlined over the past several years. . ." (A copy of Ms. Baker's April 3, 2025, email is attached hereto as **Exhibit U**).

112. Specifically, Ms. Baker stated Defendants' retaliation was related to her internal reports of non-compliance/compliance risk concerning several Federal laws and regulations, including but not limited to:

a. The Equal Credit Opportunity Act ("ECOA") with regulations administered by the CFPB as Regulation B. 12 C.F.R. §§ 1002.1–1002.16, 1002.101—1002.114.

b. The Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE Act") with regulations administered by the NCUA as Regulation G. 12 C.F.R. §§ 1007.101—1007.105.

c. The Home Mortgage Disclosure Act ("HMDA"), with regulations administered by the CFPB as Regulation C. 12 C.F.R. §§ 1003.1–1003.6.

d. The Gramm-Leach-Bliley Act ("GLBA") with regulations administered by the FTC as the Safeguards Rule. 16 C.F.R. §§ 314.1–314.6.

(**Exhibit U**).

113. On or about April 22, 2025, Ms. Baker reminded Defendant Horizon's Chief Financial and Information Officer ("CFIO") Michael Burns that Defendant Horizon still needed to adopt and maintain call recording policies and procedures to ensure compliance with Federal law.

114. CFIO Burns assured Ms. Baker that he had presented the requisite policies and procedures to Defendant Howard for approval.

115. Defendant Howard never adopted the proposed policies and procedures.

116. In late April/early May 2025, CFIO Burns disabled the Lock Haven branch's use of the call recording program.

117. It is believed and averred that through Ms. Baker's termination, Defendant Horizon lacked regulatorily-compliant policies and procedures.

118. It is believed and averred that Defendant Horizon did not inform its employees that internal calls at Horizon's Member Engagement Center were being recorded.

119. On or about April 23, 2025, Defendant Horizon again pressured Ms. Baker to accept and/or choose an unfavorable personnel action, i.e., demotion or separation.

120. On or about May 8, 2025, Defendant Horizon created and advertised a new position called the Chief Relationship Officer ("CRO").

121. Ms. Baker was qualified and applied for the CRO position. (A copy of Ms. Baker's completed CRO application and carrier email to Defendant Howard is attached hereto as **Exhibit V**).

122. Defendants never considered Ms. Baker's application for the CRO position.

123. It is believed and averred that Ms. Baker's whistleblowing activity was a contributing factor in Defendants' decision not to consider her application for the CRO position.

124. On May 14, 2025, Ms. Baker externally reported Defendant Horizon's call recording compliance violations to the

Federal Communications Commission ("FCC"), and she made a second report to the FTC.

125. On May 15, 2025, Ms. Baker externally reported Defendant Horizon's compliance violations to the NCUA and the Pennsylvania Attorney General.

126. On May 16, 2025, Ms. Baker externally reported Defendant Horizon's compliance violations to the NCUA Office of Inspector General, NCUA Cyber Security, and James Fedele ("Mr. Fedele"), Chairman of Defendant Horizon's Board of Directors. (A copy of Ms. Baker's email to Mr. Fedele is attached hereto as **Exhibit W**).

127. Mr. Fedele replied to Ms. Baker on May 18, 2025, stating that "[Defendant Howard] has been keeping us informed of the situation. Generally the board's position is not to get involved in employee issues as we do not have first hand knowledge of the situations. I hope you can respect that position. . ." (**Exhibit W**).

128. On May 21, 2025, Defendant Howard conveyed Ms. Baker's performance review for the period between January 1 and April 30, 2025 and assigned Ms. Baker an overall score of 2.6 out of

5. (A copy of the aforesaid performance review is attached hereto as **Exhibit X**).

129. Any score below 3.0 indicates a failure to meet expectations.

130. Prior to her demand for corrective action in March 2025, Ms. Baker's performance scores had been 3 or above.

131. It is believed and averred that Ms. Baker's intensified whistleblowing activity was a contributing factor in Defendant Howard's reduction of her performance rating.

132. On or about May 22, 2025, the NCUA requested a statement from Ms. Baker and advised her to file a formal complaint with Defendant Horizon's Supervisory Committee.

133. On or about May 22, 2025, Ms. Baker submitted her Sworn Statements of Events to the NCUA. (A copy of Ms. Baker's Sworn Statement of Events is attached hereto as **Exhibit Y**).

134. On or about May 27, 2025, Ms. Baker submitted a formal complaint to Defendant Horizon's Supervisory Committee. (A copy of Ms. Baker's complaint is attached hereto as **Exhibit Z**).

135. Ms. Baker's formal complaint reported, among other things, Defendant Horizon's "[b]reaches of the FTC Safeguards Rule, Pennsylvania Dual Consent for Call Recording for Wiretapping, Regulation B, FCRA, BSA, and other federal and state requirements[.]" (**Exhibit Z**).

136. Defendant Horizon's Supervisory Committee never replied to Ms. Baker.

137. Ms. Baker completed the substantive portions of Defendant Horizon's core conversion project on or about June 2, 2025.

138. The only remaining tasks , such as "clean-ups," were expected to be completed by July 2025 and for which Ms. Baker's expertise was not required.

139. By letter dated June 11, 2025, Defendants terminated Ms. Baker's employment, stating:

> A few months back, you were informed about these coming changes [the recombination of the CXO and CLO roles] and provided with different options regarding your future with Horizon and the best fit in this new organizational structure. After multiple opportunities were provided to you, you did not select any of the options provided. It is now time that the organization must move forward.

(A copy of the June 11, 2025, termination letter is attached hereto as **Exhibit AA**).

140. Defendant Horizon could have but refused to retain Ms. Baker as an employee.

141. Ms. Baker's repeated reports of compliance violations/risks were a contributing factor in Defendants' decision to terminate her employment.

## COUNT I
## RETALIATION IN VIOLATION OF THE CONSUMER FINANCIAL PROTECTION ACT, 12 U.S.C. § 5567
## (Defendant Horizon, Defendant Howard, Defendant Patterson)

142. The preceding averments are incorporated as if set forth in full.

143. Defendant Horizon provides consumer financial products and services within the meaning of the CFPA. *See* 12 U.S.C. § 5481(5).

144. Defendant Horizon is a "covered person" and/or "service provider" within the meaning of the CFPA. *See* 12 U.S.C. §§ 5481(6), (26).

145. As a "covered person" and/or "service provider" within the meaning of the CFPA, Defendant Horizon is subject to

the anti-retaliation provisions of the CFPA. *See* 12 U.S.C. § 5567 (prohibiting covered persons and service providers from discriminating and/or retaliating against covered employees for engaging in protected whistleblowing activity).

146. Defendants Howard and Patterson are "covered person[s]" and/or "service provider[s]" within the meaning of the CFPA. *See* 12 U.S.C. §§ 5481(6), (26).

147. As "covered person[s]" and/or "service provider[s]" within the meaning of the CFPA, Defendants Howard and Patterson may be held individually liable under the anti-retaliation provisions of the CFPA. *See* 12 U.S.C. § 5567 (prohibiting covered persons and service providers from discriminating and/or retaliating against covered employees for engaging in protected whistleblowing activity).

148. At all relevant times, Ms. Baker performed tasks related to the offer or provision of consumer financial products and/or services. *See* 12 U.S.C. § 5481(5).

149. At all relevant times, Ms. Baker was a "covered employee" within the meaning of the CFPA. *See* 12 U.S.C. § 5567(b).

150. Ms. Baker's internal and external reports of regulatory violations to Defendants, Defendant Horizon's Supervisory Committee, the FTC, and the NCUA are protected activity as defined by the CFPA. *See* 12 U.S.C. §§ 5567(a)(1)–(a)(4).

151. Defendants took an unfavorable personnel action against Ms. Baker.

152. All of the options presented to Ms. Baker, i.e., coerced "voluntary" separation or demotion, were unfavorable personnel actions.

153. Defendants knew of Ms. Baker's protected activity.

154. It is believed and averred that Defendant Howard and Defendant Patterson are the executives responsible for making and implementing personnel actions.

155. Ms. Baker's internal and external protected activity was a contributing factor in Defendants' decisions to take unfavorable personnel actions against her, e.g., to reduce her performance evaluation scores, ignore her application for the CRO position, terminate her employment, etc.

**COUNT II**
**RETALIATION IN VIOLATION OF THE SARBANES-OXLEY ACT, 18 U.S.C. § 1514(A)**
**(Defendant Horizon, Defendant Howard, Defendant Patterson)**

156. Defendant Horizon is believed and averred to operate as a contractor for several publicly traded entities, including the following:

a. Experian plc, traded on the London Stock Exchange under the ticker symbol EXPN;

b. TransUnion LLC, traded on the New York Stock Exchange under the ticker symbol TRU;

c. Equifax, Inc., traded on the New York Stock Exchange under the ticker symbol EFX; and

d. ChexSystems, Inc., owned by a subsidiary of Fidelity National Information Service, which is traded on the New York Stock Exchange under the ticker symbol FIS.

157. As a contractor of several publicly traded companies, Defendant Horizon is subject to the anti-retaliation provisions of the Sarbanes-Oxley Act of 2002 (the "SOX"). *See* 18 U.S.C. § 1514A(a) ("No. . . contractor. . . of such company [required to register and/or file reports under the Securities Exchange Act of

1934]. . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of [protected whistleblowing activity]"); *see also Lawson v. FMR LLC*, 571 U.S. 429, 441 (2014) (". . . A contractor may not retaliate against its own employee for engaging in protected whistleblowing activity.").

158. As officers of Defendant Horizon, Defendants Howard and Patterson may be held individually liable for violations of the anti-retaliation provisions of the SOX. *See* 18 U.S.C. § 1514A(a) (prohibiting, *inter alia*, discrimination against whistleblowers of suspected fraud by officers of covered entities); *see also generally Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658 (4th Cir. 2015) (discussing individual liability imposed against chairman and CEO of defendant company, sued in their individual capacities, in successful SOX retaliation claim).

159. Ms. Baker made internal and external reports challenging the veracity of Defendant Horizon's financial status and its reporting obligations to its members and regulatory authorities, including violations involving income falsification, loan fraud,

negative amortization, governance failures, and systematic failure to disclose adverse credit decisions.

160. Ms. Baker reasonably believed that Defendant Horizon's aforesaid regulatory violations would have a negative financial impact on the public companies it contracts for, and by extension, their shareholders.

161. Ms. Baker subjectively believed that Defendant Horizon's conduct violated laws and regulations enumerated in the SOX. 18 U.S.C. § 1514A; *see also Wiest v. Lynch*, 710 F.3d 121, 131–33 (3d Cir. 2013).

162. Ms. Baker's subjective belief that Defendant Horizon's conduct violated laws and regulations enumerated in the SOX was objectively reasonable under the circumstances. *See Wiest*, *supra* at 132.

163. Ms. Baker's reports were protected activity under the SOX. 18 U.S.C. § 1514A(a)(1)–(a)(2).

164. Defendants knew of Ms. Baker's protected activity.

165. Defendants took unfavorable personnel actions against Ms. Baker, e.g., reduced her performance evaluation

ratings, did not consider her for the CRO position, terminated her employment, etc.

166. Ms. Baker's protected activity was at least a contributing factor in Defendants' decision to take unfavorable personnel actions against her.

**COUNT III**
**MISREPRESENTATION**
**(Defendant Horizon, Defendant Howard, Defendant Patterson)**

167. The preceding averments are incorporated as if set forth in full.

168. At all times relevant to this Complaint, Defendants maintained a Whistleblower Policy. (**Exhibit Q**).

169. The Whistleblower Policy in effect at the time of Ms. Baker's unlawful termination was drafted, reviewed, and approved by Defendants Howard and Patterson. (**Exhibit Q**).

170. The stated purpose of the Whistleblower Policy is to "encourage[] [all of Defendant Horizon's employees] to report wrongdoings or suspected wrongdoings without fear of victimization, retaliation, subsequent discrimination, or disadvantage" and to "enable employees, officers, and directors to

raise serious concerns within the Credit Union rather than merely overlooking a possible problem." (**Exhibit Q**).

171. The Whistleblower Policy also represents Defendants' alleged commitment to confidentiality of and non-retaliation for whistleblowing reports. (**Exhibit Q**).

172. The Whistleblower Policy is a representation by Defendants to all of Horizon's employees, including Ms. Baker. (**Exhibit Q**).

173. The representations contained in the Whistleblower Policy were material in Ms. Baker's decision to make internal reports of regulatory non-compliance.

174. Ms. Baker reasonably believed that Defendants would take appropriate steps to protect her from retaliation.

175. Defendant Howard repeatedly told Ms. Baker that he would address CXO Lariviere's compliance violations.

176. Defendant Howard told Ms. Baker that non-compliance issues would be readdressed after the complex core conversion. (**Exhibit D**).

177. Defendant Howard's representations to Ms. Baker were material to her decision/s to continue to engage in protected whistleblowing activities.

178. Despite the representations in the Whistleblower Policy, Defendants retaliated and/or permitted retaliation against Ms. Baker.

179. Defendants knew that they failed to carry out the representations of non-retaliation and confidentiality required by the Whistleblower Policy.

180. Defendants made the representations in the Whistleblower Policy to induce Horizon employees to make whistleblower reports and thus expose themselves to retaliation.

181. Ms. Baker's termination was proximately caused by her reliance on the Whistleblower Policy.

182. Throughout 2023 and 2024 Defendant Howard represented that the policies and procedures for the use of call recording and security of credit card information had been adopted and implemented.

183. Ms. Baker's termination was proximately caused by her reliance on Defendant Howard's representations that Defendant

Horizon had or would addressing her reports of non-compliance/compliance risk.

**WHEREFORE,** Plaintiff demands judgment against Defendants Horizon Federal Credit Union, Justin Howard, and Michael Patterson, and prays for the following relief: (1) Reinstatement to Plaintiff's position as Chief Lending Officer, or, in the alternative, commensurate front pay with interest in lieu of reinstatement; (2) back pay with interest; (3) other compensatory damages with interest, including emotional pain and suffering, embarrassment, humiliation, and reputational damages; (4) special damages, including litigation costs, expert witness fees, and reasonable attorney fees; (5) punitive damages to deter Defendants and those similarly situated from similarly egregious misconduct; and (6) all other relief this Honorable Court deems necessary to make Plaintiff whole.

Respectfully submitted,

Jennifer A. Nachamkin, Esq.
I.D. No. 200931
Jacob I. Toth, Esq.
I.D. No. 338504
***STROKOFF & COWDEN, P.C.***
224 Pine Street
Harrisburg, PA 17101
Tel: (717) 233-5353
Fax: (717) 233-5806

Date: 8.24.2026

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRITTANY BAKER,**<br>Plaintiff;<br><br>**v.**<br><br>**HORIZON FEDERAL CREDIT UNION, JUSTIN HOWARD, MICHAEL PATTERSON,**<br>Defendants | **Case No.**<br><br>**Jury Trial Demanded**<br><br>Filed Electronically |

## VERIFICATION

I, **Brittany Baker**, certify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

**DATE:** 8/24/2026

[signature]
**Brittany Baker**