# EXHIBIT D

JacksonLewis

**Jackson Lewis P.C.**
Three Parkway, Suite 1350
1601 Cherry Street
Philadelphia PA 19102
(267) 319-7802 Main
(215) 399–2249 Fax
jacksonlewis.com

TIMOTHY M. MCCARTHY, ESQ.
DIRECT DIAL: (267) 319-7810
TIMOTHY[redacted]

JESSICA L. MAZZEO, ESQ.
DIRECT DIAL: (267) 319-7820
JESSICA[redacted]

August 21, 2025

**VIA ELECTRONIC MAIL**

Mr. Stephen Fitzgerald
Regional Investigator
U.S. Department of Labor, OSHA
Directorate of Whistleblower Protection Programs
3477 Corporate Parkway
Suite 120
Center Valley, PA 18034
Fitzgerald.[redacted]

**Re: Brittany Baker v. Horizon Federal Credit Union**
**OSHA Case #: 301055479**

Dear Investigator Fitzgerald:

Respondent Horizon Federal Credit Union ("Horizon" or "Respondent") submits this statement of position in response to the July 1, 2025, Complaint and July 31, 2025, Amended Complaint (collectively, the "Complaint") of its former employee, Brittany Baker ("Baker" or "Complainant"). Complainant alleges Horizon unlawfully retaliated against her for allegedly engaging in protected activity in violation of both Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX") and the Consumer Financial Protection Act, 12 U.S.C. § 5567 ("CFPA") (collectively, the "Statutes"). Complainant alleges Horizon terminated her employment on June 11, 2025, based on complaints she purportedly made to "multiple executive level" employees at Respondent.

Horizon seeks a dismissal of the Complaint on the basis that it has no legal merit. First, as set forth in greater detail below, reporting (and correcting) compliance concerns fell directly under the purview of Complainant. Second, Horizon is not a covered employer under SOX and as such, Complainant cannot avail herself of the anti-retaliation provision of that statute. Third, Complainant's employment was terminated not because of any retaliatory animus for a SOX or CFPA related matter – nor because of any concerns she raised. Instead, Horizon eliminated Complainant's position in June 2025 as part of a wider planned corporate restructure, where Complainant failed to elect to take any of the alternative options presented to her months prior. Moreover, Complainant cannot establish a *prima facie* case under SOX or the CFPA because she was terminated due to a corporate restructuring, not any alleged protected activity.

Accordingly, Horizon respectfully requests that the Department of Labor/OSHA immediately dismiss the Complaint without further investigation.

## I. FACTUAL BACKGROUND

### A. Horizon Conduct & Whistleblower Policies.

Horizon is a federal credit union that was originally established in 1955 with a specialty in serving health care professionals. Today, with over 14,000 members, Horizon serves a broad array of personal and business customers across 11 counties in central Pennsylvania.

As a federal credit union, Horizon places a heavy emphasis on confidentiality, compliance and regulatory reporting when it comes to protecting its members and employees and complying with the law. Horizon has strict policies surrounding appropriate conduct and ethical behavior as expected from all of its employees. As such, every employee, including Complainant, is given a copy of these policies at the outset of their employment. Horizon therefore ***requires*** staff to report any illegal or fraudulent activity they observe and maintains an anti-retaliation policy. Its whistleblower policy provides, in relevant part:

> If you have knowledge of or concern about illegal or dishonest fraudulent activity, you must contact your immediate supervisor or Human Resources. Please exercise sound judgment to avoid baseless allegations. Any employee who intentionally files a false report of wrongdoing will be subject to corrective action, up to and including termination.
>
> Whistleblower protections are provided in two important areas: (1) confidentiality; and (2) against retaliation. …The Credit Union will not retaliate against a whistleblower for raising a concern in good faith. Any whistleblower who believes he/she is being retaliated against must contact Human Resources immediately. The right of a whistleblower to protection against retaliation does not include immunity for any misconduct or personal wrongdoing that is alleged and investigated.

(*See* attached as **Exhibit A** hereto, relevant portions of Horizon's employee policies.)

### B. Complainant's Employment History.

Complainant was hired in February 2022 as Director of Retail Delivery, a position reporting to Horizon's Chief Experience Officer who in turn reported directly to Horizon's Chief Executive Officer ("CEO"). During the first several months of her employment, Complainant performed her job in a satisfactory manner. A few months after joining Horizon, Complainant raised her first concern regarding alleged non-compliance, which Horizon promptly and thoroughly addressed.

As part of Horizon's employee evaluation system, employees generally receive, at a minimum, performance appraisals on a trimester schedule. This was true for Complainant. As part of her first appraisal period, Complainant received very promising feedback and, as a result, her first promotion.

### 1. Complainant's First Promotion to Director of Lending.

Horizon promoted Complainant to the position of Director of Lending roughly six months after she joined the credit union. In this new role, Complainant still reported to Horizon's Chief Experience Officer. The Director of Lending position included, in part, the following job responsibilities:

- Ensures operational integrity including compliance in all policies and procedures;
- Ensures all lending employees adhere to policies and procedures described in the Employee Handbook; and
- Completes annual mandatory compliance and other training.

*See* Director of Lending Job Description attached hereto as **Exhibit B**. As part of Complainant's job duties, Complainant was responsible for ensuring Horizon remained in compliance with various federal, state and local laws and regulations. In that regard, during her tenure as Director of Lending, Complainant identified and brought to the attention of Horizon's CEO approximately 19 situations that needed review for regulatory compliance.[1] For each one identified by Complainant, Horizon promptly and thoroughly addressed and cured any alleged defects.

Complainant's performance appraisal for the evaluation period January to April 2023, delivered to her by her direct supervisor, Horizon's Chief Experience Officer, made note that Complainant had "been working on her modes of communication when facing conflicting view [sic] with peers." Complainant's performance appraisal for the evaluation period September to December 2023, was again delivered to her by her direct supervisor, Horizon's Chief Experience Officer. The performance evaluation noted that when Complainant takes on additional responsibilities it causes undo stress on Complainant which manifests into Complainant displaying negative and impulsive behaviors towards her colleagues. In November 2023, Horizon budgeted for a third-party consultant to be utilized in 2024 who would, among other things, help develop Complainant's leadership capabilities. One of the items the consultant worked on with Complainant in 2024 was improving her undesirable responses when interacting with her colleagues. The evaluation also positively noted Complainant's time and work towards training one of her direct reports on reporting and compliance processes. Again, considering her an asset to the credit union, Complainant was promoted a second time (*after* reporting no less than 19 compliance situations to Horizon's CEO, as outlined above).

[1] Throughout her employment, Complainant often raised what she *perceived* as compliance issues that ran afoul of laws or regulations for which Horizon was bound. Often times, the issues raised were violations of internal policy rather than violations of various federal, state or local laws and regulations.

### 2. **<u>Complainant's Second Promotion to Chief Lending Officer and Related Corporate Restructuring</u>.**

In conjunction with Complainant's second promotion in January 2024, this time to Chief Lending Officer, Horizon initiated a corporate restructuring. This restructuring pulled Complainant out from under the reporting line of the Chief Experience Officer (her supervisor since she joined Horizon) and now transitioned it so that Complainant reported directly into Horizon's CEO (and was now considered a contemporary of her former supervisor, the Chief Experience Officer). The Chief Lending Officer position included, in part, the following job responsibilities:

- Ensures operational integrity including compliance in all policies and procedures;
- Serves as a role model to other employees through words and actions;
- Provides exemplary leadership through influence, communication, goal setting, employee development, coaching, mentoring, personal actions, and behaviors;
- Leads and provides strategic development and growth for consumer and commercial lending, indirect lending, and real estate lending. Manages performance and mitigates risk in an ethical manner;
- Maintains a current and comprehensive knowledge of all related products, services, policies, procedures, rules, and regulations applicable within the lending network, and ensures staff is aware of and comprehends changes;
- Communicates in person, over the phone, and through written correspondence in a clear, diplomatic, and professional manner;
- Works harmoniously with other Horizon executives, creating a united effort with communication, decision-making, and actions.
- Ensures all lending employees adhere to policies and procedures described in the Employee Handbook; and
- Maintains a positive attitude through communication and behaviors.

*See* Chief Lending Officer Job Description attached hereto as **Exhibit C**. During her tenure as Chief Lending Officer, which spanned almost 18 months until her termination in June 2025, Complainant identified and brought to the attention of Horizon's CEO approximately 36 situations that needed review for regulatory compliance. While some of these alleged violations were the result of internal violations as opposed to federally regulated violations, Horizon, with one limited exception, never stopped or interfered with Complainant when she attempted to fix any alleged compliance problem that she had raised.[2] In addition, as part of her job duties, if other Horizon employees raised any compliance concerns, Horizon did nothing to prevent or stop Complainant

[2] In February 2025, Complainant raised a concern to Horizon that had been previously addressed and discussed with NCUA years prior to Complainant's tenure with Horizon. At no time did Horizon inform Complainant that it was going to ignore her concerns about this issue; instead Horizon told Complainant that they would readdress the issue once Horizon had gotten through the highly complex core conversion of its internal systems.

from ensuring those concerns were properly addressed as well.

**a) Complainant's and the Chief Experience Officer's Working Relationship Breaks Down.**

Now that she reported directly into the CEO, Complainant's performance appraisals were conducted by Horizon's CEO rather than the Chief Experience Officer. Complainant's performance appraisals throughout 2024, while positive in many areas, consistently focused on the opportunity to improve Complainant's ability to "communicat[e] both verbally and in writing in a professional manner", as the CEO also noted Complainant's "communication is not done professionally." Feedback for Complainant also included that "creating a harmonious work environment is an area to work on as the work environment or working relationships are sometimes thrown into turbulence with ineffective communication, a lack of communication with tact, lack of trust with other people, and/or own opinion on how things should be done." As previously noted in one of her 2023 appraisals, it was again noted that Complainant struggled with "impulse control" with her reactions and communications that sometimes left others in management bereft at losing opportunities to also meaningfully contribute. In addition to the trimester performance appraisals, Complainant and the CEO, for the most part, had bi-weekly one-to-one meetings during the time Complainant reported to the CEO. This translates to no less than 30 one-to-one meetings in the 2024-2025 time period, during many of which Complainant received the same or similar feedback as she received in her trimester appraisals.

It was this management and working style of Complainant that led to several complaints throughout the credit union by other employees who had difficulty working for or alongside Complainant – including her direct reports as well as the Chief Experience Officer. Specifically, Complainant seemed particularly keen on providing (mostly negative) unsolicited feedback and advice to the Chief Experience Officer in her day-to-day tasks. In many instances, if Complainant provided feedback or suggestions to the Chief Experience Officer it was often seen as 'my way or the highway' type of unsolicited advice which caused their relationship to rapidly deteriorate. In December 2024 Horizon learned (and which was later discussed at the senior management meeting in January 2025) that employees throughout the credit union knew about the problems between Complainant and the Chief Experience Officer. By that point, the animosity between the two were causing issues in getting questions answered timely, resolving member service problems, and overall, negatively impacting Horizon's culture. Invested in the success of both Complainant and the Chief Experience Officer, Horizon again initiated use of its third-party consultant to work with both employees to try and find a positive path forward.

**3. Horizon's Second Corporate Restructuring is in Direct Response to Disruption and Conflict Between Complainant and the Chief Experience Officer – Restructuring Which Impacted Both Complainant *and* the Chief Experience Officer.**

By late February 2025, the rising tension and conflict between Complainant and the Chief Experience Offer was so palpable that the CEO decided a corporate reorganization was necessary. The specific instance that led to this decision were the two separate meetings that the CEO had within days of each other, first with Complainant and then the Chief Experience Officer, where

*both* informed the CEO that they were considering looking for another job as they could no longer work with the other. Both Complainant and the Chief Experience Officer insisted that the CEO "do something" about this dynamic as it was no longer tenable for anyone.

In March 2025, Complainant again offered to resign from the credit union, specifically writing to the CEO that "if I am the problem that is causing all of this anxiety and all of this tension… then you and I can have a conversation, and I will begin the process of actively looking for other opportunities." Upon reflection on the growing issues between the two over several months, the CEO decided at that time to complete a reorganization where neither Complainant ***nor the Chief Experience Officer*** would be in senior roles due to their demonstrated problems.

Horizon's CEO presented the corporate reorganization plan to ***both*** Complainant and the Chief Experience Officer in mid-March 2025. Both employees were presented with the ***same*** options: accept a new, less senior role as neither would be considered for the to-be-created Chief Relationship Officer position, or work through a specific time period (roughly July 2025) and then transition to finding new employment outside of Horizon. The Chief Experience Officer, after taking a brief unrelated leave of absence in late March 2025, resigned from Horizon in early May 2025 upon her return from leave. At no time prior to her resignation had the Chief Experience Officer reported any potential compliance violations that had not been fully or properly addressed by Horizon.

Complainant was asked to inform Horizon of her decision regarding her continued employment by April 1, 2025. Instead, on April 9, 2025, Complainant wrote a letter to Horizon's CEO stating that she refused to accept any offer on the table and instead suggested that it would be "imprudent" for Horizon to terminate her and suggested an alternative timeline of keeping Complainant employed through December 2026. Further, despite being told that she would not be considered for the role, Complainant applied for the Chief Relationship Officer position in early May 2025. When she learned that she would not get the new role, she conveyed her anger to Horizon's Chief Financial & Information Officer. Most notably, it was not until May 30, 2025, which was ***after*** Complainant learned she was not getting the new position, that Complainant raised her alleged compliance concerns.

After eliminating both the Chief Experience Officer and Chief Lending Officer roles as planned, in June 2025, Horizon created a new Chief Relationship Officer position for which the Directors of Lending and Retail Delivery would report into. This new structure returned Horizon to its previously successful reporting structure with the CEO having only three direct reports (as noted above, Horizon had made Complainant a fourth direct report to the CEO after her second promotion). On June 11, 2025, after Complainant still had failed to elect any of the options presented to her months prior, Horizon terminated her employment as the Chief Lending Officer position had been formally eliminated.[3]

[3] In addition to refusing to select a new position, by June 2025, Complainant had been bragging to staff that she had gotten the Chief Experience Officer *fired* and that the CEO would also be getting fired by NCUA in July – both statements which are untrue.

## II. BAKER FAILS TO STATE A PRIMA FACIE CASE OF RETALIATION UNDER SOX.[4]

Section 806 of SOX makes it unlawful for covered entities to discharge, demote, suspend, threaten, harass or in any other way discriminate against an employee in terms and conditions of employment because the employee engaged in protected activity as defined by the Act. "Under [the] burden-shifting framework [of Section 806], the employee bears the initial burden of making prima facie showing of retaliatory discrimination because of a specific act." *Day v. Staples, Inc.*, 555 F.3d 42, 53 (1st Cir. 2009).

To succeed in making a *prima facie* case, "an employee must prove by a preponderance of the evidence that (1) [s]he engaged in protected activity; (2) the employer knew that [s]he engaged in the protected activity; (3) [s]he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Bechtel v. Administrative Review Bd., United States Dep't of Labor*, 710 F.3d 443 (2d Cir. 2013) (citation omitted). Once an employee makes her *prima facie* case, an employer prevails only if "it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior." *Id*. (citation and internal quotation marks omitted). *See also* 18 U.S.C. § 1514A(b) ("An action brought under paragraph (1)(B) shall be governed by the legal burdens of proof set forth in section 42121(b) of title 49, United States Code."); 49 U.S.C. § 42121(b)(ii) ("[N]o investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.").

### A. <u>Horizon Is Not A Covered Entity Under SOX</u>.

Most notably, federal credit unions are ***not*** subject to the whistleblower protections as governed by SOX. *See* 18 U.S.C.S. § 1514A (limiting whistleblower protections to only companies "with a class of securities registered under section 12 of the Securities Exchange Act of 1934… or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization… .")[5] Horizon is neither a publicly traded company nor a contractor or subcontractor of such and thus SOX protections do not apply to Complainant's Complaint. While Horizon contests Complainant's allegations that any fraudulent activity occurred during her employment, to be clear, Horizon also did not facilitate or perpetuate any alleged violations as asserted in the Complaint.

---

[4] To date, the full nature and extent of Complainant's allegations are unclear. Thus, Horizon's response to Complainant's claim is based solely on the information contained in the Complaint Allegation and Allegation Summary. Horizon reserves the right to respond more fully once more detailed allegations are provided. Further, in submitting this Position Statement, Horizon does not intend to waive any defenses it may have to the claim or in any way prejudice itself with respect to any issue, whether of a procedural or substantive nature.

[5] Instead, federal credit union anti-whistleblower retaliation protections are governed by 12 U.S.C.S. § 1790b ("No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the Board or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.")

JacksonLewis



**B. <u>Regardless Of Any Alleged Protected Activity, Horizon Would Have Terminated Complainant's Employment Because Her Role Was Eliminated in its Planned Corporate Reorganization</u>.**

Despite whether Complainant can establish that she engaged in "protected activity," which we assert she cannot, her claims still fail as a matter of law. An employer can successfully defend against a SOX claim by demonstrating by clear and convincing evidence that it would have taken the same adverse employment action against the complainant in the absence of the employee's alleged protected activity.

Complainant's employment was terminated not because of any retaliatory animus for a SOX related matter – nor because of any concerns she raised. Rather, the relationship between Complainant and the Chief Experience Officer had deteriorated so significantly that Horizon was left with no choice but the institute a corporate reorganization that eliminated ***both*** positions. The decisional law is clear that employers have discretion to make personnel decisions. The court does not sit as a super-personnel department that reexamines an entity's business decisions. *Johnson v. Stein Mart, Inc.*, 2011 U.S. App. LEXIS 18736 at *2 (11th Cir. 2011) (affirming summary judgment of plaintiff's SOX claim); *see also Macias Soto v. Core-Mark Int'l Inc.*, 521 F.3d 837, 842 (8th Cir. 2008) (stating that the relevant inquiry "is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred"); *Klopfenstein v. Admin. Review Bd.*, 2010 U.S. App. LEXIS 24243, *7-8 (5th Cir. Nov. 23, 2010).

Complainant was not a victim of whistleblower retaliation. Her own conduct, and that of the Chief Experience Officer, led to Horizon being forced to reorganize its corporate structure. Horizon terminated Complainant's employment because when presented with options to remain employed post-reorganization, Complainant refused to do so. Once the reorganization took place, Complainant's position was eliminated and therefore her employment was terminated. *See Trimmer v. U.S. Dept. of Labor*, 174 F. 3d 1098, 1104 (10th Cir. 1999) ("[Whistleblower provisions] are not, however, intended to be used by employees to shield themselves from the consequences of their own misconduct or failures.") (citing *Kahn v. Secretary of Labor*, 64 F.3d 271, 279 (7th Cir. 1995).

## III. COMPLAINANT FAILS TO STATE A PRIMA FACIE CASE OF RETALIATION UNDER THE CFPA.

The CFPA makes it unlawful for a covered person or service provider to terminate or in any other way discriminate against, or cause to be terminated or discriminated against, any employee who engages in protected activity under the CFPA. To state a claim for retaliation under the CFPA, Complainant must establish that "(1) she engaged in protected activity; (2) the employer knew or suspected, either actually or constructively, that she engaged in the protected activity; (3) she suffered an unfavorable personnel or employment action; and (4) the protected activity was a contributing factor in the unfavorable action." *Veard v. F&M Bank*, 704 F. App'x 469, 473 (6th Cir. 2017). If Complainant makes out a successful *prima facie* case, the employer must demonstrate by clear and convincing evidence "that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Id.* (citing 12 U.SC. §

5567(c)(3)(B).

### A. Complainant Did Not Engage In Protected Activity And, Regardless Of Any Alleged Protected Activity, Horizon Would Have Terminated Complainant's Employment.

Protected activity under the CFPA includes when an employee:

> has provided, caused to be provided, or is about to provide or cause to be provided, information to the employer, the Bureau, or any other State, local, or Federal, government authority or law enforcement agency relating to any violation of, or any act or omission that the employee reasonably believes to be a violation of, any provision of this title or any other provision of law that is subject to the jurisdiction of the Bureau, or any rule, order, standard, or prohibition prescribed by the Bureau.

12 U.S.C. § 5567(a)(1). Notably, the CFPA utilizes the same subjective and objective belief standard as SOX. *See Veard v. F&M Bank*, 704 Fed. Appx. 469, 474 (6th Cir. 2017) (applying SOX standard to CFPA claim); *Slawin v. Bank of Am. Merch. Servs.*, 491 F. Supp. 3d 1334, 1349 (N.D. Ga. 2020) (same).

Complainant's alleged protected activity under the CFPA is the same alleged protected activity that she rests her SOX claim upon.[6] Complainant's termination was based solely on Horizon's business need to create a corporate structure that supported its culture and was not based on any concerns that Complainant raised. Further undermining Complainant's claim of retaliation is that following the concerns she raised (throughout her entire employment with Horizon), she was given multiple positive performance evaluations and promoted two separate times. Thus, under these circumstances, Complainant cannot demonstrate that her alleged protected activity was a contributing factor in Horizon's decision to terminate her employment. The Company's actions were not retaliatory as it had a clear, non-retaliatory, basis to terminate Complainant. It was objectively unreasonable for Complainant to believe that Horizon was intentionally allowing alleged compliance violations to go unchecked despite its clearly established history of addressing all potential violations before and during Complainant's employment (including the many "violations" that were more likely violations of Horizon internal procedures rather than any federal, state or local regulations). As Complainant cannot establish that she engaged in protected activity under SOX, her claim fails for this reason.

Complainant could not have objectively believed that she was raising potential violations that Horizon was failing to rectify despite years of prior instances where Horizon properly responded to reports of alleged non-compliance made by Complainant and any other employee.

---

[6] Complainant alleges that she voiced her concerns about reports of non-compliance and that she was doing so in order for Horizon to be compliant with applicable laws and regulations. Thus, Complainant's alleged protected activity is the same for both claims.

Moreover, Horizon terminated Complainant's employment for legitimate reasons unconnected to alleged protected activity. *See supra* Point II.C.

## IV. COMPLAINANT'S SOX AND CFPA CLAIMS ALSO FAIL AS THERE IS CLEAR AND CONVINCING EVIDENCE OF NO PRETEXT.

Finally, Complainant fails to allege any credible evidence at all suggesting that she was treated any differently than any other similarly situated employee who engaged in the same or similar conduct. Even *assuming arguendo* that Complainant can illustrate she engaged in protected activity by bringing complaints of non-compliance to Horizon that were ignored (which she cannot), she cannot point to a single other employee (similarly situated or otherwise) who did not engage in protected activity, but who was treated more favorably than her. To the contrary, Horizon *can* point to the Chief Experience Officer, who never made a single complaint of non-compliance that was ignored or unaddressed, yet was also presented with the same options post-reorganization that Complainant had been presented. There is simply no evidence to suggest that Horizon's reason for termination is pretextual. On these facts, the termination is not retaliatory and Complainant's claims fails as a matter of law.

## IV. CONCLUSION AND REQUEST FOR MEETING.

As set forth above, Complainant has failed to set forth a *prima facie* case of retaliation under the Statutes as Horizon terminated her employment for legitimate, non-retaliatory reasons (i.e., corporate reorganization), Horizon is not a covered employer under SOX and Complainant also cannot show that she engaged in protected activity under either statute. Therefore, pursuant to 29 C.F.R. 1980.104(e), the Complaint should be dismissed without further investigation. In the event this matter is not dismissed, Horizon requests the opportunity pursuant to 29 C.F.R. § 1980.104 to meet with you or your designee, to discuss its defenses to the claims, answer any questions or provide additional necessary information to assist in the consideration and dismissal of the Complaint.

We thank you for your consideration of this matter.

**Very truly yours,**

**JACKSON LEWIS P.C.**

Timothy M. McCarthy, Esq.
Jessica L. Mazzeo, Esq.

Enclosures
cc: Jennifer Nachamkin, Esq.

# EXHIBIT A

Horizon
Federal Credit Union

# EMPLOYEE HANDBOOK

Effective 2.18.2025

## Section 6

## Performance Management

### Problem Resolution

Horizon is committed to providing all staff with opportunities to ask questions, express concerns, make suggestions and register complaints. Every member of management is committed to maintaining open two-way communication with the staff.

Staff are encouraged to use the normal chain of command to express their concerns and complaints. In most cases, management will be able to resolve any issues. Human Resources is available to all employees if other management cannot satisfy the situation.

Employees who prefer to request a discussion or resolution from Human Resources may submit their concerns in writing. Signed statements will receive an acknowledgment of receipt within five working days. Human Resources will review written statements in a timely manner and respond to the employment process.

### Code of Conduct Policy

Policy: 5/18/2021

Horizon Federal Credit Union has a tradition of ethical conduct and high integrity on the part of its employees, directors, committee members, and others associated with the operation of the Credit Union.

All employees must adhere to the following regarding confidentiality: "The officers, directors, members of committees, volunteers, and employees of this Credit Union shall hold in confidence all transactions of this Credit Union with its members and all information respecting their personal affairs except to the extent deemed necessary by the Board of Directors in connection with making of loans, extending lines of credit, the collection of loans and the guarantee of member share drafts by third parties."

Confidentiality and personal information of Horizon employees fall under the same rules and regulations as this Code of Conduct policy. Violation may result in immediate termination.

All persons associated with the operation of the Credit Union must conduct themselves with the highest standards of integrity, honesty, and fair dealings to preclude conflict between the interests of the Credit Union and their personal interests. Such persons shall avoid any actions or relationships which could adversely affect, or have the appearance of adversely affecting, their judgment or actions in performing their duties.

This policy applies to officers, employees, directors, committee members, and all others associated with the operation of Horizon Federal Credit Union.

**Standards of Business Conduct**

It is the policy of Horizon Federal Credit Union to conduct its business in accordance with applicable laws of the United States and the states in which it conducts business and in accordance with ethical standards of business conduct. All managers, other employees, directors, committee members, or others associated with the operation of the Credit Union shall adhere strictly to this policy.

All illegal or unethical acts are prohibited under this policy, including but not limited to the following:

- Making or accepting bribes, kickbacks, or other illegal payments by or on behalf of the Credit Union directly or indirectly.
- Maintaining funds or assets at the Credit Union for an illegal or improper purpose or maintaining funds or assets which are not clearly disclosed in the books and records of the Credit Union, for any purpose.
- Making false, misleading, or artificial entries in the books or records of the Credit Union.
- Making payments by or on behalf of Horizon Federal Credit Union for any purpose other than that described by supporting documents maintained by the credit union.
- Making directly or indirectly, by or on behalf of the Credit Union illegal political contributions.
- Borrowing or otherwise removing from the Credit Union premises (without management or, if appropriate, board approval) cash, negotiable instruments, equipment, furniture, or other property belonging to Horizon Federal Credit Union and its members.
- Using or disclosing Credit Union records, plans, or data (except as necessary in the course of normal business activities) unless authorized by Credit Union management. In this regard, it is imperative that all member information and transactions with Horizon Federal Credit Union be handled in strict confidence by Credit Union employees, directors, committee members, and representatives.
- Failure to observe the culture of the Credit Union

**Conflicts of Interest**

Credit Union employees are not to engage in any activity that conflicts with the interests of the Credit Union, its members, or the Credit Union system.

The following are for illustrative purposes only as it is not possible to detail all situations that may give rise to a conflict of interest or the appearance of such:

- Any conduct on the part of the employee which creates or supports competition with or damages the Credit Union is strictly forbidden.
- Employees are not to accept any form of employment with any competitor of the Credit Union while employed at Horizon.

- Immediate financial disclosure is required when an employee or immediate family member holds a financial interest in any firm that either competes with or does business with the Credit Union. Depending on the holdings and the situational context, financial divestiture may be required as a condition of continued employment with Horizon Federal Credit Union.
- All applicable NCUA and other Federal and State regulations concerning conflicts of interest apply to employees of the Credit Union.
- Employees are not to disclose internal information on the Credit Union or its members to anyone, either inside or outside of the Credit Union, who does not have a legitimate and legal need to know.

**Disciplinary Action**

All employees are required to meet Horizon conduct and performance standards.

Disciplinary action may occur due to a violation of any Horizon policy or procedure. Horizon may at any time institute any form of disciplinary action it solely deems appropriate. Horizon reserves the right to terminate immediately any employee whose performance, actions, or conduct are clearly undermining the interests and/or culture of the Credit Union, its members, or employees. Employment is At-Will by both the Credit Union and the employee.

Examples of disciplinary action may include verbal warning, written warning, probation, suspension with or without pay, demotion, and up to possibly including termination. However, nothing in this policy alters the At-Will relationship, and all disciplinary action policies are guidelines only.

At Management's discretion based upon the circumstances, progressive disciplinary action may not be followed. Employment may be terminated at any time. Each instance is dealt with on a case-by-case basis.

Some examples of serious misconduct are listed below. They are illustrative and not exhaustive:

- Misrepresenting or withholding facts in securing employment.
- Disclosing confidential information.
- Engaging in conduct that is a conflict of interest.
- Exhibiting abusive or grossly inappropriate conduct with members or co-workers.
- Being grossly insubordinate to managers or supervisors.
- Stealing or destroying an employee's property or credit union property.
- Harassing (sexually or otherwise), threatening, intimidating, or coercing a member or any other employee.
- Exhibiting behavior or conduct which threatens life, safety, or health.
- Excessive absenteeism without cause.

This policy will be interpreted and applied in accordance with all applicable laws.

## Section 10

## Workplace

### Whistleblower Policy

Policy 5/18/2021

A whistleblower, as defined by this policy, is an employee of the Credit Union who reports an activity that he/she considers to be illegal or dishonest to one or more of the parties specified in this policy. The whistleblower is not responsible to, and must not, investigate the activity independently; Credit Union management is charged with these responsibilities.

Examples of illegal or dishonest activities include billing for services not performed or for goods not delivered and other fraudulent financial reporting.

If you have knowledge of or concern about illegal or dishonest fraudulent activity, you must contact your immediate supervisor or Human Resources. Please exercise sound judgment to avoid baseless allegations. Any employee who intentionally files a false report of wrongdoing will be subject to corrective action, up to and including termination.

Whistleblower protections are provided in two important areas: (1) confidentiality; and (2) against retaliation. Insofar as possible, the confidentiality of the whistleblower will be maintained. However, identity may have to be disclosed to conduct a thorough investigation, to comply with the law, and to provide accused individuals their legal rights of defense. The Credit Union will not retaliate against a whistleblower for raising a concern in good faith. Any whistleblower who believes he/she is being retaliated against must contact Human Resources immediately. The right of a whistleblower to protection against retaliation does not include immunity for any misconduct or personal wrongdoing that is alleged and investigated.

All reports of illegal and dishonest activities will be promptly submitted to Human Resources, who is responsible for investigating and coordinating corrective action.

### Workplace Violence Prevention Policy

Policy: 5/18/2021

The Credit Union is committed to preventing workplace violence and to maintaining a safe work environment. Given the increasing violence in society in general, the Credit Union has adopted the following guidelines to deal with intimidation, harassment, or other threats of (or actual) violence that may occur during business hours or on its premises.

The Credit Union will not tolerate intimidation (direct or indirect), bullying, harassment, coercion, threatened or actual violence, or other disruptive behavior that may involve or affect the Credit Union or its employees or clients, which occur during business hours or on Company or client property. The following is a non-exhaustive list of examples of conduct

## Section 12

## Miscellaneous

### Anti-Harassment and Discrimination Policy

Policy: 1/2022

The Credit Union is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits unlawful discriminatory practices, including unlawful harassment. Therefore, the Credit Union expects that all relationships among persons at the Credit Union will be respectful and professional. The Credit Union will neither engage in nor tolerate sexual or any other form of unlawful harassment.

Unlawful sexual harassment constitutes discrimination and is prohibited under federal, state, and local laws. For the purpose of this policy, sexual harassment is defined, as in the Equal Employment Opportunity Commission Guidelines, as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when, for example: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment *or* submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Sexual harassment may include a range of subtle as well as overt behaviors and may involve individuals of the same or different gender. Depending on the circumstances, these behaviors may include, but may not be limited to: unwanted sexual advances or requests for sexual favors; sexual jokes and innuendo; verbal abuse of a sexual nature; commentary about an individual's body, sexual prowess, or sexual deficiencies; leering, whistling or touching; insulting or obscene comments or gestures; display in the workplace of sexually suggestive objects or pictures; and other physical, verbal or visual conduct of a sexual nature.

Unlawful harassment on the basis of any other protected characteristic such as race, color, religion, age, sexual orientation, gender identity or expression, national origin, handicap, or any other characteristic of the employee or that of his/her relatives, friends, or associates and is protected by law is also strictly prohibited. For example, verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her protected category and: (i) has the purpose **or** effect of creating an intimidating, hostile, or offensive work environment; (ii) has the purpose or effect of unreasonably interfering with an individual's work performance; or (iii) otherwise adversely affects an individual's employment opportunities, constitutes unlawful harassment and will not be tolerated.

Harassing conduct may include, but may not be limited to epithets, slurs, or negative stereotyping; threatening, intimidating, or hostile acts, denigrating jokes and written or graphic material that denigrates or shows hostility or aversion toward an individual or group and that is placed on walls or elsewhere on the employer's premises or circulated in the workplace.

**Individuals And Conduct Covered**

These policies apply to all applicants, candidates, and employees, whether related to conduct engaged in by fellow employees or someone not directly connected to the credit union (e.g., an outside vendor, consultant, or customer).

Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business trips, business meetings, and business-related social events.

**Reporting an Incident of Harassment, Discrimination, or Retaliation**

The Credit Union encourages reporting of all perceived incidents of discrimination, harassment, or retaliation, regardless of the offender's identity or position. Individuals who believe that they have been the victim of such conduct should discuss their concerns with his/her immediate supervisor and/or Human Resources as soon as possible.

In addition, the Credit Union encourages individuals who feel they are being subjected to inappropriate discriminatory or harassing conduct to promptly advise the offender that his or her behavior is unwelcome and request that it be stopped immediately. The Credit Union recognizes, however, that an individual may prefer to pursue the matter through the complaint procedure as stated below.

**Complaint Procedure**

If you believe you have been, or anyone else may have been, unlawfully discriminated against, harassed by, or retaliated against by any officer, manager, supervisor, co-worker, agent, or non-employee with regard to any term or condition of employment in violation of our policy, you should report the alleged violation immediately to your supervisor (if comfortable) and/or Human Resources.

The Credit Union:

- Will conduct a prompt, thorough, and fair investigation
- Disclose allegations only to the extent necessary to conduct the investigation and/or take corrective action (keeping them as confidential as possible)
- May temporarily transfer or suspend, with or without pay, any employee involved in the allegations pending conclusion of the investigation
- Will take corrective action with respect to any employee or non-employee whom the Credit Union believes has engaged in unlawful discrimination, harassment, or

retaliation and/or inappropriate behavior inconsistent with this policy (even if not unlawful), including discipline up to and including termination of the employment or other relationship

- Neither engages in nor tolerates unlawful retaliation of any kind against an employee who makes a complaint alleging unlawful discrimination, harassment, or retaliation, serves as a witness, or otherwise participates in the investigatory process.

Misconduct constituting harassment, discrimination or retaliation will be dealt with appropriately. Corrective action may include, for example, individualized training, referral to counseling, and/or disciplinary action such as written warning, reprimand, reassignment, suspension without pay or termination, as the Credit Union deems appropriate under the circumstances.

False and malicious complaints of harassment, discrimination, or retaliation (as opposed to complaints which, even if erroneous, are made in good faith) may be subject to appropriate disciplinary action.

## Bank Bribery Act Policy

Policy: 5/18/2021

It is the policy of Horizon Federal Credit Union that any employee, officer, director, agent, or attorney associated with the Credit Union is prohibited from accepting anything of value in connection with any transaction. **The Bank Bribery Act** makes it clear that anyone who gives or accepts a gift with the intent to influence or reward an officer, director, employee, agent, or attorney will be severely punished with fines not to exceed $1,000,000 or up to thirty years in prison or both. *Monetary gifts and gratuities may never be accepted, no matter how small the amount.* If there is the slightest doubt about the morality of this action, seek counsel from Human Resources.

**Solicitation and Gifts Gratuities Guidelines:**

Employees are not permitted to accept or solicit gifts or gratuities from members (for services performed by the associate), vendors (regardless of whether or not the Credit Union currently does business with the vendor), or from other employees, except as noted below. Further, the Credit Union requires that employees do not retain payment rendered for services provided to outside organizations on Credit Union time.
It is the policy of the Credit Union that no employee or member shall solicit or distribute literature for any purpose at the Credit Union. Employees may, however, leave order forms or donation forms in the employee break area, not in any work area.

## Fraud Policy

Policy: 1/2022

Horizon Federal Credit Union considers any form of fraud or dishonesty on the part of its employees as unacceptable conduct. Acts that are considered to be either fraudulent or dishonest include but are not limited to:

- Manipulation of loan accounts, documents, computer records, shares, share drafts, or other types of accounts.
- Theft of any kind, including stealing from members' accounts, overpayment of dividends, or
- Creating fictitious loans.
- Check/share draft kiting.
- Forgeries.
- Unauthorized or unapproved salary advances or overtime reimbursement.
- Intentional violation of Credit Union rules, internal controls, regulations, or procedures.
- Intentionally failing to secure collateral, to properly record a security interest in the collateral, or
- Pledging a member's shares as collateral without that member's permission.
- Granting or requesting preferential treatment for anyone.
- Unauthorized use of any computer, equipment, or software.
- Criminal activity involving a financial institution that uses the Horizon Federal Credit Union as a conduit for criminal activity (examples include structuring transactions to evade Bank Secrecy Act requirements or laundering monetary instruments).

Any violations of this policy will result in disciplinary action, up to and including termination of employment. Infractions may also be reported to law enforcement.

## Company Vehicle

The vehicle owned by Horizon Federal Credit Union is primarily utilized by the Facilities Manager and Facilities Associates. Other employees of Horizon Federal Credit Union may drive the vehicle.

Use of vehicle by anyone other than the Facilities Manager and Facilities Associates requires prior approval by CEO, CBO, or CFIO.

Use of the vehicle is permitted only for Credit Union business.

The vehicle will routinely be parked overnight at Horizon Federal Credit Union's Corporate Facility at 2849 Reach Road, Williamsport, PA.

Use of vehicle by anyone other than a Horizon employee or official is prohibited.

# EXHIBIT B

Horizon
Federal Credit Union

# HORIZON FEDERAL CREDIT UNION
# POSITION DESCRIPTION

***POSITION DESCRIPTION:*** Director of Lending
***REPORTING TO:*** Chief Experience Officer
***DEPARTMENT:*** Lending
***FLSA STATUS:*** Exempt
***LOCATION:***

Horizon understands our employees are the credit union's greatest asset. We recruit and develop enthusiastic, engaged, and empowered individuals to take ownership of each and every member experience to ensure the member is receiving exemplary service. Together, we strive to provide a brighter financial future for our staff, our members, and our surrounding communities.

***Our staff is driven by a common passion to be the BEST by doing whatever it takes to exceed the expectations of our members and internal team. They are determined to differentiate our Credit Union in the marketplace through our obsession for delivering superior quality and professionalism. They are collectively focused on conducting all business, internally and externally, with the highest degree of honesty, integrity, consistency, and ethics.***

## POSITION OBJECTIVE

Responsible for the vision, leadership, strategy, and overall success of the lending areas. Ensures efficient operation of all consumer, commercial, and mortgage lending while focusing on strategic initiatives for growth. Supervises, coaches, mentors, and develops direct reports; providing operational support as needed.

## RESPONSIBILITIES

1. Serves as ambassador of the Horizon Federal Credit Union (Horizon) brand. Continuously demonstrates the Credit Union's mission, vision, and core values in all interactions with current and prospective members, colleagues, vendors, and members of the community.
2. Ensures operational integrity including compliance in all policies and procedures.
3. Serves as a role model to other employees through words and actions.
4. Provides exemplary leadership through influence, communication, goal setting, employee development, coaching, mentoring, personal actions, and behaviors.
5. Effectively sets and monitors lending objectives and goals through all channels in conjunction with the overall goal and plan of the Credit Union.
6. Leads, coaches, counsels, mentors, and develops lending management and other direct reports to increase efficiency, enhance productivity, achieve goals, and provide a consistent atmosphere aligned with Credit Union culture.

7. Takes ownership of the overall direction and performance of all areas of lending to create a culture valuing high performance, continuous improvement, learning and development, and a commitment to quality and member satisfaction.
8. Maintains a current and comprehensive knowledge of all related products, services, policies, procedures, rules, and regulations applicable within the lending network, and ensures staff is aware of and comprehends changes.
9. Collaborates with management to strategize and create goals, plans, and initiatives, and coordinate activities in alignment with Horizon's goals, vision, and member expectations.
10. Works in conjunction with senior leadership, accounting, and marketing to determine rate analysis for lending products; stays up to date with rate trends.
11. Directly oversees Horizon's commercial lending program, including commercial services.
12. Expertly evaluates and continually examines Horizon's goals. Collaborate with team members to continually strategize and plan for future business development to achieve these goals, develop new resources and revenue streams to increase member growth and retention.
13. Expertly leads lending project initiatives to ensure timely, effective project implementation.
14. Prepares all budget projections as requested.
15. Reviews, evaluates, and decisions loan applications based on credit strength, collateral, employment profile, and all other pertinent loan documentation and information
16. Communicates in person, over the phone, and through written correspondence in a clear, diplomatic, and professional manner.
17. Takes ownership of member inquires, actively resolves escalated member issues and complaints, and further escalates when necessary.
18. Proactively identifies and communicates areas to increase and enhance efficiencies, productivity, profitability, and provide a consistent team atmosphere.
19. Tracks productivity of lending areas and report monthly.
20. Works harmoniously with colleagues across all departments to meet the needs of the members and Credit Union and achieve goals.
21. Ensures all lending employees adhere to policies and procedures described in the Employee Handbook.
22. Recommends and manages lending budget, including the purchase of equipment and supplies.
23. Keeps abreast of competitor's products, services, and pricing; communicates any potential competitive disadvantage to Chief Experience Officer.
24. Actively seeks, develops, and maintains business relationships with external business partners within our entire service area.
25. Coordinates and participate in special events, both onsite and offsite, for members, local businesses, and communities.
26. Actively participates in internal and external educational programs, schools, or conferences to continually develop greater knowledge and expertise. Take initiative for personal career development, as well as the development of staff, and seek opportunities to learn new skills.
27. Completes annual mandatory compliance and other training.
28. Willingly participates in Credit Union functions, committees, and events on a volunteer basis or as reasonably requested.
29. Maintains a positive attitude through communication and behaviors.

30. Represents Horizon in a positive and professional manner in community events, sales calls, meetings, and conferences.
31. Regular travel within chartered counties and between branch locations as required.
32. Willingly works a flexible schedule that includes Saturdays and overtime as needed.
33. Completes all other duties as assigned and/or required.

## QUALIFICATIONS

**Education and Experience:** Associates degree from accredited college or university with a concentration in business or finance. Bachelor's degree preferred.

**Other:**

- Minimum 5 years experience in progressive leadership within lending.
- NMLS required
- Prior experience with commercial lending.
- Maintains a professional demeanor in appearance, communication, and action.
- Possesses a high level of interpersonal communication, both verbal and written.
- Takes command of situations; remains confident, unfazed, and undeterred by conflict, dealing with strong personalities, communicating unfavorable information, and allowing others to take risks and grow.
- Effectively work and remain calm under pressure and in tense situations.
- Focused and driven to obtain goals in an ethical manner.
- Demonstrates positivity and enthusiasm regardless of the situation and motivates the team to do the same.
- Creative and innovative thinker and problem solver.
- Maintains confidentiality of all members and employees, their business dealings, and transactions.
- Solid working knowledge of PC-based programs.

**Language Skills:**

Ability to read, analyze, and interpret financial reports and documents, periodicals, journals, reference resources, and training and policy manuals. Ability to comprehend and respond to common inquiries or complaints from credit union members, colleagues, regulatory agencies, vendors, or members of the business community. Ability to effectively present job-related information to members and colleagues.

**Mathematical Skills:**

Ability to count currency in denominational increments. Ability to compute discount, interest, profit, and loss; commission markup and selling price; and ratio, proportion, and percentage. Able to perform simple algebra.

**Reasoning Skills:**

Ability to apply logical or scientific thinking to define problems, collect data, establish facts, and draw conclusions. Able to interpret a variety of technical instructions and can deal with multiple variables.

**Physical Requirements:**

While performing the duties of this job, the employee is required to stand; walk, sit; use hands to finger, handle or feel objects, tools, or controls; reach with hands and arms; climb stairs; balance; stoop, kneel, crouch or crawl; talk or hear; taste or smell. The employee must occasionally lift and/or move up to 40 pounds. Specific vision

abilities required by the job include close vision, distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus.

Must possess sufficient manual dexterity to skillfully operate standard office equipment, including but not limited to: computer mouse and keyboard, facsimile machine, photocopier, telephone, and calculator. Must be able to view and read written words and numbers from paper and computer screens. Must be able to hear verbal communication in normal volume, pitch, and tone in person and over the telephone.

The physical demands described are representative of those required to successfully perform the essential functions of the job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**Note:** Job descriptions are intended to be accurate reflections of those principal job elements essential for making decisions pertaining to compensation. They should not be considered to be an exhaustive list of all responsibilities, skills, efforts, or working conditions associated with the position.

***I acknowledge that I have read and understand the above job description. I am physically and mentally capable of handling the above responsibilities.***

________________________________________ ________________________________________

Employee Signature Date Supervisor Signature Date

**This is not to be construed as an employment contract.**

**This job description does not alter the Employment-At-Will relationship in any way.**

**in any way.**

# EXHIBIT C

Horizon
Federal Credit Union

# HORIZON FEDERAL CREDIT UNION
# POSITION DESCRIPTION

| | |
|---|---|
| ***POSITION DESCRIPTION:*** | Chief Lending Officer |
| ***REPORTING TO:*** | Chief Executive Officer |
| ***DEPARTMENT:*** | Senior Management |
| ***FLSA STATUS:*** | Exempt |
| ***LOCATION:*** | |

Horizon understands our employees are the credit union's greatest asset. We recruit and develop enthusiastic, engaged, and empowered individuals to take ownership of each and every member experience to ensure the member is receiving exemplary service. Together, we strive to provide a brighter financial future for our staff, our members, and our surrounding communities.

***Our staff is driven by a common passion to be the BEST by doing whatever it takes to exceed the expectations of our members and internal team. They are determined to differentiate our Credit Union in the marketplace through our obsession for delivering superior quality and professionalism. They are collectively focused on conducting all business, internally and externally, with the highest degree of honesty, integrity, consistency, and ethics.***

## POSITION OBJECTIVE

Oversees all areas of lending: consumer, commercial, real estate, and collections. Responsible for the vision, leadership, strategic development, growth, risk management, and overall success of these areas. Ensures all Credit Union staff deliver the ultimate member experience, enthusiastically projecting Horizon's culture and values.

## RESPONSIBILITIES

1. Serves as ambassador of the Horizon Federal Credit Union (Horizon) brand. Continuously demonstrates the Credit Union's mission, vision, and core values in all interactions with current and prospective members, colleagues, vendors, and members of the community.
2. Ensures operational integrity including compliance in all policies and procedures.
3. Serves as a role model to other employees through words and actions.
4. Provides exemplary leadership through influence, communication, goal setting, employee development, coaching, mentoring, personal actions, and behaviors.
5. Manages and leads the Lending functions throughout the Credit Union. Plans and develops policies, programs, goals, initiatives, and other projects.
6. Leads and provides strategic development and growth for consumer and commercial lending, indirect lending, and real estate lending. Manages performance and mitigates risk in an ethical manner.
7. Assesses underwriting process; developes opportunities to improve process, and increase loan growth while mitigating risk.

8. Leads, coaches, counsels, mentors, and develops lending management and other direct reports to increase efficiency, enhance productivity, achieve goals, and provide a consistent atmosphere aligned with Credit Union culture.
9. Takes ownership of the overall direction and performance of all areas of lending to create a culture valuing high performance, continuous improvement, learning and development, and a commitment to quality and member satisfaction.
10. Maintains a current and comprehensive knowledge of all related products, services, policies, procedures, rules, and regulations applicable within the lending network, and ensures staff is aware of and comprehends changes.
11. Collaborates with management to strategize and create goals, plans, and initiatives, and coordinate activities in alignment with Horizon's goals, vision, and member expectations.
12. Works in conjunction with senior leadership, accounting, and marketing to determine rate analysis for lending products; stays up to date with rate trends.
13. Maintains open and constant avenues of communication with CEO, Board of Directors, management, team members, and other staff.
14. Expertly evaluates and continually examines Horizon's goals. Collaborate with team members to continually strategize and plan for future business development to achieve these goals, develop new resources and revenue streams to increase member growth and retention.
15. Expertly leads lending project initiatives to ensure timely, effective project implementation.
16. Prepares all budget projections as requested.
17. Reviews, evaluates, and decisions loan applications based on credit strength, collateral, employment profile, and all other pertinent loan documentation and information
18. Communicates in person, over the phone, and through written correspondence in a clear, diplomatic, and professional manner.
19. Takes ownership of member inquires, actively resolves escalated member issues and complaints, and further escalates when necessary.
20. Proactively recognizes training opportunities; creates and facilitates training for staff, when appropriate.
21. Proactively identifies and communicates areas to increase and enhance efficiencies, productivity, profitability, and provide a consistent team atmosphere.
22. Tracks productivity of lending areas and report monthly.
23. Works harmoniously with other Horizon executives, creating a united effort with communication, decision-making, and actions.
24. Ensures all lending employees adhere to policies and procedures described in the Employee Handbook.
25. Recommends and manages lending budget, including the purchase of equipment and supplies.
26. Keeps abreast of competitor's products, services, and pricing; communicates any potential competitive disadvantage to Chief Executive Officer.
27. Actively seeks, develops, and maintains business relationships with external business partners within our entire service area.
28. Coordinates and participate in special events, both onsite and offsite, for members, local businesses, and communities.
29. Actively participates in internal and external educational programs, schools, or conferences to continually develop greater knowledge and expertise. Take initiative for personal career development, as well as the development of staff, and seek opportunities to learn new skills.

30. Completes annual mandatory compliance and other training.
31. Willingly participates in Credit Union functions, committees, and events on a volunteer basis or as reasonably requested.
32. Maintains a positive attitude through communication and behaviors.
33. Represents Horizon in a positive and professional manner in community events, sales calls, meetings, and conferences.
34. Regular travel within chartered counties and between branch locations as required.
35. Willingly works a flexible schedule that includes Saturdays and overtime as needed.
36. Completes all other duties as assigned and/or required.

## QUALIFICATIONS

**Education and Experience:** Associates degree from accredited college or university with a concentration in business or finance. Bachelor's degree preferred.

**Other:**

- Minimum 5 years experience in progressive leadership within lending.
- NMLS required
- Prior experience with commercial lending.
- Maintains a professional demeanor in appearance, communication, and action.
- Possesses a high level of interpersonal communication, both verbal and written.
- Takes command of situations; remains confident, unfazed, and undeterred by conflict, dealing with strong personalities, communicating unfavorable information, and allowing others to take risks and grow.
- Effectively work and remain calm under pressure and in tense situations.
- Focused and driven to obtain goals in an ethical manner.
- Demonstrates positivity and enthusiasm regardless of the situation and motivates the team to do the same.
- Creative and innovative thinker and problem solver.
- Maintains confidentiality of all members and employees, their business dealings, and transactions.
- Solid working knowledge of PC-based programs.

**Language Skills:**

Ability to read, analyze, and interpret financial reports and documents, periodicals, journals, reference resources, and training and policy manuals. Ability to comprehend and respond to common inquiries or complaints from credit union members, colleagues, regulatory agencies, vendors, or members of the business community. Ability to effectively present job-related information to members and colleagues.

**Mathematical Skills:**

Ability to count currency in denominational increments. Ability to compute discount, interest, profit, and loss; commission markup and selling price; and ratio, proportion, and percentage. Able to perform simple algebra.

**Reasoning Skills:**

Ability to apply logical or scientific thinking to define problems, collect data, establish facts, and draw conclusions. Able to interpret a variety of technical instructions and can deal with multiple variables.

**Physical Requirements:**

While performing the duties of this job, the employee is required to stand; walk, sit; use hands to finger, handle or feel objects, tools, or controls; reach with hands and arms; climb stairs; balance; stoop, kneel, crouch or crawl; talk or hear; taste or smell. The employee must occasionally lift and/or move up to 40 pounds. Specific vision abilities required by the job include close vision, distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus.

Must possess sufficient manual dexterity to skillfully operate standard office equipment, including but not limited to: computer mouse and keyboard, facsimile machine, photocopier, telephone, and calculator. Must be able to view and read written words and numbers from paper and computer screens. Must be able to hear verbal communication in normal volume, pitch, and tone in person and over the telephone.

The physical demands described are representative of those required to successfully perform the essential functions of the job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**Note:** Job descriptions are intended to be accurate reflections of those principal job elements essential for making decisions pertaining to compensation. They should not be considered to be an exhaustive list of all responsibilities, skills, efforts, or working conditions associated with the position.

***I acknowledge that I have read and understand the above job description. I am physically and mentally capable of handling the above responsibilities.***

________________________________________ ________________________________________

Employee Signature Date Supervisor Signature Date

**This is not to be construed as an employment contract.**

**This job description does not alter the Employment-At-Will relationship in any way.**

**in any way.**

STROKOFF & COWDEN, P.C.
ATTORNEYS AT LAW
224 PINE STREET
HARRISBURG, PENNSYLVANIA 17101
www.strokoffandcowden.com
TELEPHONE (717) 233-5353
FAX (717) 233-5806

September 5, 2025

**Via Email ONLY:** Fitzgerald[redacted]

Mr. Stephen Fitzgerald
Regional Investigator
U.S. Department of Labor, OSHA
Directorate of Whistleblower Protection Programs
3477 Corporate Parkway - Suite 120
Center Valley, PA 18034

Re: *Brittany Baker v. Horizon Federal Credit Union*
OSHA Case #: 301055479
**Complainant's Rebuttal**

Dear Mr. Fitzgerald:

We received the position statement submitted by Horizon Federal Credit Union (Respondent) on or about August 21, 2025. Complainant (Ms. Baker) herein provides a brief rebuttal to highlight factual errors and conspicuous omissions to assist you in the process of pretext testing.

As you likely recall, Ms. Baker submitted an interactive and comprehensive timeline, which mapped and documented the dates and substance of Ms. Baker's protected activity, and Respondent's responses in retaliation. In its submission, Respondent explained that the CEO decided to demote or eliminate Ms. Baker's employment before she engaged in protected activity. That is demonstrably false. Ms. Baker's timeline and the supporting documents undeniably establish a *prima facie* case of retaliation. Indeed, to determine whether there is reasonable cause, Ms. Baker need only establish that protected activity was a contributing factor in the adverse action. 29 C.F.R. § 1980.109(a), (b) and 29 C.F.R. §1985.104(e)(3).

While Respondent correctly stated the burden-shifting standards associated with the implicated whistleblower laws, it noticeably failed to provide sufficient, credible or supported facts to meet the standard it bears to avoid the advancement of this investigation and adverse merit findings. The statutes and legal authorities are clear. In fact, the Supreme Court of the United States recently reiterated that, once the burden shifts to the employer, to avoid liability it must:

> "'demonstrate[], **by clear and convincing evidence**, that [it] would have taken the same unfavorable personnel action in the absence of' the protected behavior."

*Murray v. UBS Sec., LLC,* 601 U.S. 23, 38, 343 (2024), *quoting* 49 U. S. C. § 42121(b)(2)(B)(ii) (SOX) (emphasis added). The Court was analyzing facts in the context of a Sarbanes Oxley (SOX) retaliation case; however, the same burden/ standard applies under the Consumer Financial Protection Act (CFPA). *See* 12 U.S.C.A. § 5567(c)(3)(C): No relief (to the whistleblower) will be ordered "...if the employer demonstrates **by clear and convincing evidence** that the employer would have taken the same unfavorable personnel action in the absence of that behavior."

Respondent cannot meet this burden. Nowhere has Respondent stated in clear or convincing terms that Ms. Baker's termination for failure to elect a demotion would have occurred absent her protected activity. Indeed, the Respondent's submission established the opposite: Respondent claims that eliminating Ms. Baker's position was "necessary" in immediate and direct response to Ms. Baker's protected activity on March 3, 2025.

**Respondent Admitted that Its Adverse Action Was Borne Out Of Ms. Baker's Protected Activity**

There are some facts that are not in dispute. After her promotion to the position as Chief Lending Officer (CLO), Ms. Baker was regularly reporting violations and mistakes caused by her former supervisor, the Chief Experience Officer (CXO). She regularly provided the CXO with compliance advice and demanded strict observance of regulatory *and* internal requirements. Much of Ms. Baker's communication with the CXO was related to spotting regulatory and compliance errors, and her repeated follow up with the CXO to address/correct them. Otherwise, Ms. Baker had to correct the errors herself. These interactions were increasing and exposing Respondent to greater risk of liability.

Ms. Baker and Respondent also agree that the trigger for adverse action was Ms. Baker's March 3, 2025, email to the CEO,[1] Ms. Baker

---

[1] Ms. Baker's initial submission provides dates, substance and documentation of her reports of wrongdoing and Respondent's reactions during the relevant timeframe. Herein, Ms. Baker addresses only Respondent's misplaced reliance on, and mischaracterization of the March 3, 2025 email as Respondent alleged it related it to the decision to take action against Ms. Baker. As set out in the previous submission, Ms. Baker's protected activity prior to March 3, 2025 regularly and with growing frequency involved unlawful behavior not just attributable to the CXO. Further, contrary to the Respondent's claims, Ms. Baker's reports to outside agencies began prior to any adverse action and well before May 30, of 2025. (See Respondent's Submission, p. 6). Reports to the FTC, NCUA, FBI EEOC all preceded Respondent's refusal to

mentioned the email and provided it (in its entirety) with her initial submission. Respondent's submission corroborated that the email was important in Respondent's decision, as evidenced by the *selected* quotes from it. (The March 3, 2025, email is attached hereto as Exhibit A).

By March 3, 2024, the frequency and precariousness of the CXO's transgressions had escalated to the point where Ms. Baker sought intervention from the CEO. (Exhibit A). Among other things, Ms. Baker advised the CEO that the institution was not compliant with Fair Lending practices and their loan error rates were likely to rise and bring the scrutiny of auditors and potentially federal regulators. (*Id.*) She conveyed that, in her experience multiple auditors had called out the same mistakes the CXO was making at Respondent credit union. In effort to avoid scrutiny she described the number of hours she was spending addressing those errors. (*Id.*)

The tone of the email conveyed exasperation and exhaustion, in admitting that she could not sustainably continue to fix the errors alone. She perceived the CEO's repeated dismissal and non-response to her compliance concerns implied that he was "condoning" the CXO's behavior. Not only that, but his non-response also implied that he did not care or failed to recognize that Ms. Baker, in her capacity as the CLO, bore all the risk from the regulatory overseers. In particular, she said, "you may be willing to put your neck out for that, but you can't voluntarily offer mine up too." (*Id.*)

She gave numerous examples of lending practice errors and inconsistencies, that had been the subject of NCUA scrutiny in the past. She indicated that those errors were frequently occurring and "growing exponentially worse." (*Id.*) She said, "I have felt like I am one undocumented or poorly documented risk-based decision away from losing my job for months." (*Id.*) In essence, she was asking the CEO to help her address the growing risk of liability associated with the CXO's inconsistent and frequently incorrect loan practices that did not comply with the law.

It is not credible for the Respondent to characterize Ms. Baker's March 3, 2025, email as evidence of a simple relationship conflict with the CXO. Nor is it persuasive for Respondent to imply that Ms. Baker reported only what she "*perceived*," to be compliance violations. (*See* Respondent's submission, *fn.* 1). That said, in its submission, Respondent admitted that this exchange between Ms. Baker and the CEO was the reason the CEO conceived a plan to take adverse action/s against Ms. Baker. (Respondent's submission, p. 6). After supplying a select quote from the March 3, 2025, email, Respondent claimed, "...the CEO decided *at that time* to complete a reorganization...." (*Id.*)

---

interview her for the newly created executive position. Respondent's claims to the contrary are demonstrably false.

By its own admission, the CEO's immediate response to Ms. Baker's March 3, 2025, plea for help to address mounting instances of non-compliance was to eliminate her position and the CXO's position. (Respondent's submission p. 6). These are undeniable admissions that the Respondent's adverse action; 1) occurred within days **after**; and 2) in **immediate reaction to** Ms. Baker's protected activity.

The Respondent failed to present any evidence that absent the protected activity, Ms. Baker would have lost her position or her job.

**Respondent's Need for Corporate Reorganization Was a Sham**

As earlier forecasted, Respondent claims that the tension between Ms. Baker and the CXO justified adverse changes to Ms. Baker's employment. As set forth more fully above, that is a red herring. It is no surprise that there was conflict in their relationship. Ms. Baker was regularly correcting the CXO's lending practice errors, regulatory inconsistencies, and violations.

Proffering the relationship "dynamic" as the reason for adverse change to fails to acknowledge the fundamental reason the "dynamic" existed in the first instance: Ms. Baker was blowing the whistle on the CXO's increasingly risky and time consuming non-compliant behavior. More pointedly, Respondent fails to acknowledge that the cause of the "dynamic" is inseparable from Ms. Baker's engaging in protected activity.

In justification for reorganization, Respondent posits that in her March 3, 2025, email, Ms. Baker "offered to resign." The quote implies that Ms. Baker wanted to resign because she could no longer work with the CXO. (Respondent's submission, p. 6). That is not what the March 3, 2025, email said. Indeed, Respondent quoted *some* of Ms. Baker's words, but failed to supply the March 3, 2025, email where the quote appears.

Notably, in its submission, Respondent lifted only a portion of a sentence that supported its self-serving narratives: that Ms. Baker offered to resign. In the preceding sentence (omitted by Respondent), Ms. Baker wrote, "I don't want to leave, I love my job. I love what I do." (Exhibit, A, p. 2). About resignation, Ms. Baker actually said: "if my ... doubling down on the guardrails whenever I see us skating toward the edge, and ...trying to maintain consistency is causing all of this then you and I can have a conversation...". (*Id.*) In context, Ms. Baker did not offer to resign because she could not get along with the CXO. Rather, Ms. Baker said she would consider "actively looking for other opportunities," if the CEO remained unwilling to assist her with her growing compliance concerns with the CXO and/or support her efforts to avoid penalties imposed by regulators. (Exhibit A, p. 2).

Presumably as evidence of its non-retaliatory conduct, Respondent made the gratuitous claim to have eliminated both Ms. Baker's and the CXO's

position equally. That fact is completely irrelevant.[2] Moreover, Respondent failed to clearly or convincingly establish that the "reorganization" was planned before Ms. Baker's protected exchange on March 3, 2025.

Respondent's assertions present another logical fallacy. According to Respondent, the reason reorganization was "necessary" was the tense relationship between Ms. Baker and the CXO. However, the CXO went out on leave in March, did not return, and resigned in early May. (*See* Respondent's submission, p. 6). If that "tense" relationship and "growing issues between the two" was the legitimate reason for reorganization, it only stands to reason that the CXO's permanent departure in May should have altered the outcome. Specifically, if the conflict in the relationship were the true reason reorganization was necessary in March, then when it became clear in May that the conflict would permanently end, the reorganization logically was no longer necessary. Yet, Respondent continued forward even when the alleged reasons no longer existed.

Not only that, but Respondent issued Ms. Baker's performance evaluation in which the negative comments, almost exclusively, implicated the conflict that would not exist into the future. The evaluation was issued at the end of May, ***after*** the CXO resigned and ***after*** Respondent knew the inter-office conflict would not support a reason to take adverse action against Ms. Baker. In other words, Respondent created evidence to support its decisions after the decisions were made, in effort to conceal its true motives. Respondent's conspicuous failure to address its dissembling logic, implies that Respondent's reorganization was not undertaken for the legitimate purpose to quell conflict, but rather, to punish and silence Ms. Baker.

**It Was Far from Clear That Ms. Baker Would Have Been Terminated Absent Her Protected Activity**

Ms. Baker's June 11, 2025, termination letter read,

> "A few months back, you were informed about these coming changes and provided with different options regarding your future with Horizon and the best fit in this new organizational structure. After multiple opportunities were provided to you, you did not select

---

[2] Even assuming without conceding that comparator evidence is relevant, the CXO is not the appropriate comparator; **she was implicated as the wrongdoer**. Ms. Baker suggests instead that the relevant comparator would be the Chief Financial and Information Officer (CFIO), Michael Burns. He is an employee with equal executive status as Ms. Baker, and who also reported to the CEO. He received similar negative feedback in his performance review. He played no role in compliance concerns, did not engage in protected activity, and he was unaffected by Respondent's reorganization.

> any of the options provided. It is now time that the organization must move forward."

(June 11, 2025, termination letter is attached as Exhibit B).

Respondent's burden to avoid liability is to demonstrate clearly and convincingly that Ms. Baker's termination would have occurred absent the protected activity. Respondent cannot credibly establish that it planned to terminate Ms. Baker when the documentation unmistakably stated that she could have chosen to stay. Indeed, correspondence between the undersigned and counsel for Respondent confirm that Respondent wanted Ms. Baker "to decide in April, whether to accept demotion or separation on or about July 25..." (April 23, 2024, email traffic attached hereto as Exhibit C). In response counsel wrote, "that is correct, [Respondent] **wants to have Ms. Baker's future employment status resolved** as soon as possible and before it begins moving forward with ... restructuring." (*Id.*) (emphasis added).

In other words, Respondent had not resolved to terminate Ms. Baker before the reorganization. According to Respondent, the termination occurred because Ms. Baker "failed to elect any of the options presented to her..." (Respondent's submission, p. 6). In another passage, Respondent stated it terminated Ms. Baker because "when presented with options to remain employed post-reorganization, [Ms. Baker] refused to do so." (*Id.*, p. 8). The "options" presented were a classic Hobson's Choice: accept Respondent's demotion with no hope of advancement or give up your job. Notwithstanding the manner in which the options were tendered, at the time those lose-lose propositions were offered, the outcome was not clearly or convincingly certain.

It confounds the imagination why Respondent did not simply demote or fire Ms. Baker, as it had the discretion to do. Likely because it wanted Ms. Baker to agree to accept the harm. Had she elected any of the "options" to remain employed, however, she would have undermined her ability to prevail in any retaliation claim. Ms. Baker will have the ultimate burden to establish that the harm she suffered was not legitimate; but instead, was a pretext. If she agreed/elected to be harmed, she would reduce, if not eliminate, any practical ability to persuasively argue that Respondent's adverse action was a pretense. Respondent could convincingly counter that the demotion was legitimate as evidenced by the fact that Ms. Baker agreed to "accept" it.

**Request For Merit Findings of Probable Cause and Reinstatement**

To avoid further investigation and liability Respondent was tasked with providing you with clear and convincing evidence that its actions were inevitable in the absence of Ms. Baker's protected activity. Instead, Respondent quoted from materials that were not appended. Most notably, the March 3, 2025, email (Exhibit A). It made claims that it failed to support with

credible evidence. For example, there were no evidence that there were any "complaints of other employees." (Respondent's submission, p. 5). To the contrary, Ms. Baker believes that Respondent possesses (but failed to produce) unredacted results of an employee survey conducted in early spring 2025. If the results supported Respondent's presumptuous narrative, they would have been produced.

There is no evidence of the engagement, conclusions, suggestions, reports or proposals made by any third-party consultant to support Respondent's assertions. Indeed, while Respondent engaged a contractor in 2023, Respondent submitted no evidence of any work performed in 2024 or 2025 relevant to any decision to "reorganize." (*See* Glatt Consultant Signature page dated August 7, 2023, attached hereto as Exhibit D).

Respondent mentioned but failed to supply copies of any of the "options" made available to Ms. Baker or her responses. Although referenced in its submission, Respondent omitted its ultimatum delivered March 20, 2025. It omitted Ms. Baker's response of April 9, 2025. (Respondent's submission, p. 6) (The March 20 and April 9, 2025, letters are attached hereto as Exhibits E and F, respectively).

The reorganization lacked forethought or planning. Indeed, Respondent neglected to advise that the jobs and options presented to Ms. Baker were different with each written iteration. (*Cf.* March 20, 2025 "options" letter, Exhibit E; with the positions described in an April 7, 2025, email from the CEO attached hereto as Exhibit G, and an April 21, 2025, letter attached hereto as Exhibit H).

It is undisputed that Ms. Baker's performance was rated more favorably just prior to March 2024. Respondent merely claimed that Ms. Baker's trimester evaluation contained certain critical feedback but failed to provide any of the evaluations for timing, comparison, or contrast. Notably, the "negative" evaluation was delivered ***after*** the pretextual reorganization was underway. To wit, the negative evaluation delivered in May, could not possibly support the argument that the decision to reorganize in March was based upon poor performance. It is believed that another lateral executive (the CFIO) received similar critical feedback but is still employed by Respondent. Respondent also failed to advise you of or provide Ms. Baker's thorough, well-supported rebuttal, which specifically calls out the evaluation as a pretext for Respondent's retaliatory actions. (Ms. Baker's May 30, 2025, rebuttal is attached hereto as Exhibit I).

Respondent's repeated reference to but failure to produce any corroborating evidentiary documents is a clear indication of pretext. Namely, the reason Respondent withheld referenced documents was because its assertions lack merit and the evidence does not in fact support its narratives.

We ask that you consider Respondent's unsupported statements, assertions and defenses in stark contrast with the timeline and contemporaneously created documents submitted to you by Ms. Baker. The protected activity herein described occurring March 2025, is only one instance among the dozens of reports of wrongdoing, about which Respondent is undeniably aware, but failed to reveal or discuss in its submission.

In the absence of clear or convincing evidence that the Respondent would have taken the same action absent the protected activity, we respectfully request that OSHA find reasonable cause to believe the whistleblower statutes have been violated and issue merit findings and order the following:

1. Immediate, preliminary reinstatement together with compensation (including back pay);

2. Restoration of the terms, conditions, and privileges associated with Ms. Baker's employment;

3. Compensatory damages, costs, and expenses to Ms. Baker (including attorney fees) reasonably incurred; and

4. Any other remedy to make Ms. Baker whole.

Additionally, Ms. Baker's health declined in the months leading up to her termination. She continues to suffer hypertension, mental distress, and anxiety. Should you require any additional information or if you would like to schedule interviews with Ms. Baker, please contact me.

Very truly yours,

Jennifer Nachamkin

JAN/smm
Enclosures
cc: Brittany Baker (via email w/enclosures)
Timothy M. McCarthy, Esq. (via email w/enclosures)
Jessica L. Mazzeo, Esq. (via email w/enclosures)

JacksonLewis

**Jackson Lewis P.C.**
Three Parkway, Suite 1350
1601 Cherry Street
Philadelphia PA 19102
(267) 319-7802 Main
(215) 399–2249 Fax
jacksonlewis.com

TIMOTHY M. MCCARTHY, ESQ.
DIRECT DIAL: (267) 319-7810
TIMOTHY[redacted]

JESSICA L. MAZZEO, ESQ.
DIRECT DIAL: (267) 319-7820
JESSICA[redacted]

October 1, 2025

**VIA ELECTRONIC MAIL ONLY**

Mr. Stephen Fitzgerald
Regional Investigator
U.S. Department of Labor, OSHA
Directorate of Whistleblower Protection Programs
3477 Corporate Parkway, Suite 120
Center Valley, PA 18034
Fitzgerald.[redacted]

**Re: Brittany Baker v. Horizon Federal Credit Union**
**OSHA Case #: 301055479**

Dear Investigator Fitzgerald:

In further support of its August 21, 2025, statement of position, Respondent Horizon Federal Credit Union ("Horizon"), and as more thoroughly outlined below, seeks a dismissal of the Complaint on the basis that it has no legal merit. First and foremost, Baker's September 5, 2025, Rebuttal (the "Rebuttal") fails to challenge or rebut that Horizon is not a covered employer under SOX and therefore is not subject to whistleblower protections governed by SOX. Moreover, like her Complaint, Baker's Rebuttal glosses over the biggest impediment to her allegations: at no time did Horizon ignore or try to prevent Baker's reporting of alleged compliance issues but instead it worked through each one in a manner that Horizon determined was timely.[1] To be sure, it was *only* Baker's long-documented unprofessional communications and inability to get along with her peers and subordinates that was the primary factor in the restructuring which ultimately led to the elimination of Baker's role. Any alleged protected activity engaged in by Baker had absolutely nothing to do with Horizon's decision. Baker has not established a *prima facie* case under SOX or the CFPA and accordingly, Horizon respectfully requests that her Complaint be immediately dismissed without further investigation.

---

[1] Regarding the June 30, 2025, NCUA audit, while final findings are not expected to be released until the end of 2025, the Issues and Actions Report focused more on compliance issues than lending issues – despite Baker's claims of significant violations that were going to cost Horizon's CEO his job.

**A. <u>Baker Ignores That It Was Her Own Conduct That Caused Her Role Elimination – And Not Any Alleged Protected Activity.</u>**

When seen in a full telling of the facts, Baker will be hard pressed to prove any adverse employment action was the result of her alleged whistleblower activity rather than her long-documented performance issues.[2] Despite her claim in the Rebuttal that it is "demonstrably false" that Horizon decided to eliminate Baker's role before her alleged protected activity, the record shows otherwise. What the record *does show* is that Horizon took all of Baker's compliance complaints seriously. The record also shows that starting in early 2023, Horizon began notating that Baker struggled with her professionalism with her peers and colleagues (and not limited to the Chief Experience Officer) and that it was of ongoing and growing concern. Her inability to overcome these challenges almost two years later, coupled with issues with another senior leader, led Horizon to restructure.

Rather than accept any iota of responsibility, Baker attempts to paint herself as an innocent bystander.[3] She claims that naturally there was growing conflict between herself and Horizon's Chief Experience Officer because "Baker was regularly correcting the CXO's lending practice errors, regulatory inconsistencies, and violations." Rebuttal at p. 4. Baker conveniently ignores Horizon's portrayal of the unstable work environment created by Baker; Horizon specifically discussed in its Position Statement that Baker was considered difficult to work with "including [by] her direct reports as well as the Chief Experience Officer." Position Stmt. p. 5. In fact, approximately two weeks before Baker's position was eliminated and she was terminated, one of her direct reports abruptly resigned from Horizon citing a toxic work environment, in large part contributed by Baker telling many employees that she got the Chief Experience Officer fired and was also going to get Horizon's CEO fired after the NCUA audit in July. Because of the negative "atmosphere" at the branch location where this employee worked with Baker, Horizon agreed to let that employee work her final two weeks at another branch.

Baker's sole focus on her relationship with Horizon's Chief Experience Officer is misguided. While that played a significant role in the decision to restructure, Baker's overall poor communication skills and unprofessional behavior also played a significant role. Baker's communication and behavior issues were exhibited toward other co-workers, not just Mr. Howard or the Chief Experience Officer. So, while Baker would like to redirect focus that if the Chief Experience Officer resigned, she should have been allowed to stay in her current role, that is simply

[2] Notably, Baker filed a Charge of Discrimination with the EEOC on or about August 19, 2025. In her Charge, she alleged that Horizon terminated her position due to Horizon's discriminatory and retaliatory animus against Baker not only for being a protected whistleblower but also because of her sex and alleged disability. Baker's credibility suffers here as she expects it to be believed that not only did Horizon terminate her for engaging in alleged protected activity *but also because she was a woman with an alleged disability*. (See August 19, 2025, Charge of Discrimination attached hereto as **Exhibit 1**.) Baker's tale is unrealistic: she is attempting to convince us that despite never facing any prior claims of discrimination or retaliation, Horizon decided to commit a trifecta of illegal offenses *all at one time and against one person*. On August 26, 2025, the EEOC issued Baker a Right to Sue notice and closed its file.
[3] It was brought to the attention of Horizon that Baker, through her public Facebook page, has been making social media posts regarding her Complaint. In total, since July 24th, Baker has made 67 Facebook posts. (*See* Baker Facebook posts, attached hereto as **Exhibit 2**.) If nothing else, the tone and content of these posts demonstrate Baker's inability to communicate professionally.

a fallacy. As noted in its Position Statement *across several pages*, Horizon constantly attempted to work with Baker on improving her professionalism and communication *for over two years*. To assure Baker that Respondent did not intentionally "fail[] to produce any corroborating evidentiary documents" to avoid establishing pretext, and to reiterate that it was not just her broken relationship with the Chief Experience Officer but was also Baker's inability to act and work in a professional manner any organization would expect from its most senior leadership that caused her role elimination, Horizon attaches hereto annotated versions of Baker's trimester reviews starting September 2023 through May 2025. (*See* December 2023, April 2024, August 2024, December 2024, May 2025 Trimester Reviews, attached hereto as **Exhibits 3, 4, 5, 6 and 7**, respectively). As you will see, Horizon consistently documented Baker's inability to act professionally not only with the Chief Experience Officer but also with those on Baker's team and others at the credit union. Not only was this feedback given to Baker by the Chief Experience Officer and the CEO during multiple trimester evaluations, but the CEO gave this same feedback during many of the at least 30 one-to-one meetings Baker had with the CEO.

Finally, there is no credible evidence here that Baker was treated any differently than any other employee who was not engaged in the same or similar conduct. Baker's attempt to create a comparator in Horizon's CFIO also fails. While it was mentioned in *one* of his trimester reviews that certain areas of the CFIO's communication style could be improved, that singular reference falls woefully short from the *five consecutive trimester reviews* that had the same feedback (actually worse) for Baker.

**B. <u>Horizon's Restructuring Decision Was Not Illegal Under Any Statute.</u>**

While Baker may not have agreed with the options presented to her (demotion or resignation) that does not make Horizon's decision to restructure illegal. In fact, many poor performing employees would like the ability to dictate to their employers how the employer should make decisions about running its business, but that is simply not how it works. Here, Baker wanted to control the timeline of events and, despite being asked directly as well as through her counsel, she refused to provide a response to the alternatives Horizon presented in advance of the restructuring. (*See* April 21-30, 2025, Email Chain attached hereto as **Exhibit 8**.) This email chain *completes* the April discussions between counsel for Horizon and counsel for Baker - for which Baker attached only a limited section as Exhibit C to her Rebuttal. As noted, when pressed weeks after the original deadline for a response to the proposed employment options for Baker, Baker's attorney, on April 23, 2025, told Horizon's counsel that Baker "does not have time to discuss or develop a response today." Ex. 8. When Horizon's counsel asked again a week later on April 30, 2025, whether Baker was prepared to respond, her counsel failed to reply. *Id*. Horizon's restructuring plans, while initiated due to Baker's unprofessional behavior, were not going to be delayed or impeded simply because Baker didn't like the options in front of her. When Horizon finally went through with the restructuring three months after originally informing Baker about its plans, and because Baker had still failed by that time to decide, Horizon eliminated her role and terminated her employment. That was not illegal – it was a purely business decision and had nothing to do with any alleged protected activity Baker claims to have been engaged in.

Pursuant to 29 C.F.R. 1980.104(e), the Complaint should be dismissed without further investigation. Horizon renews its request for an opportunity pursuant to 29 C.F.R. § 1980.104 to meet with you or your designee, to discuss its defenses to the claims, answer any questions or provide additional necessary information to assist in the consideration and dismissal of the Complaint.

We again thank you for your consideration of this matter.

**Very truly yours,**

**JACKSON LEWIS P.C.**

Timothy M. McCarthy, Esq.
Jessica L. Mazzeo, Esq.

Enclosures
cc: Jennifer Nachamkin, Esq.
4938-7457-4702, v. 1

# EXHIBIT 1

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| **CHARGE PRESENTED TO:** | **AGENCY CHARGE NO.** |
|---|---|
| EEOC | 530-2025-05056 |
| Pennsylvania Human Relations Commission | |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Brittany E. Baker

Phone No.: [redacted]

Year of Birth: 1985

Mailing Address: [redacted]

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: Horizon Federal Credit Union

No. Employees, Members:

Phone No.: 570-326-3636

Mailing Address: 330 Pine St Suite 400

WILLIAMSPORT, PA 17701, UNITED STATES OF AMERICA

Name:

No. Employees, Members:

Phone No.:

Mailing Address:

DISCRIMINATION BASED ON:

Disability, Retaliation, Sex

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 12/08/2024

Latest: 06/11/2025

THE PARTICULARS ARE:

I was hired by Respondent on or about February 7, 2022, as the Director of Retail Delivery. On or about September 1, 2022, I was promoted to Director of Lending. On or about January 1, 2024, I was promoted to Chief Lending Officer. Respondent is aware of my disability.

On or about June 27, 2024, I notified Justin Howard (CEO) of my disability, and I requested for him to read a book about my disability and to send detailed emails to accommodate my disability.

Around December 2024, I made an internal complaint about Respondent's unethical and illegal business practices. In that same month, I requested for Respondent's development journal to be provided in a fillable PDF. I made this request as it is easier to put the paper journal to the side whereas the digital one is always on the desktop. On or about January 28, 2025, I notified Respondent that the company has not been properly notifying customers that the calls are being monitored and how Denise Rivera (CXO, Female) failed to create the required policies. Respondent failed to promptly correct the issue.

On or about March 3, 2025, I filed an internal whistleblower complaint. On or about March 20, 2025, Respondent informed me that I needed to pick between a demotion or to quit because Respondent does not believe I am a good fit for the C-Suite. I

was told that I needed to work on my soft skills, which I found to be a negative comment regarding my disability. Respondent requested I make a decision no later than March 27, 2025. On March 27, 2025, I proposed that I go on a probation period and keep my position. On or about April 3, 2025, Respondent informed me that my position was to be combined with Rivera's role and that I would not be eligible for the role due to my conflict with Rivera. On or about April 9, 2025, I declined Respondent's proposition to be demoted or separated. In that same day, I filed a sex-discrimination and whistleblowing complaint with Respondent.

Due to Respondent failing to take corrective action into their illegal business practices. I filed external complaints with the FTC (March 20, 2025), FCC (May 14, 2025), FBI (May 14, 20255) NCUA (May 15 & 16 2025), and OSHA (June 11, 2025). I filed inquiries with EEOC and PHRC on April 7, 2025.

In May 2025, I filed a complaint with the board of the ongoing unethical and illegal practices at Respondent. On or about May 15, 2025, I applied for the Chief Relationship Officer. On or about May 18, 2025, the board stated they were aware of what was going on and they do not get involved in personnel matters. On or about May 30, 2025, I received my trimester review and received 1s & 2s. Respondent cited it was due to my interpersonal relationship with Rivera. On or about June 11, 2025, I was discharged for not selecting a position.

I allege that I have been discriminated and retaliated due to my sex (Female) and disability in violation of Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act of 1990, as amended.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Brittany E. Baker

08/19/2025

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

_______________________________________________

Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary_________________________________________________________

Printed Name _____________________________________________________________

# EXHIBIT 2



**Brittany Baker**

2h ·

Sooo... turns out when people try to quietly hire someone into a renamed version of the job they pushed me out of while I'm still a federally and legally protected whistleblower... that's not just shady, it's retaliation.

Just filed a fresh complaint..... or two....

When you think the rules and laws don't apply to you, eventually someone reminds you they do.

Agencies are watching. Timelines are tracking. Receipts are organized.

I'm not going anywhere, and I'm definitely not done. 🤷‍♀️

3 comments

Like Comment Send Share

Gail Hanselman
Oh they so do not know who they messed with

17h Like Reply

Brittany Baker
**Gail Hanselman** its not like I havent won lawsuits before and know how to preserve evidence... weird huh lol

17h Like Reply

Gail Hanselman
**Brittany Baker** exactly what I was thinking

24m Like Reply

Brittany Baker
**Gail Hanselman** I can say an aggravated escalation in whistleblower retaliation letter just landed with OSHA and NCUA Department of Supervision a few hours ago so it is probably a very uncomfy Friday in lycoming county.

16m Like Reply



**Brittany Baker**

6h ·

I have conquered the laundry, dishes, vacuuming, and even started the rabbit cage... which obviously warrants a lunch break.

All this while keeping an eye on a certain high-stakes deadline that's looking better by the day. Let's just say my "receipts" are PLENTIFUL, timestamped, airtight, and momentum is definitely on my side. Big guns at the ready, whoop whoop.

Like Comment Share

1:57

# Brittany Baker

Posts Photos Videos

## Brittany's posts

**Brittany Baker**
1h ·

OSHA has certified an amendment to my whistleblower retaliation complaint, adding ongoing aggravated retaliation events to the case.

This is part of the official process under 18 U.S.C. § 1514A (SOX) and 12 U.S.C. § 5567 (CFPA).

Truth matters. Retaliation has consequences.

**Complainant Information**

| | | | |
|---|---|---|---|
| Complainant Name | Brittany Baker | | |
| Primary Address | 1' | Mailing Address | 1' N |
| Phone | ( | E-mail | b. |

| | | | |
|---|---|---|---|
| Designated Rep | JenniferNachamkin | Organization | Strokoff and Cowen |
| Primary Address | 224 Pine St Harrisburg, PA 17101 | Mailing Address | |
| Phone | (717) 695-8809 | E-mail | jnachamkin@strokoffandcowden.c om |

**Respondent Information**

| | | | |
|---|---|---|---|
| Respondent Name | Horizon Federal Credit Union | DBA | |
| Primary Address | 330 Pine St Williamsport, PA 17701 | Mailing Address | 330 Pine St Williamsport, PA 17701 |
| Phone | (570) 326-3636 | E-mail | hr@horizonfcu.org |

**Complaint Allegation**

| | |
|---|---|
| Statute | SOX |

Allegation Summary

Since December 12, 2024 up to her termination, Complainant alleges she notified multiple executive level Respondents via email of potential SOX violations. Complainant alleges Respondent provides services to publicly traded companies. Complainant alleges she engaged in protected activities.

Sometime in April, 2025, Complainant alleges Respondent offered her the choice to resign or reassigned to a less desirable or resignation.

Amended* Complainant alleges Respondent failed to hire her to the CXO position

Add friend Message

Home Friends Reels Marketplace Notifications Profile

**U.S. Department of Labor – Occupational Safety and Health Administration**

**Whistleblower Case Activity Worksheet**

| Filed Date | Case # | Local Case # | Investigator |
|---|---|---|---|
| 06-11-2025 | 301055479 | | Stephen Fitzgerald |

**Complainant Information**

| | | | |
|---|---|---|---|
| Complainant Name | Brittany Baker | | |
| Primary Address | 1 | Mailing Address | 1<br>N |
| Phone | ( | E-mail | b |

| | | | |
|---|---|---|---|
| Designated Rep | JenniferNachamkin | Organization | Strokoff and Cowen |
| Primary Address | 224 Pine St<br>Harrisburg, PA 17101 | Mailing Address | |
| Phone | (717) 695-8809 | E-mail | jnachamkin@strokoffandcowden.c<br>om |

**Respondent Information**

| | | | |
|---|---|---|---|
| Respondent Name | Horizon Federal Credit Union | DBA | |
| Primary Address | 330 Pine St<br>Williamsport, PA 17701 | Mailing Address | 330 Pine St<br>Williamsport, PA 17701 |
| Phone | (570) 326-3636 | E-mail | hr@horizonfcu.org |

**Complaint Allegation**

| Statute | SOX |
|---|---|

**Allegation Summary**

Since December 12, 2024 up to her termination, Complainant alleges she notified multiple executive level Respondents via email of potential SOX violations. Complainant alleges Respondent provides services to publicly traded companies. Complainant alleges she engaged in protected activities.

Sometime in April, 2025, Complainant alleges Respondent offered her the choice to resign or reassigned to a less desirable or resignation.

Amended* Complainant alleges Respondent failed to hire her to the CXO position

On or about June 11, Complainant was terminated.

Complainant alleges she was offered the option to resign or be reassigned to a less desirable position, and terminated for engaging in protected activities.

| Statute | CFPA |
|---|---|

**Allegation Summary**

Since December 12, 2024 up to her termination, Complainant alleges she made weekly reports via email notifying multiple executive level Respondents of potential CFPA violations. The alleged violations pertain to:
- Regulation B - Equal Credit Opportunity
- Regulation C - Home Mortgage Disclosure
- Regulation G & H - S.A.F.E. Mortgage Licensing Act
- Regulation X - Real Estate Settlement Procedures Act
- Regulation V - Fair Credit Reporting
- Regulation Z - Truth in Lending , Complainant alleges she engaged in protected activities.

Sometime in April, 2025, Complainant alleges Respondent offered her the choice to resign or reassigned to a less desirable or resignation.

On or about June 11, Complainant was terminated.

Amended* Complainant alleges Respondent failed to hire her to the CXO position.

Complainant alleges she was offered the option to resign or be reassigned to a less desirable position, and terminated for engaging in protected activities.

I certify that the complaint was amended.

| Signature | Title | Date |
|---|---|---|
| Stephen Fitzgerald | Regional Investigator | July 31, 2025 |

Brittany Baker
24m ·

Cross-filed. Confirmed. Moving forward. When one agency calls it serious, that's one thing. When three agencies do, it's a trend.

Some folks thought the story was over. Turns out it's just getting interesting. EEOC and PHRC are officially in the mix. Accountability has many doors.

Like Comment Share



**Brittany Baker**

26m ·

Rumors travel fast, but here's the truth: the work we've built doesn't crumble because of a few bad calls at the top. Teams are stronger than that, and so is the foundation beneath them.

Yes, things look messy from the outside, but I didn't spend years building protections, documentation, and programs just to watch them fall apart. I've already prepared for every contingency to keep people safe, and those who've been doing the right thing every day will come out ahead.

So don't panic. Don't buy the fear. What's broken can be fixed, and it will be.

Like Comment Share

Brittany Baker
2h ·

🎶 Hi ho, hi ho, it's off to sign Form 5 I go... 🎶

Tomorrow I'll be finalizing three charges, *not one ah ah ah*, *not two ah ah ah*, but as the Count von Count would say... *three ah ah ah*!
Retaliation. ADA. Gender.
Officially filed with the EEOC and cross-filed with PHRC.

✅ Interview Thursday
✅ Charges approved Friday (in under 24 hours!)
✅ Formal paperwork signed Monday

Sometimes accountability moves faster than anyone expects. 😉

🧛 Three signed charges! Ah ah ah!
🖊️ One pen.
📄 Three charges.
💥 Zero chill.

#CountOnAccountability #FormFiveFinalized #WhistleWhileYouWin #CountOnIt #FormFiveFanfare #ProtectedAndPersistent

Like Comment Share



Brittany Baker
2h ·

The position statement clock is ticking.

Here's the problem with leaning too hard on "executive spin": if what gets submitted doesn't match the paper trail, the witnesses, or the timelines... that's not just a weak argument. That's risk.

Receipts don't lie. Multiple witnesses don't lie. Metadata doesn't lie. Sworn statements hold weight.

If the statement tries to skate past all of that? Then OSHA gets to line up reality against fiction. And that's never a good place for an employer to be.

🎯 Accountability > Storytelling.

Like Comment Share

Brittany Baker
16h ·

🎶 Hi ho, hi ho, it's off to sign Form 5 I go... 🎶

Tomorrow I'll be finalizing three charges, *not one ah ah ah*, *not two ah ah ah*, but as the Count von Count would say... *three ah ah ah*!
Retaliation. ADA. Gender.
Officially filed with the EEOC and cross-filed with PHRC.

✅ Interview Thursday
✅ Charges approved Friday (in under 24 hours!)
✅ Formal paperwork signed Monday

Sometimes accountability moves faster than anyone expects. 😉

🧛 Three signed charges! Ah ah ah!
🖊 One pen.
📄 Three charges.
💥 Zero chill.

#CountOnAccountability #FormFiveFinalized #WhistleWhileYouWin
#CountOnIt #FormFiveFanfare #ProtectedAndPersistent

4 comments

Like Comment Share

**Alyshia Heimbach**
I feel you need to come to work with me and just document everything for me .... so I can have a freaking win for once cause no one should go to workand be treated and as stressed as me and my co workers are

13h Like Reply 2

**Brittany Baker**
**Alyshia Heimbach** I can give you what you need to document it and the process. This is whistleblower retaliation where I repeatedly called out regulatory and law violations and was then threatened with demotion or termination under the guise of restructuring.

12h Like Reply

**Alyshia Heimbach**
I work for the state of pa anything that we write down as witness statements get buried and swept under the rug or its my fault cause I said something

2h Like Reply

**Brittany Baker**
**Alyshia Heimbach** well the state has their own Employee whistleblower laws and reporting. I would look up those laws and check out OSHA's website. They are the whistleblower protection arm and they dont play.

1h Like Reply



Brittany Baker

32m ·

A lot of folks have been asking me for their own situations what it really takes for OSHA to issue a merit finding in a whistleblower case. From my research, conversations, and interviews it's easier than I thought it was if you have evidence. Spoiler alert: it's not magic, it's math.

✅ You engaged in a protected activity (translation: you spoke up about something the law protects, laws broken, regulations violated, or compliance ignored).
✅ The employer knew you did it (no "we had no idea" card to play).
✅ They took action against you (demotion, firing, cutting pay, poor reviews, restructuring, sidelining... pick your poison).
✅ That action was because you spoke up, or close enough in proximity (close in time, generally 30 days) that the timing is sus (a.k.a. the retaliation link).

That's it. Four boxes. Called Prima Facie. Check, check, check, check. 🎯

The "he said, she said" drama? Cute, but irrelevant. The law doesn't care about spin, it cares about evidence and timing. OSHA only needs ONE set of all four elements... just one. When you have stacks and stacks of emails and receipts, it can escalate to willful or aggravated retaliation, which is a whole other level of don't do that that makes three-letter agencies very unhappy.

So when you hear "merit finding," just know: it means the feds looked at the receipts, connected the dots, and said yep, retaliation happened.

Defense counsels loves to pretend the standard is higher, harder, or impossible. Cute try. OSHA doesn't grade on a curve. Four boxes, one set, and that's game, set, match. 🔥

#WhistleblowerProtection #Accountability #ReceiptsMatter

Like Comment Share

**Brittany Baker**
56m ·

The common misconception is to think OSHA investigations just fizzle out. Spoiler alert: when OSHA finds merit, it's game-on, not game-over.

✅ Order of Reinstatement – Translation: "Here's your badge back, see you at your desk." Effective immediately, like that second... not later... not maybe... right then and there.
✅ Back pay + interest – Because the law doesn't let employers profit off retaliation.
✅ Compensatory damages – Legal fees, medical bills, sometimes even emotional distress.
✅ Make-whole remedy – Fancy way of saying: "Put them right back where they would've been if you hadn't retaliated."
✅ Federal enforcement muscle – If the company drags its feet? The Department of Labor has lawyers who don't bill by the hour. In cases where the employer has agencies that oversee them, defying a federal order becomes very very dicey with openings for enforcement orders or worse from those agencies especially when all things get sent to them by the complainant from start to finish to keep them in the loop as it happens. This risk piles on top of what OSHA does with the objection process to ALJ then ARB for final orders. Then add the insurance coverage burn and their actuaries dislike funding protracted actions.

And here's the kicker: OSHA's bar isn't "beyond a reasonable doubt." It's: Did retaliation likely happen? If yes → merit finding. If merit → orders. If orders → compliance, or the feds step in. They can object to build in delays to bleed out complainants which is normal, but here thats a biiiig risk to defy a federal order with other agencies who have enforcement action are watching, like NCUA.

So next time you hear "merit finding," just know it's not a suggestion. It's a legally binding federal directive with teeth. 🦷⚖️

Merit finding isn't a warning shot. It's the law, in black and white. Comply or get steamrolled. 🚦⚖️

#WhistleblowerProtection #ComplianceHasConsequences #ReceiptsMatter

Brittany Baker
1h ·

People sometimes forget just how rare an OSHA merit finding really is. It's not routine — it's lightning-strike rare. ⚡

📊 Thousands of whistleblower complaints hit OSHA every year. Most get tossed at the door for being late, incomplete, or outside the statute.
📊 Only a slim fraction even make it to the "reasonable cause" stage.
📊 And merit findings? They're less than 1% of all filings. To put that in perspective: you're more likely to be struck by lightning or bitten by a shark than to see one. 🦈

That's why when merit lands, it's a seismic shift. It doesn't just mean "retaliation happened." It means reinstatement orders, back pay, damages, and federal enforcement power all drop at once. So merit is always the goal, and for me it's simply in OSHA's hands to decide now, I've already front-loaded enough of my evidence months ago to overcome the common issues and have more held back just in case it's needed.

Merit isn't a maybe. It's a legally binding directive that can reset careers and rewrite outcomes overnight. If it's objected to, that typically just prolongs the process and increases costs for insurers because the ALJ and ARB don't typically go against the initial merit.

Defense counsels can posture all they want, but the numbers don't lie: merit is rare, it's real, and it changes the game.

#WhistleblowerProtection #Accountability #ReceiptsMatter

Like Comment Share



Brittany Baker
10h ·

Imagine filing a big official response and not even getting the dates straight. 📅✨ Fluff is cheap. Facts are stubborn.

Meanwhile, I'm over here neck-deep in exhibits already submitted, and plenty more saved, ready to go. 📁⚖️

Like Comment Share



Brittany Baker
1h ·

Everyone hears "OSHA complaint" and thinks it's all the same. Nope. The funnel is brutal:

⚖️ ~≈3,500 complaints filed each year
⚖️ Only ~700 (<≈20-25%) survive first screening
⚖️ Fewer than ~300 (<≈10%) get a Cause/Complaint Process (CP) notice
⚖️ Just ≈20–25 a year get a double-statute CP notice (two federal laws at once)
⚖️ Only ~10 a year reach an aggravated certified amendment

📊 Do the math: that's 0.28% of all complaints.
Translation → fewer than 1 in 350 ever make it this far or ≈99.72% get dismissed by now.

So when someone has:
✅ CP notice
✅ Double-statute CP
✅ Aggravated certified amendment...

That's rare, like a lightning strike + shark bite + lottery win combined rare. 🦈⚡🎰

OSHA merit isn't about luck. It's math, receipts, and evidence. And when you're in the <0.5% bracket...the odds already spoke.

#WhistleblowerProtection #Accountability #ReceiptsMatter

👍

Brittany Baker
21h ·

Some people bring vague, contradictory, and unsupported arguments. Others bring proof. Accountability and receipts matter.

Like Comment Share

Comment as Mike Patterson

Brittany Baker
August 22 at 6:59 PM ·

Some processes feel like waiting rooms. You hand over every detail, every timeline, every document... and then you wait.

Not everything needs a loud answer. Sometimes the quiet part is where the truth settles in. Now the last stage of the wait has arrived. Fingers crossed there's a determination in my inbox next week.... I'm ready to get back to work while the 3 and 4 letter agencies handle what comes next.

#Process #Patience #ReceiptsMatter

Like Comment Share



Brittany Baker is with Janet Bowersox at Union County Sportsmen's Club.

43m · Millmont ·

Union County Muzzleloaders this weekend. So of course I use what might be one of my last free week days to go help my mom pack up her stuff to set up..... no reception for a bit so I'm hoping to come out with zero news because that silence means other things are being written and I'm OK with that.









Brittany Baker

1h ·

When the best they can do is a weak story and so far it doesn't even need me to answer back... that silence speaks volumes. Its been a few days and nothing yet asking for me to provide anything else. No questions. No follow-up. Just silence. That's how strong cases look.

#ReceiptsMatter #Accountability

Like Comment Share



Brittany Baker
1h ·

Funny thing about cases like this: defense firms always hope the client and their lawyer are at odds, stretched thin, or out of sync.
Not here.

I've been one step ahead the whole way: prepping rebuttals "just in case," pulling witness statements, drafting reinstatement plans, and keeping counsel looped at every turn. The result? A tight, unified front they can't fracture: she leads, I supply the details.

When this is over, I'll gladly drive the hour down just to deliver a second batch of Eagle Winds' legendary donuts to thank my attorneys' whole office. They've earned them. The other side? They've earned something very different. 🍩⚖️

#WhistleblowerProtection #ReceiptsMatter #Accountability

Like Comment Share



Brittany Baker

56m ·

Following legal advice and still breaking the law is a bold move. 🫠

Here's the thing: legal advice is not a magic shield. If the actions themselves cross the line: retaliation, false statements to federal agents, violations of federal law. It's the actions that carry liability. Especially when the dates used, claims of corrections all made, and situations misquoted dont line up with the documents already submitted 2 months ago.

Courts don't hand out free passes stamped 'but my lawyer said it was fine.' Accountability still lands where it belongs. Generally it lands with the individuals tied to the actions as it should, and thankfully not everyone as a whole.

#Accountability #WhistleblowerProtection #ReceiptsMatter

Like Comment Share



Brittany Baker
4h ·

How accurate, maybe takes a little longer when it involves federal agencies but lack of candor always sees the light of day.





Brittany Baker
1h ·

Silence speaks volumes. 📪 When a weak employer's position statement comes in late... and days roll by without a single rebuttal request... that's telling.

Here's why:

🔹 Willful retaliation triggers = they knew the law prohibited retaliation and did it anyway. Things like:
– Handbook policies that say "no retaliation."
– HR leaders who should know better.
– Emails where "whistleblower" or "retaliation" are spelled out.
– Warnings ignored.

🔹 Aggravated retaliation triggers = it wasn't just one bad act, it was escalation.
– Each time the complaints grew, so did the retaliation.
– Threats, smears, or firing.
– Denying protections even after they were invoked.
– False statements to regulators layered on top.

Those are the boxes investigators look for and each of those words Aggravated and Willful have unique meanings and consequences in the world of whistleblower retaliation complaints. ✔✔✔

I wonder how many of those boxes I've already checked...
I know. Do you? Those words might make an appearance if the agencies agree with me.

#Accountability #ReceiptsMatter #WhistleblowerProtection

Like Comment Share

Brittany Baker
11h ·

Omgggggg I need this in my life only because it is HILARIOUS. Kaleb Daniels does this count as a duck???????

duckylaylamp
Reels · Jul 11 ·




he is me, he is you, he is everyone in their mid 20s 😭

duckylaylamp · Original

3 comments 1 share



he is me, he is you, he is everyone in their mid 20s 😭

ylaylamp · Original audio

3 comments 1 share

Like Comment Share

**Kaleb Daniels**
Geese and Ducks are related. I'll allow it 😂

11h Like Reply 😛

**Brittany Baker**
**Kaleb Daniels** sweeeeet!

10h Like Reply

**Brittany Baker**
I know what someone is getting for Christmas 🤣😂🤣😂🤣😂🤣😂🤣😂🤣😂🤣😂😂🤣

10h Like Reply



Brittany Baker
3h ·

Silence isn't safety. 📪 When OSHA skips rebuttal, every extra day isn't delay, it's more eyes sharpening the order. Stronger. Detailed. Unappealable.

#ReceiptsMatter #Accountability

Like Comment Share



Brittany Baker
14h ·

Happy Labor Day 🇺🇸✨

A short work week ahead, but a meaningful one. Sometimes the quiet weeks are the ones that matter most. When files move and hopefully to bigger more southern offices, reviews happen, and decisions start to take shape.

I'm grateful for all the support I've had through this journey, and for the fact that accountability is never on holiday. Every step, every review, every safeguard exists for a reason.

Here's to resilience, fairness, and the protections that ensure workers can stand up without being pushed down. ⚒️⚖️

#LaborDay #WorkplaceRights #Accountability #Compliance #Fairness #Resilience

Like Comment Share

Brittany Baker
August 31 at 9:21 AM ·

✨ Funny thing about life... ✨

The same traits some people label as "too much", the ADHD hyperfocus, the specific detail recall, the obsession with accountability and accuracy. They turn out to be the very things that make justice possible.

Every email saved, every statute cited, every timeline entry preserved... they weren't quirks. They were receipts.

What some tried to dismiss as inconvenient or "overly intense" is exactly what ensured the truth was documented, protected, and impossible to ignore.

Turns out, the details matter. And so does refusing to back down.

#ReceiptsMatter #Accountability #WhistleblowerProtection #ADHDPower



5:39 92

Brittany Baker

Posts Photos Reels

Brittany Baker
1h ·

Funny thing about investigations...
After an employer files their position statement, investigators usually have questions. Lots of them. Dates to clarify, gaps to fill, contradictions to iron out.

But when there are zero follow-ups? That generally means two things:

1. The case is so weak it's already on the chopping block, and those go fast because holding bad news for the complainant is never the goal.

2. The case is so airtight there's nothing left to ask. No gaps, no questions, nothing needing to be clarified. Why, because it was already provided a long time ago.

Eight business days of silence. No questions. No clarifications. No gaps.

🤔 I wonder which lane I'm in... 🤷‍♀️

#Accountability #Compliance #WorkplaceRights #WhistleblowerProtection #Governance #ReceiptsMatter

Add friend Message ···

Home Friends Reels Marketplace Notifications Profile



Brittany Baker

30m ·

Lunch with Robin Carlin and her parents at Rusty Rail for the afternoon. Whoop whoop. Good use of the silence on business day eleven as my unasked for rebuttal drops just to check a box and move things along.

Like Comment Share

Brittany Baker
15m ·

Always worth remembering..... as defined under federal law....

What is retaliation?
The whistleblower laws that OSHA enforces prohibit employers from retaliating against employees for engaging in activities protected under those laws.

Retaliation occurs when an employer (through a manager, supervisor, or administrator) fires an employee or takes any other type of adverse action against an employee for engaging in protected activity.

WHISTLEBLOWERS.GOV

**Retaliation | Whistleblower Protection Program**



Brittany Baker

17h ·

The truth is like a lion; you don't have to defend it. Let it loose, it will defend itself.' – Augustine. A favorite reminder that transparency always finds its way forward.

Don't pick sides until you know the full story, some people are skillfully good at making others look bad.

**Brittany Baker** is 😆 feeling excited.
September 5 at 6:58 PM · 🌐

✨ Weekend vibes… ✨

It's funny how the rules of the game shift depending on the role you play. For whistleblowers, the law requires clear and convincing evidence, a high standard that demands facts, receipts, and credibility. For employers, all too often the defense is just pretext, narratives built on omissions, half-truths, or after-the-fact spin.

Here's the thing: when you actually have the evidence, "pretextual" excuses crumble faster than Friday afternoon productivity.

So as we roll into the weekend, I'm sipping my coffee with calm confidence. The truth doesn't need polish, it stands on its own. Next week, we'll see where the chips fall.

Wishing everyone a weekend of clarity over pretext. 🌟

#WeekendVibes #TruthMatters #Compliance #Governance #WhistleblowerProtection #EvidenceNotExcuses

👍

Like Comment Share

Comment as Mike Patterson



Brittany Baker
15h ·

The repercussions or penalties for those who instigate, participate, or allow retaliation is not pretty and it can get heavier when NCUA weighs in or the violations reported by the whistleblower are potential felonies themselves.

What are the penalties for retaliation?
Most whistleblower laws require employers to restore the employee through remedies like reinstatement, back pay, and compensatory damages. But in some cases, retaliation can go further:

Civil penalties: Employers can be ordered to pay damages, legal fees, and in some statutes, fines.

Individual liability: Managers and executives who retaliate may face personal financial exposure.

Criminal penalties: Under federal law (18 U.S.C. § 1513), it is a crime to retaliate against someone for providing information about a federal offense. Penalties can include heavy fines or even imprisonment of up to 10 years.

Obstruction of justice: Threats, intimidation, or lying to regulators during an investigation can also lead to separate criminal charges.

👉 Retaliation isn't just a workplace issue — under federal law, it can carry serious civil and criminal consequences.

WHISTLEBLOWERS.GOV

**Retaliation | Whistleblower Protection Program**



Brittany Baker

21h ·

What is adverse action?
An adverse action is any action taken by an employer that could discourage a reasonable person from engaging in protected activity.

Examples include:

Firing or laying off

Demotion or cutting pay/benefits

Discipline or negative evaluations

Threats, intimidation, or harassment

Blacklisting or damaging reputation

Adverse action is the "punishment" side of retaliation — the law protects employees from both.

WHISTLEBLOWERS.GOV

**Retaliation | Whistleblower Protection Program**

Like Comment Share

Brittany Baker
September 8 at 9:52 PM ·

What is protected activity?
The whistleblower laws that OSHA enforces protect employees who report violations of law, fraud, unsafe practices, or other misconduct.
Protected activity includes things like:

Reporting suspected violations internally or to a regulator

Participating in an investigation

Refusing to participate in unlawful conduct

Employees are shielded from retaliation for engaging in these activities — even if their concerns turn out to be mistaken, as long as they are raised in good faith.

👉 Knowing what qualifies as "protected activity" is the foundation of your rights.

WHISTLEBLOWERS.GOV
**Retaliation | Whistleblower Protection Program**

Like Comment Share

Brittany Baker
2h ·

Holding steady.
Somewhere south, the gears are grinding, the pages are flipping, and the silence is... delicious.

Vindication doesn't need a spotlight to do its work, it just needs time. And when it comes back around, it won't be with whispers, but with clarity.

In the meantime, I'm enjoying the view from the high ground. Confidence isn't noise, it's patience backed by truth.

#Vindication #Accountability #WhistleblowerProtection #Confidence #Compliance #Governance




Like Comment Share



Brittany Baker

1h ·

Some things in life aren't for sale. Silence before vindication is one of them. Merit first, always. 🚫 💰 #WhistleblowerRights #MeritMatters

Like Comment Share



Brittany Baker
1h ·

BD16. That's 16 business days of silence since the other side had their chance. Silence isn't weakness, it's the sound of odds increasing to near 100% that something big is being drafted. ⏳
#MeritCountdown

Like Comment Share



Brittany Baker
September 13 at 8:47 AM ·

Most cases fall under one whistleblower statute. Mine? Two. Double statutes = double protection. It's unusual, but so is standing your ground when it counts. #SOX #CFPA #Accountability

Like Comment Share

Brittany Baker

20h ·

My job isn't for sale. My rights aren't for sale. My voice isn't for sale. Bullies tried it, they failed, never again. #ReinstatedPotential #Unstoppable

Like Comment Share

Comment as Mike Patterson

Brittany Baker

September 13 at 8:49 PM ·

When compliance meets courage, sometimes new precedent is born. Credit unions and executives aren't exempt from accountability just because of their title, and soon that may be written into history. #WhistleblowerProtection #SOX

Like Comment Share



Brittany Baker

13h ·

'Willful' isn't just a word that OSHA can use in a Whistleblower merit finding, it has a specific meaning, a legal standard. To OSHA, NCUA, and DOJ, it means retaliation wasn't an accident, it was intentional. And intentional wrongdoing has consequences.

In my case, I even warned them that retaliation was illegal and carried consequences. They knew better, knew it was against the law, and chose to break the law anyway. That's exactly... **See more**

Like Comment Share



Brittany Baker
1h ·

‘Aggravated’ isn’t just a mood, it’s a legal classification.
When OSHA calls conduct aggravated, it means the wrongdoing wasn’t just intentional, it was egregious, so bad it has the potential to multiply the liability and the consequences. It didn’t happen once, maybe not even twice, but over and over and over again.

In plain terms: aggravated = beyond careless, beyond reckless, straight into “you knew better, you knew it was illegal, and you did it anyway at a level that shocks the conscience.”

So when Hobson’s Choice meets declining applications, meets ignoring direct retaliation warnings, meets termination, meets replacement, meets amended complaints… They didn’t just break the law, they possibly did it in a way that compounds their exposure.

Aggravated conduct means heavier penalties, harsher scrutiny, and zero sympathy from regulators.

#Accountability

Like Comment Share



Brittany Baker
15h ·

'Bad Faith' isn't just a figure of speech, it's a legal escalation of actions.
When OSHA calls conduct bad faith, it means the employer didn't just retaliate... they did it dishonestly, with an intent to deceive, cover up, or manipulate the process.

In plain terms: bad faith = not only breaking the rules, but stacking the deck while pretending to play fair. Pretending there are choices and options or things done above board but systematically doing the opposite behind closed doors.

So when false explanations replace facts, when shifting stories take the place of evidence, when key documents go missing or are omitted, when timelines are bent to fit excuses... that's not just sloppy, that's bad faith.

Bad faith conduct cuts against credibility, destroys defenses, and adds weight to penalties.
Regulators treat it as proof the employer can't be trusted.

#Accountability

Like Comment Share

Brittany Baker
10h ·

😂🤣😂🤣

Jackie Sullivan · Follow
Reels · Sep 7 ·




Last Breath Creed · One

Brittany Baker
14h ·

When the decision comes and it lands like the landslide you hope it will be some people take a payout to walk away. Me? I'm planning on walking back in, ready to lead, ready to fix, ready to move us forward. No shortcuts, no sellouts.

Like Comment Share

Comment as Mike Patterson

Brittany Baker
22h ·

'Obstruction' isn't just being difficult, it's a legal escalation all on its own.

When OSHA or DOJ call conduct obstruction, it means the employer didn't just retaliate, they actively tried to interfere with the investigation. That's crossing into "hide the evidence, twist the record, stall the process" territory.

In plain terms: obstruction = throwing sand in the gears to keep the truth from coming out.... **See more**

Like Comment Share

Brittany Baker
1h ·

Some rhythms are predictable if you know where to look.

OSHA doesn't just drop decisions at random, there's a cadence. Merit findings often land midweek, Tuesday through Thursday, and while a lightning-fast turnaround is possible, the more typical track takes about five weeks of polishing and review before it's ready especially when it has multiple sets of eyes on it as I suspect this does. Manuals, studies, articles, and DOL announcements are fairly transparent in the process if you know what to read and who to ask.

At the end of the day, I'm looking ahead to next week with cautious optimism and eager anticipation. The process isn't stalled, it's moving the way it usually does when something serious is on the table. The more serious the situations.... the longer it takes. Utter silence for 4 solid weeks is a very telling indicator and even more so when coupled with no ask for rebuttal, follow up interviews, clarifications, or witness interviews. That's a real humdinger, but not for me. Instead we had a hoot of a time just giving them a rebuttal voluntarily for funsies and extra. Its almost like they weren't even needed, isn't that snazzy? 🤷‍♀️😭

Patience, persistence, and accountability. The rest will follow in its own time.

#WhistleblowerProtection #Accountability #Compliance #Governance

Like Comment Share



Brittany Baker

September 19 at 5:51 PM ·

Why does this remind me of Burns and I? Total opposites but somehow the friendship works 😂🤣. Can't wait to annoy him again, if everything lines up with merit and my clear intent for full reinstatement.



Brittany Baker
September 20 at 9:12 AM ·

Every org has policies. Every org has procedures. But when those rules are "optional" for the chosen few, HR stops being human resources and becomes hostage resources.
I didn't play along. I won't.

You'd be amazed how many witness statements existed before I ever walked in the door that told the same story: the problem wasn't new, it was ignored. It was shared with those that were the problem like it was a joke instead of wrong and perpetuated or even exacerbated the problem.
Ignore it once? Shame.
Ignore it twice? Liability.
Ignore it for years? Retaliation waiting to happen.
#WhistleblowerProtection #NoMoreCoverUps

Brittany Baker
September 20 at 6:22 PM ·

Ah Ah Amanda whats my favorite question of the day?????? Lol!




😛

Like Comment Share



Brittany Baker

September 21 at 7:10 PM ·

Pressure doesn't crush me, it sharpens me.
Every move forward is inevitable.
I don't wait for doors, I walk through them.

Can't wait to see if this week brings any clarity to the situation, might be a tad too early in the process but it is getting to that sweet spot.

#Leadership #Resilience

Like Comment Share

Brittany Baker
17h ·

Funny how HR is supposed to be a safeguard, but sometimes it's just a shield... for the wrong people.

When "compliance" means silence, when "support" means cover-up, that's not HR, that's a liability.
And liabilities get exposed.

Compromise is great... until it's HR's integrity.
When HR exists only to "protect leadership optics" instead of protecting employees, the whole system is compromised. Some of us refuse to stand down when rules get trampled.
And that refusal? It's called accountability.
#Leadership #Compliance

3 comments

Like Comment Share

**Stephanie Best**
Ah, now it's making more sense! 😆
18h Like Reply

**Brittany Baker**
**Stephanie Best** lol I am innocent and sweet, only pointing out the obvious
13h Like Reply

**Alyshia Heimbach**
Hr is there to protect the company not the employees my hr works from home.... how does that work for an employee 🤔
1h Like Reply



Brittany Baker
12h ·

The louder they tried to bury the truth,
the clearer it became.

I don't bluff. I don't bend. I don't quit.

#Accountability #Strength

Like Comment Share



Brittany Baker

September 19 at 3:53 PM ·

It's a hoot how some people say they've 'never had a bad day in their life', maybe because they hand their bad days to everyone else to carry. Accountability has a way of evening that out.

Like Comment Share

Brittany Baker

September 23 at 11:18 AM ·

They thought silence would break me.
Instead, silence became the fuel.
I'm not backing down, I'm only just getting started.

Week 5 and business day 23 is almost over.... it's right around the time cases tend to magically pop back out of that OSHA silence void. The longer it takes, the more eyes on it and typically the more structured and appeal proof the wording becomes.... **See more**

Like Comment Share

Brittany Baker
Yesterday at 11:46 AM ·

Silence doesn't mean nothing's happening. Sometimes it means the weight of accountability is being sharpened behind the curtain. Five weeks of quiet only makes the noise louder when it lands.

Typical cadence is 5 to 7 weeks but the stronger it is the longer it takes and then add the potential shutdown next week... down side of waiting on the government agencies to do their thing. It's fine because justice and accountability matter, whenever they come... they just shine lights onto the things some wished would have been swept under the rug with fake charisma and charm but no real substance or help to the teams.

#Accountability #WhistleblowerProtection #Persistence

Like Comment Share

Brittany Baker
4h ·

Sometimes progress looks like... five scoops of mulch. 🌱

My attorney is out on vacation this week, which means OSHA movement is on pause until at least next week. That's normal, these cases often run on a cadence of weeks, not days. The silence isn't a setback; it's just part of the process.

So for now, I'm focusing on the kind of progress you can see and feel in the moment: fresh mulch, a little sunshine (optional today clearly lol), and the reminder that patience is still progress.

#WhistleblowerProtection #Persistence #Accountability #Patience #OSHA

3 comments

Like Comment Share

**Beatrice Ross-Mulford** ···



4h Like Reply

**Trudy Persavage**
You are blessed with patience and thank goodness for that! Impatience is a curse.

4h Like Reply

**Brittany Baker**
**Trudy Persavage** oh I am VERRRRRRRY impatient but what helps is reading their manual, reading other published cases, analyzing their normal cadence and behaviors. It gives me a good outlook on how they operate.

3h Like Reply



Brittany Baker

1h ·

Merit lands first, no shortcuts.
Silence money before that? Off the table.
My job is worth the fight, all the way, just like the statutes provide for.
The LinkedIn roster is curated for impact, and anyone ignoring agency orders risks more than headlines, they risk bondability.
I don't predict outcomes, but I'm confident in where this is headed.

Like Comment Share

Brittany Baker

September 27 at 9:34 AM ·

I'm patient, and confident merit will land.
But the longer it drags, the greater the bondability and headline risks.
Ignoring orders isn't just delay, under safety and soundness, it's a bigger risk than any settlement.

Like Comment Share

Brittany Baker
September 27 at 6:55 PM ·

First comes the closing conference, then compliance.
The alternative? Federal filings in the public record and bondability risks under governance scrutiny.
If they're smart, they'll push for the former before they're forced into the latter.
Merit first, settlement second, and who runs with the story in between is up to them.

Merit isn't optional, delay only trades time for headlines, filings, and the not very pretty bondability risk.

Like Comment Share



Brittany Baker
20h ·

Governance isn't a shield if federal orders are ignored once they are issued. It's a spotlight. And the longer they wait, the brighter it gets.

Especially when those over governance have been apprised of everything all along. Forwarded emails, sworn and notarized statements, witness statements, all the things....

The things said on letterhead from the prior JV team .... oh man.... they were.... truly inspiring.... and cc'd to the very regulators who could see it as a part of potential pattern of governance failure is chef's kiss. Truly it was super cute, made me giggle, personally my fav especially not having to submit it myself or need it for OSHA.... yet....

If I were anyone but me I would be wondering what else hasn't been submitted yet, was the front-loaded evidence only like 10% of total archive, 20%, 50%.... who knows?!?!

Then add that someone has been REAL bored so matching unique triggers for multi-year stacking has become a game, are they still double digits or have they crested into treble, I mean triple digits?!?!

Like Comment Share

Brittany Baker
11h ·

Conference = controlled, then we can talk. Federal filings = public, and I won't entertain settlement until vindication is on record.

That's just how it will shake out. I've been through litigation and delays to drag things out in attempts to bleed me out, and I just hunkered down, held the line, and made friends with the local reporters who covered the story. In the Sunshine Act case with the school board, I didn't ask for a payout... just accountability, turnover, and reimbursement of what I spent. Accountability is what matters, always. This one means even more, which means I have a lot more stubborn willpower, and I will stay through until the bitter end. I'm not afraid of how noisy it can get, are you?

1 comment

Like Comment Share

**Diedrich Farber III**
I know you will stay the course 👍

1h Like Reply



Brittany Baker
3h ·

A closing conference isn't delay, it's due process. I don't do pre-merit shortcuts, accountability and vindication first, talks second. Objections with a side of compliance? Fine, preserve your options. But the only door to settlement opens after merit and order compliance. Skip straight to filings and you're in public record on day one, with discovery I've had neatly cataloged with dates, subject, and evidence #. That's not strategy, that's safety-and-soundness roulette with something as sacred as bondability, tsk tsk tsk.

Like Comment Share

Brittany Baker
12h ·

Conference, compliance, then conversations. I won't touch settlement before vindication. Federal filings, bondability risk, and headline news are the messy alternatives...but I'm game if that's how we have to play it. My LinkedIn roster wasn't built by accident; it's a handcrafted bench, carved piece by piece for exactly this moment. Plenty of seats, and they're already filled, might need to build a bigger stadium? With 80+ new connections in September alone it is getting a little crowded 😉





Brittany Baker

1h ·

Merit first, conference next, compliance with orders third. The only way I even come to a settlement table is after that. Skipping straight to filings just stacks up headlines and bondability questions.

My job is not and never was for sale, my integrity and accountability never was and never will be for sale.

Like Comment Share



Brittany Baker
3h ·

It will be real cute when management has to explain to everyone why I am legally a whistleblower after refusing to accept violations and liability for issues I brought up, and why my "restructure" and "demotional" opportunities ignored my stated protections.

Why my eventual firing after refusing to "shut up and sit down" and step down as well as applying for the very job that replaced mine, followed the handbook to the letter PLUS even OSHA makes it clear: reporting issues INTERNALLY is just as protected as going to an outside agency,  retaliation for either is illegal. Also having reported to what... 8 EIGHT agencies BEFORE (yuppppp before)....during....and after it was all brought up....multiple times.... fits the very definition of whistleblower retaliation under OSHA.

“The whistleblower laws that OSHA enforces prohibit employers from retaliating against employees for engaging in activities protected under those laws. Retaliation occurs when an employer ... fires an employee or takes any other type of adverse action against an employee for engaging in protected activity.”

“An adverse action is an action which would dissuade a reasonable employee from raising a concern about a possible violation or engaging in other related protected activity.”

Examples OSHA gives: firing, demoting, denying overtime or promotion, disciplining, denying benefits, intimidation or harassment, reassignment to less desirable position, excluding from meetings, ostracizing, constructive discharge.

Source: https://www.whistleblowers.gov/know_your_rights

“It is illegal for an employer to fire, demote, transfer or otherwise retaliate against a worker who complains to OSHA ... uses their legal rights.”

Source: https://www.osha.gov/workers

Feels like textbook retaliation to me.... what do you think?!

Brittany Baker
4h ·

Mom, Hedgie, and I are off to Quantico for the 6th Marine Division reunion as family of one of their former members and former President.





Brittany Baker

11h ·

Rounding out September the right way... adding a little extra firepower to the LinkedIn network.🔥

Nothing like a new connection being a whistleblower attorney who knows their way around Sarbanes-Oxley, Dodd-Frank, and governance.

Just dialing up the stage, because if you thought the pre-show was loud, wait until the main act drops with a curated audience. 🎤

#Accountability #WhistleblowerProtection #Governance

Like Comment Share

# EXHIBIT 3

## Horizon Manager Performance Appraisal

**Name: Brittany Baker** **Job Title: Director of Lending**

**Supervisor: Denise Lariviere** **From: Sep 2023 To: Dec 2023**

**Scoring Scale**

| | |
|---|---|
| 1 | Does not demonstrate |
| 2 | Below Expectations |
| 3 | Meets Expectations |
| 4 | Exceeds Expectations |
| 5 | Extraordinary |

**Knowledge & Skill**

| Evidence of job knowledge, responsibilities, products/services to succeed in their role | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 5 | 10 | 50 |

**Comments:** Brittany has a vast depth and breadth of knowledge in the financial services industry in both the commercial and credit union segments. She spends a significant amount of time staying relevant on regulations, market trends, compliance, and legislative topics. Since joining Horizon, she immersed herself, learning every aspect of our Core and ancillary systems (Ring Central, EOscar, Loan Director, Open/Close, BAI, ...to name a few) and is the most proficient query developer. She uses these skills to uncover opportunities to improve data integrity, regulatory compliance, and quality control.

Her expertise led to her year end promotion to Chief Lending Officer.

These skills were utilized in completing the following projects this period:

- Mortgage Profitability
- Commercial Policy Review
- Business Debit Card Cleanup
- Loan QC Reporting
- Lending Procedure development

**Quality**

| Measure how accurately and efficiently emp. performs job duties to achieve their goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 15 | 45 |

**Comments:**

Consumer Lending: 61% of T3 Loan Production Goal Achieved, 77% (Goal 60%) for GAP, 46% (Goal 45%) for Debt Protection

Consumer YTD: 80% Origination, 76% GAP, 44% DP

Mortgage Lending: 60.6% of T3 Production Goal = YTD 49%

Credit Solutions: .99% YTD delinquency, .23% YTD Charge off ratio. – Excellent job decreasing both over the prior months.

We adjusted budgeted numbers earlier this year to reflect the unanticipated economic rate environment impacting our results. Branches had staffing stabilized by year end, but Mortgage Lending suffered with vacancy and new hire training throughout the period. Despite these challenges, our Loan Balances are slightly above target and Net Income for the organization is above budget with interest income on booked loans above target.

**Teamwork**

| Evidence of working harmoniously with team members to achieve common goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 10 | 30 |

**Comment**
Brittany always has a willingness to help. We have found that accepting additional responsibilities can, at times, cause undo stress that can manifest into frustrations that impact her behaviors that can be impulsive and/or negative. Brittany has identified and will be working with Tom Glatt on various behaviors that can help her improve.

**Service**

| Evidence of providing exceptional service to internal/external members | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 5 | 10 | 50 |

**Comments:** Brittany continues to share her expertise with all areas of the organization. She is very responsive in all channels of communication, actively recognizes others successes and milestones in Heidi (monthly) across the organization.
For this period:

- Facilitated 2 Share One tabs training
- Facilitated 3 Lending classes
- Assisted HR with BAI testing
- Updated several Consumer Lending policies and procedures with Amanda
- Providing the rate change analysis with recommendations for Justin
    - …………to name a few

**Brand Awareness**

| Evidence of embracing Horizon's brand and culture and demonstrating core values. | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 5 | 15 | 75 |

**Comments:**

- Muncy Reality Fair
- UN Conference
- Several outside volunteer hours with other organizations

**Internal Development**

| | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| Taking advantage of internal and/or external resources to enhance knowledge and skills. | 5 | 10 | 50 |

**Comments:** As mentioned in other areas of this review, Brittany is a continuous learner that faithfully keeps engaged in the learning process.
This period:

- Completed 140 BAI training for content review
- Attended Expand Expo and ACUMA conference

**Leadership**

| | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| Evidence of providing direction, displaying innovative ideas and staff development. Ability to make decisions and problem solve. | 4 | 20 | 80 |

**Comments:** Brittany 's lending teams are thriving under her leadership and coaching.

- Team results from Credit Solutions have improved, Becky has improved her problem solving skills, and ability to hold Katie accountable.
- Brittany has been working closely with Jackie on communication and coaching the RE Lending team. They worked together to fill 2 Mortgage Lending positions, and has provided Jackie direction on identifying optional mortgage partners.
- Brittany has worked with Amanda on team efficiencies, reporting, compliance, procedural development and behavioral changes of staff through effective coaching.

**Goal #1 – Completion of Insurance Type Clean Up**

| | Rating (1-5) | Weight (Max total is 10) | Points (Rating x Weight) |
|---|---|---|---|
| Assigned prior to rating period. Maximum weight for both goals is 10. If 1 goal only weight is x 10 | 5 | 5 | 25 |

**Comments:** Using her impeccable query skills, Brittany dug into accounts to identify the policies that we have active and focus on data clean up. This was completed by period end.

**Goal #2 – Conversion to Fortegra**

| | Rating (1-5) | Weight (Max total is 10) | Points (Rating x Weight) |
|---|---|---|---|
| Assigned prior to rating period. Maximum weight for both goals is 10. If 2 goals weight of each is x 5 | 5 | 5 | 25 |

| |
|---|
| **Comments**: Brttany worked closely with Lee & Mason in the process of mapping DP policies in the anticipation of moving to Fortegra. The final step to convert was delayed into January, 2024 due to delayed contract negotiations which Brittany was not responsible for. |

| | |
|---|---|
| **Employee Current Period Score**<br>**Sum all points/ 100**<br>**If new employee: Sum all points/90 and set goals for next evaluation** | 4.30 |

| | |
|---|---|
| **Employee Year to Date Score** | T1= 3.70, T2= 4.35, T3= 4.30 = YTD = 4.12 |

**Overall Comments**

Brittany has been a tremendous asset to Horizon. Her leadership has supported the improvements realized across her lending teams. Her accomplishments were recognized in her promotion to Chief Lending Officer. I enjoy collaborating with Brittany and look forward to working on our shared mission and vision for the organization.

**Employee Development Plan**

**Employee Goals for Next Period. Must be quantitative, with detailed information.**

**Goal #1** ~~**Completion of Insurance types clean up**~~

See attached

**Goal #2** ~~**Working with L&M to successfully covert to Fortegra**~~

a. Core Switch
    i. To Do:
        1. Recruit project team
        2. Create and Develop a Detailed Project Plan to ensure all areas of the project are tackled for a smooth transition
        3. Outline dates on the project plan to ensure each task is completed timely and project is organized
        4. Work with marketing to have a communication plan outlines for members and deliverables
        5. With project team outline a communication schedule for staff to keep them informed of the transition and tentative training dates/topics
        6. Schedule regular project team meetings
        7. Marketing should have themed outline for the core with pieces of some marketing items in development
    ii. In Process:
        1. Assist with selection of Core
    iii. Done:
    iv. Extras Completed Toward Goal:
b. Commercial Program
    i. To Do:
        1. Commercial Systems Lending Training for products, process, and systems
        2. Create lending products in Share One to test products for the 7 products we will initially offer.
        3. Work with Accounting to have the product GLs set up for each product, branch, and fees
        4. Break out the commercial policy/procedure from BAFS into HFCU formatted policies
        5. Gain board approval for the commercial policies.
        6. Break out the commercial procedures from BAFS and into HFCU formatted procedures for compliance review and upload to Heidi
        7. Create and test rate sheet for commercial products with input and review by partners and external sources for pricing validation.
        8. Outline the ancillary services we will offer to our commercial members
    ii. In Process:
        1. Commercial Deposit Training to staff- scheduled with Denise for Manager and conference room is reserved for February 14th.
    iii. Done:

| **Employee Comments** |
|---|
| |

**Supervisor Signature:** Denise A. Lamme **Date:** 2/6/24

With my signature, I attest I have received this performance appraisal from my supervisor.
I have had sufficient opportunity to provide my comments in the above area.

**Employee Signature:** [signature] **Date:** 2/6/24

This performance appraisal is not to be construed as an employee contract and does not alter the Employment-AT-Will relationship in any way,

# EXHIBIT 4

## Horizon Manager Performance Appraisal

**Name:** ____**Brittany Baker**_____________ **Job Title:** __**Chief Lending Officer**_______

**Supervisor:** ___**Justin Howard**___________ **From:** __**1/1/2024**__ **To:** __**4/30/2024**__

**Scoring Scale**

| | |
|---|---|
| 1 | Does not demonstrate |
| 2 | Below Expectations |
| 3 | Meets Expectations |
| 4 | Exceeds Expectations |
| 5 | Extraordinary |

**Knowledge & Skill**

| Evidence of job knowledge, responsibilities, products/services to succeed in their role | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 4 | 10 | 40 |

**Comments:** Brittany has exceptional knowledge in most of her areas and with regulations. She is currently working on expanding her knowledge of mortgages and it hasn't stopped her yet from being able to oversee that area. She has a tremendous amount of knowledge on the commercial side. There is a lot of familiarity surrounding our policies and procedures even though she has only been here roughly 3 years. She is also very strong on computer applications and the ability to utilize them to get the data and information she needs. The area of opportunity here is communicating both verbally and in writing in a professional manner. There are times and instances when communication is not done professionally like the email to me when she thought I was providing feedback and there was other people on the email chain and the discussion in the management meeting around brand awareness & community involvement.

**Quality**

| Measure how accurately and efficiently emp. Performs job duties to achieve their goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 15 | 45 |

**Comments:** Brittany does an excellent job at tackling her job, projects, and goals with a high level of accuracy. This past trimester, we had the implementation of a new mortgage partner with Owners Choice, launching BAFS for commercial lending, updated reports for lending & collections, etc. There are numerous times where she seems to spread herself too thin and working on too many items at once. Multi-tasking is okay for low intensity and less thought-provoking tasks, and it isn't for more complex and strategic work. Being able to focus for periods of time on certain activities will elevate the end result. Also, taking on less at any time so one's plate of responsibility doesn't overflow creates the environment for improved health, lower stress, and happiness. Delegation has improved with Brittany and there is some opportunity to do this at a higher level to grow team members and keep focuses on the crucial tasks.

**Teamwork**

| Evidence of working harmoniously with team members to achieve common goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 10 | 30 |

**Comments:** Over this past trimester, Brittany routinely stepped up to assist team members. This can be seen with phone calls, trainings, branch support, community events, and community seminars. Brittany suggests ideas for improving the credit union from the remote work policy discussion and collection ideas, like switching our attorney. The creating a harmonious work environment is an area to work on as the work environment or working relationships are sometimes thrown into turbulence with ineffective communication, a lack of communication with tact, lack of trust with other people, and/or own opinion on how things should be done. Brittany did a great job overseeing debt protection and gap this past trimester. Debt protection has seen improvement and just missed goal being at 42%. Gap is rockin it at 82% and well above goal. On the flip side we did miss on both origination goals with consumer being behind about $1 million and mortgage being behind $2 million.

**Service**

| Evidence of providing exceptional service to internal/external members | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 4 | 10 | 40 |

**Comments:** Brittany is exceptional at service. She follows-up in a timely manner with clear and direct responses. She does an exceptional job at trouble-shooting issues when it came to increase phone calls from the card transition and figuring out issues/complaints from members. Routinely Brittany can be heard talking to team members to answer questions as she makes herself available.

**Brand Awareness**

| Evidence of embracing Horizon's brand and culture and demonstrating core values. | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 2 | 15 | 30 |

**Comments:** I believe this is the area with the most opportunities for professional growth. Brittany will get the results that we want no matter what it takes, and it must be kept in mind that the journey and how we get the results are just as important as the results. Her work ethic, drive, and perseverance are impressive. There are times that a lack of impulse control is evident, and Brittany just starts talking about a topic, sharing thoughts, and/or taking over a discussion when it is not the right time or place to do so. An example of this is the management meeting where we started discussing community involvement. Brittany got very engaged in the discussion and immediately jumped in with numerous points. I feel that she was passionate about the topic and her viewpoints, which is good. The concern is she kept going and going, sometimes cutting off Justin and Mike P. which caused others around the room to not engage due to the emotional charged discussion. I want leaders to share their viewpoints and do it in a way that fosters conversation and engages others to join in, not shut down the conversation. This is a time were controlling the impulse to speak was needed so others could engage and give time to think about not only what to say but also how to say it. Impulse control may also be needed when presented with something to-do, a question, etc. to assist in not bouncing around topics/tasks and focus with what is at hand. Another area is coming to judgements without all the facts or listening to other opinions and not wanting to understand other perspectives. A few times this has happened with me where I felt after the interaction that Brittany must hate me and/or I was concerned with what is going to happen next as I thought the conversation wasn't over with and Brittany would circle back with the same or more

| |
|---|
| intensity than she had previously. An example of one of these conversations was talking to Lori about the call recording which caught her off-guard as there hadn't been a conversation with Denise as of yet. When it comes to community involvement, Brittany is a role model of what is expected. She participated at the home show, shred day, financial reality fairs for Horizon. She also was involved in multiple non-profits and causes like dog rescue, Rotary, etc. |

**Internal Development**

| Taking advantage of internal and/or external resources to enhance knowledge and skills. | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 4 | 10 | 40 |
| **Comments:** Brittany is constantly expanding her knowledge and taking in education. There have been numerous webinars she has participated in, core demos by traveling to other credit unions to learn about the system while in action, and various trainings she has been a part of. She has also been reading books that Tom Glatt wanted us to review as a senior team. She also stays on top of reading industry news as I have gotten emails about banks closing, credit union blogs with content and her thoughts about it, economic trends, etc. The one area I would like to see is just not only the knowledge expanding and gaining new ideas but also some skill/behavior changes to improve impact. | | | |

**Leadership**

| Evidence of providing direction, displaying innovative ideas and staff development. Ability to make decisions and problem solve. | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 20 | 60 |
| **Comments:** Brittany does a top-notch job with her direct reports. When a direct report needs something, she is on top of providing it. She routinely does 1-on-1's and I like the observation days that she has discussed with me. Most recently, she has spent time with Becky at Third Street. Brittany is also seen as an SME (subject matter expert) as she has conducted numerous trainings this past trimester. What I would really like to see with Brittany is a pause and reflection of what she can control and knowing what she knows now, what would be done differently when we are talking about how to improve something or when something didn't go as planned. As soon as I stop talking or sometimes, I am still talking, I will start hearing a list of why it was done that way which at the end of the day are excuses because we eventually get to whatever it was could have been done better by doing x, y, and z. This has also happened in meetings where no one engaged in the conversation long enough to get to that point, and we just moved on. I trust Brittany's abilities, so I just naturally assume she did the best job or made the best decision possible with what was known at the time. It is more of, what can we learn from this for the future. | | | |

**Goal #1**

| Core Transition | Rating (1-5) | Weight (Max total is 10) | Points (Rating x Weight) |
|---|---|---|---|
| | 5 | 5 | 25 |
| **Comments:** Brittany has done all she can with this project since a contract has not been signed yet. She has partaken in core demos, developed a communication plan, and reached out to a project team to keep them in the loop. She has been instrumental in the process and her insights have been valuable in deciding that when we thought we got down to a top 2, that neither were viable options so lets keep looking. | | | |

**Goal #2**

| Commercial Project | **Rating (1-5)** | **Weight (Max total is 10)** | **Points (Rating x Weight)** |
|---|---|---|---|
| | 5 | 5 | 25 |

**Comments:** Over the past trimester Brittany worked on policies, procedures, and forms for our business lending rollout. Training has occurred. We have our first commercial loans in the pipeline. I am really looking forward to getting our services determined so we can start advertising our suite of commercial offerings.

| | |
|---|---|
| **Employee Current Period Score**<br>**Sum all points/ 100** | 335/100 = 3.35% |

| | |
|---|---|
| **Employee Year to Date Score** | P1 = 3.35%, P2 =%, P3 =%: Avg: 3.35% |

**Overall Comments:** I enjoy working with Brittany because of her knowledge, tenacity, work ethic, and thought process. We have some of the most thought provoking and brainstorming conversations out of anyone I get to talk to which is exciting for me. What I would like to see Brittany work on is gaining a self-confidence in herself, a slowdown in what she takes on so she doesn't impact her health or cause burnout, a greater impulse control over her reactions and communication, and working to build trust and relationships across the organization with team members. There are times I feel she is trying to take on the world to prove herself when she shouldn't have anything to prove because of what she has already accomplished. I admire her and wish I had some of our capabilities which I would hope she can see in herself. Based upon who she is, what she has done, and what I know she can do; I trust her completely and appreciate having her on the team. Horizon is very fortunate to have her on the team striving to achieve our Vision and Mission.

**Employee Development Plan**

**Employee Goals for Next Period. Must be quantitative, with detailed information.**

**Goal #1 Commercial Ancillary Services –** Identify which services we will offer to business members. Review potential partners and select partners for various services. Work on pricing for each service to capture market share and being very competitive while generating additional income for Horizon. Partner with marketing to update website with all the new business program information from deposits, lending, and services; have an date to launch. Have a communication plan for staff to discuss the rollout of business. Keep in mind that a marketing push will occur September of 2025 and go into the first half of 2026.

**Goal #2 Mortgage Strategic Plan –** Develop a strategic plan for our mortgage department to add partners, new products, staff training as needed, pricing & fees outlined, development of a referral pipeline driven by our branches, member engagement, & consumer loan processing, and outline

mortgage production in upcoming years. By the end of the trimester, be working on the implementation of new mortgage partners.

**Employee Comments**

**Supervisor Signature:** [signature] **Date:** 5-28-2024

With my signature, I attest I have received this performance appraisal from my supervisor. I have had sufficient opportunity to provide my comments in the above area.

**Employee Signature:** [signature] **Date:** 5/28/24

This performance appraisal is not to be construed as an employee contract and does not alter the Employment-AT-Will relationship in any way,

# EXHIBIT 5

## Horizon Manager Performance Appraisal

**Name:** ____Brittany Baker_____________ **Job Title:** __Chief Lending Officer_______

**Supervisor:** ___Justin Howard___________ **From:** __5/1/2024__ **To:** __8/31/2024__

**Scoring Scale**

| | |
|---|---|
| 1 | Does not demonstrate |
| 2 | Below Expectations |
| 3 | Meets Expectations |
| 4 | Exceeds Expectations |
| 5 | Extraordinary |

**Knowledge & Skill**

| Evidence of job knowledge, responsibilities, products/services to succeed in their role | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 10 | 30 |

**Comments:** Brittany is fulfilling a large segment of her job description at a high level. Keeping policies and procedures updated for lending is top-notch. She is excellent at the operational integrity of the lending function here at Horizon. Employee development and goal setting is great. It is the softer skill side of the job description, like being an ambassador of the brand/culture that still needs to be developed when it comes to negativity at times, taking too much on, and communication between others at the credit union. Brittany is very strong at knowing our products and services, hence she does very well at referring. There are superior skills at computer applications and software needed to do her role. Verbal and written communication needs improvement for tone and professionalism.

**Quality**

| Measure how accurately and efficiently emp. Performs job duties to achieve their goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 15 | 45 |

**Comments:** I believe that Brittany and her team perform their work at a high level that is accurate. I was very impressed with the mortgage strategic plan and the thoroughness of it. Efficiently performing job duties over the past trimester is an area that was discussed due to the numerous times Brittany shared in meetings, 1-on-1 discussions, overheard with others, etc. that she was too busy. This is an area that has seen improvement towards the end of the trimester and during the 1st week of September.

**Teamwork**

| Evidence of working harmoniously with team members to achieve common goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 2 | 10 | 20 |

**Comments:** Brittany does an exceptional job with her willingness to jump in and assist others. During this past trimester, I have seen examples with this of the lending training, compliance items, and community events. Goals are a mixed bag this past trimester with Gap being over goal at 81% and dep

| |
|---|
| sessions. A key is seeing a change in results and behaviors moving forward from the discussions, and new knowledge obtained. |

**Leadership**

| Evidence of providing direction, displaying innovative ideas and staff development. Ability to make decisions and problem solve. | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 20 | 60 |
| **Comments:** For Brittany, staff development is a focus and a priority which is excellent. Brittany is seeing mixed results of her efforts in this area as Amanda and her team seem to be doing excellent and have a high capacity to handle work. Becky's abilities and results in her area ebb and flow with no consistency. As long as Brittany is regularly involved in the area, it does better, however without Brittany's involvement it isn't sustainable by Becky. Jackie there has been little noticeable impact in her area and with her people as there seems to be limited to no growth by them. Future planning is goal setting is an area where Brittany excels. Her budget numbers and projections for 2025 seem solid. As outlined in other areas, her delivery of commitments and responses to staff are superb. Problem solving and timely solutions is an area that can be strengthened when it comes to collaborating with others. | | | |

**Goal #1**

| Commercial Ancillary Services | Rating (1-5) | Weight (Max total is 10) | Points (Rating x Weight) |
|---|---|---|---|
| | 5 | 5 | 25 |
| **Comments:** This project was tackled quite well. Brittany focused on the main area and reviewed numerous providers for merchant processing. There is one that she wants to go with and has done a good job getting the terms of the relationship hammered out. | | | |

**Goal #2**

| Mortgage Strategic Plan | Rating (1-5) | Weight (Max total is 10) | Points (Rating x Weight) |
|---|---|---|---|
| | 5 | 5 | 25 |
| **Comments:** The mortgage strategic plan was an excellent document that outlines well the future of the department with growth, KPIs, products, and more. She did an exceptional job researching information and balancing it with the projected path of Horizon. | | | |

| **Employee Current Period Score**<br>**Sum all points/ 100** | 305/100 = 3.05% |
|---|---|

| **Employee Year to Date Score** | P1 = 3.35%, P2 =3.05%, P3 =%: Avg: 3.20% |
|---|---|

| |
|---|
| **Overall Comments:** It is a joy working with Brittany and having conversations with her. I appreciate her insights and dialogue, especially when we are talking strategically and operationally. The huge opportunity for growth that she is undertaking to lessen her initial response to people and things along with working on soft skills will tremendously benefit her, her team and the credit union. This past trimester, we have had some intense interactions that were not positive and could have been |

# EXHIBIT 6

# Horizon Manager Performance Appraisal

**Name:** ____Brittany Baker______________ **Job Title:** __Chief Lending Officer_______

**Supervisor:** ___Justin Howard___________ **From:** __9/1/2024__ **To:** __12/31/2024__

**Scoring Scale**

| | |
|---|---|
| 1 | Does not demonstrate |
| 2 | Below Expectations |
| 3 | Meets Expectations |
| 4 | Exceeds Expectations |
| 5 | Extraordinary |

**Knowledge & Skill**

| Evidence of job knowledge, responsibilities, products/services to succeed in their role | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 4 | 10 | 40 |

**Comments:** Brittany's knowledge of our products, services, policies, and procedures are exceptional. She routinely adheres to practices with minimal deviation. Brittany is very independent and can tackle any facet of her role on her own. With areas that she lacks knowledge, she will do research to do the answer. When needed, she will go to Justin to bounce an idea off with her suggested solution which is typically always spot on. Brittany is also quite skilled with technology and software programs which makes her impactful in her role. Developing a softer balance on the brand/culture side and communication is the opportunity area.

**Quality**

| Measure how accurately and efficiently emp. Performs job duties to achieve their goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 4 | 15 | 60 |

**Comments:** The quality that Brittany produces is very strong as she adheres to procedures and is detail-oriented. During this past trimester for the core conversion project, Brittany went through and cleaned up accounts/areas in our existing core that were not correct. This past trimester talking about workload and busy hasn't come up hardly at all which has been an improvement from the previous trimester. My only concern is the amount that Brittany takes on with the amount of time she has. Hopefully she can discover a better balance with this by automating items with the new core, eliminating indirect lending, and her direct reports and teams performing at higher levels.

**Teamwork**

| Evidence of working harmoniously with team members to achieve common goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 2 | 10 | 20 |

**Comments:** Brittany does an exceptional job at achieving goals. If a goal is not being met, she will look to see what needs to be adjusted to hit it. For 2024, the consumer lending goal was almost spot on at 94% which was almost $33 million, debt protection was within 5%, and GAP rocked it at 77% which goal was 60%. Our mortgage area was the lone disappointment when it came to lending in 2024 as we were below 50% of goal for balances and farther off with anticipated income. Brittany is one of the first people to jump in and assist others with whatever they need if they ask for assistance, sometimes even without them asking. This is a trait that I admire Brittany for and appreciate that she does this. It does come at a cost as she sometimes creates workload issues for herself. As Brittany outlined in her self-assessment, sometimes she has so much going on that her communication isn't delivered well which causes problems. I believe part of the communication & relationship struggles that take away from a harmonious work environment and our culture is working effectively under pressure but it is also more than that. A portion of it can also be contributed to personal beliefs that become expectations for others and opinions about people. This past trimester we had just as many frequent occurrences of communication that went sideways that caused problems from Kim in Credit Solutions, numerous interactions with Denise, etc. Justin needs Brittany to focus on improving in this area as she is a senior leader with numerous years of professional experience. Her actions, behaviors, and words are a role-model with significant impact across the organization, both positively and negatively.

**Service**

| | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| Evidence of providing exceptional service to internal/external members | 3 | 10 | 30 |

**Comments:** Service is typically prompt and accurate when it comes from Brittany. She routinely does overrides for others, and you can see her timely responses via email or Teams. Her service doesn't typically differ be it a teammate, member, or vendor. Over the past trimester, her service has been great when it came to the core conversion process. Working on coming up with a collaborative resolution to problems with teammates can elevate enhance this area.

**Brand Awareness**

| | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| Evidence of embracing Horizon's brand and culture and demonstrating core values. | 3 | 15 | 45 |

**Comments:** During this past trimester, Brittany has routinely volunteered and supported our community with an example being the school reality fairs. Throughout the past few months, the enthusiasm has improved because of the improvement of quick reactions by Brittany. Some of it is being more mindful and part of it is just not addressing other things that can lead to negative interaction. Continuing to work on improving relationships, impressions, and communication is key in this area as an upbeat and positive working environment is crucial for our culture.

**Internal Development**

| | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| Taking advantage of internal and/or external resources to enhance knowledge and skills. | 5 | 10 | 50 |

**Comments:** Brittany successfully completed all her BAI courses as well as additional ones. She expanded her knowledge in mortgages by going through multiple mortgage trainings that were available. Over the

| |
|---|
| past trimester, Brittany has been doing a mortgage underwriting certification that she completed. Lastly is her active involvement in the Glatt sessions. |

**Leadership**

| Evidence of providing direction, displaying innovative ideas and staff development. Ability to make decisions and problem solve. | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 2 | 20 | 40 |
| **Comments:** During the past period Brittany has continued to do her 1-on-1's and has expanded interactions with Jackie due to unsatisfactory performance in the mortgage area. This was a great decision as the results did not occur in the area as expected and more frequent contact to understand what is occurring is important. Brittany does an exceptional job at goal setting and achieving those goals which also shows with her on-time delivery of projects & commitments. The area of focus in leadership is the problem resolution and finding timely solutions in regards to teammate relationships and reputation. Over this past trimester I believe the relationship between Denise and Brittany has gotten worse, which is a hinderance for the credit union. Brittany's reputation of her way or no way, blunt, not approachable, and inconsistent response minimizes the impact she can have from a people side. The reputation and other relationships within Horizon have remained unchanged over this past trimester. These are crucial items to address and improve to maximize her full leadership potential. | | | |

**Goal #1**

| Core Conversion | Rating (1-5) | Weight (Max total is 10) | Points (Rating x Weight) |
|---|---|---|---|
| | 5 | 5 | 25 |
| **Comments:** Brittany has done a superb job with the core conversion. I like to see the notes to stay up-to-date and the regular progress meetings are useful. The marketing communication plan is completed and items are being worked upon. The data cuts have occurred. Any issues have been communicated and Brittany stays on top of them to get them resolved. | | | |

**Goal #2**

| Mortgage Department Leadership Development | Rating (1-5) | Weight (Max total is 10) | Points (Rating x Weight) |
|---|---|---|---|
| | 4 | 5 | 20 |
| **Comments:** The harmonious environment has not really occurred thus far in the past trimester. We lost one of the Mortgage Professionals and there are questions around other team member's fit within the department due to attitude or performance. These two people situations will need to be addressed moving forward into 2025 next month. I believe Brittany has a greater grasp of what is happening in the mortgage area and I don't think she could have done anything additional with this goal. | | | |

| | |
|---|---|
| **Employee Current Period Score**<br>**Sum all points/ 100** | 330/100 = 3.30% |

| | |
|---|---|
| **Employee Year to Date Score** | P1 = 3.35%, P2 =3.05%, P3 =3.30%: Avg: 3.23% |

| |
|---|
| **Overall Comments:** I enjoy my conversations with Brittany as we are talking about the business and strategizing. She has amazing insights and I have no doubt that I can depend on her to get any |

operational task done and results achieved. It is the "how" things are achieved that causes issues as outlined in this review when it comes to people. I expect anyone at a management level or higher to be able to have a productive working relationship that is built on respect for achieving the organization's goals. This has to be a focus and progress needs to be made in improving relationships, building trust throughout the organization, and repairing the reputation perception in 2025. I have no doubt that with Brittany's abilities and experiences that she can achieve this is she desires as she is one of the most talented and intelligent people I have met.

**Employee Development Plan**

**Employee Goals for Next Period. Must be quantitative, with detailed information.**

**Goal #1 Core Conversion –** Maintain the progress of the core conversion and hit key milestones with the project so everything is ready for June 1st. Start training during the month of April. Ensure the third data cut occurs and any issues are addressed timely. Work with third parties to ensure they are ready for our switch over with no disruption of service.

**Goal #2 Clean Up Lists –** Tackle the clean up projects that Synergent and Symitar outline that need to be done prior to the core conversion.

**Employee Comments**

**Supervisor Signature:** Justin Howard  **Date:** 1-10-2025

With my signature, I attest I have received this performance appraisal from my supervisor.
I have had sufficient opportunity to provide my comments in the above area.

**Employee Signature:** [signature]  **Date:** 1/10/25

This performance appraisal is not to be construed as an employee contract and does not alter the Employment-AT-Will relationship in any way,

# EXHIBIT 7

## Horizon Manager Performance Appraisal

**Name:** ____Brittany Baker______________ **Job Title:** __Chief Lending Officer_______

**Supervisor:** ___Justin Howard___________ **From:** __1/1/2025__ **To:** __4/30/2025 __

**Scoring Scale**

| | |
|---|---|
| 1 | Does not demonstrate |
| 2 | Below Expectations |
| 3 | Meets Expectations |
| 4 | Exceeds Expectations |
| 5 | Extraordinary |

**Knowledge & Skill**

| Evidence of job knowledge, responsibilities, products/services to succeed in their role | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 2 | 10 | 20 |

**Comments:** Brittany possesses a strong knowledge in product, service, policy, procedure, and compliance. This strength brings value to conversations in which she is involved. Her strong knowledge enables her to do an excellent job referring products to members, as evident this last trimester with recommendations to Vinnie's Pizzeria. When it comes to her job description, she is performing well in most operational aspects of the role. It is the people and culture aspects of the role where significant underperformance is occurring. Professional communication is a significant area that needs development both verbally and in writing. During this past trimester there were numerous communications that could have been improved. Examples are Mortgage Email to Justin that implied that he circumvented her regarding changes in the mortgage department that the Mortgage Manager was communicating, which didn't occur, and he knew nothing about. Multiple emails to Denise that had an unprofessional and aggressive tone that continued to escalate the conflict and interpersonal issues between them. A defensive and down-putting response to Mike P. when he brought up in the leadership meeting about Justin helping with underwriting duties. The 1-on-1 on February 7th and March 3rd email to Justin about Denise also were not professional or constructive.

**Quality**

| Measure how accurately and efficiently emp. Performs job duties to achieve their goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 4 | 15 | 60 |

**Comments:** During this past trimester, Brittany produced at a high quality. She demonstrated an ability to follow policies and procedures. There was a lot of effort put forth by Brittany and her teams to clean up data for our upcoming core conversion. There was thoroughness and good execution of the core system validation. The core project organization has been well done for the amount of information and moving pieces that are taking place. For the most part this trimester, time was well utilized on high

| |
|---|
| impact tasks while less important tasks had to take a backseat due to the increasing workload of our core project. |

**Teamwork**

| Evidence of working harmoniously with team members to achieve common goals | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 2 | 10 | 20 |

**Comments:** The first 4 months of 2025 were mixed results for achieving goals. The highlight was our consumer loan originations, resulting in $2.1 million above budget (118% of goal). GAP penetration was near goal, 41% achieved compared to a goal of 45%. Commercial lending underperformed by $103,000 (71% of goal). By far the biggest area of underperformance was our mortgage results; $1.1 million under budget (32% of the goal). Our mortgage area has continuously underperformed for over a year now. Brittany did well in proactively assisting her team this past trimester, especially Amanda when it came to underwriting, tasks she was working on, etc. because Amanda is not one to ask for assistance when she needs it. During the past 4 months, Brittany initiated some ideas, due to her compliance knowledge, that improved the credit union like the NCUA indirect fees to get that taken care of and suggesting a viable process to take card payments over the phone if the line is recorded. The large area under teamwork that needs to be improved is creating a harmonious work environment. The actions, behaviors, words, and tone that Brittany uses at times cause a stressful, negative, and/or combative environment for other team members. What also goes into this is that Brittany has decided of how a task, process, or discussion should go and often is unwilling to consider other outcomes. As a senior manager, we are supposed to be role-modeling acceptable behavior and creating the environment that aligns with our culture, which Brittany has not done on a number of occasions. Examples are on January 13th when Brittany sent an email to Justin around concerns with Denise, one of her direct reports was accidentally left on the email by Brittany. Other examples are how underwriting, the loan process or how lending training should occur. Brittany's tone and conduct during conversations created a negative experience & environment in senior leadership meetings, with Justin, with Denise, and/or with Justin & Denise regarding the training of Jess, Keith, and Kathy. When Brittany has made up her mind on an issue, it can be difficult to engage with her, as she often is not willing to listen to others, engage in a productive conversation, and consider other options.

**Service**

| Evidence of providing exceptional service to internal/external members | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 10 | 30 |

**Comments:** Brittany demonstrates good examples of service as well as areas of service that can be improved. She responds to questions promptly and will assist with overrides that come through Teams for various team members. On the flip side, there are times that Brittany is working on something else and the service reaction creates a perception that she is being bothered. She does a great job at problem resolution on the operational side. During the past few months, there have been adjustments and work arounds needed for various items on the core project. This can also be seen with a different loan suggestion that came out of doing the commercial loan review for a few of our business members as we gathered more information. On the personal side, the problem resolution can be improved as seen with the relationship with Denise that I thought was doing better in T3 of 2024 based on feedback from Brittany. However, starting in December, issues kept occurring, and this trimester saw more instances of finger-pointing and not working constructively to address the problems. Brittany is prompt for most of

| |
|---|
| her follow-up as seen with responses to emails, in particular to core, and responding to questions. During the past trimester, Brittany typically responds accurately to people with questions and if she doesn't know the question, she will redirect. This happened a few times where third parties were redirected to Mike P., Mike B., and/or Eric to get questions answered. |

**Brand Awareness**

| Evidence of embracing Horizon's brand and culture and demonstrating core values. | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 1 | 15 | 15 |

| |
|---|
| **Comments:** At the end of last trimester and through the first couple months of this trimester the senior management team worked on reviewing and outlining our culture better in behaviors that we expect to see from each employee. The senior management team shared that we need to role model this behavior and even shared it at our annual employee training at the end of February. During the last trimester, it was outlined that working to improve internal relationships, impression/reputation, and communication were important moving forward. That didn't occur during this trimester. The poor professional relationship between Denise & Brittany was known to other team members at Horizon and impacted team members as they couldn't work together. Failures to role model our Mission included building positive relationships, active listening, keeping emotions under control, and being empathic, which have been shared in other parts of this review. With respect to Integrity, we saw multiple behaviors not displayed including owning actions, resolving issues, and addressing people directly. As an example, Brittany initially took accountability for her role in the disfunction on the senior management team. However, weeks later when discussing senior management and how to improve the situation, Brittany seemed to make a complete reversal, took no accountability, and indicated that she wasn't the fault at all and it was all Denise and Justin who was wrong. Another situation was when Brittany shared with Justin that she is trying to work better with Denise by not addressing every small thing that could cause negative frustration and by working with Denise to meet her expectations by giving her what is important to her. 2 ½ weeks later, the opposite occurred with Brittany addressing Denise around 1 loan being taken out of the online loan queue so Denise could train a team member on Home Equities. Brittany does have strength when it comes to demonstrating our community core value, knowing our products & services, and acting with urgency. |

**Internal Development**

| Taking advantage of internal and/or external resources to enhance knowledge and skills. | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| | 3 | 10 | 30 |

| |
|---|
| **Comments:** During this last trimester Brittany completed BAI courses, participated in numerous trainings for the new core, and was part of the end of Tom Glatt's leadership and teamwork consulting. The key with development and education is not only doing it, it is also demonstrating that the new knowledge is being used to change actions and behaviors moving forward for enhanced results. The improved results are what needs to be seen, in particular with the people relationships and soft skills. |

**Leadership**

| | Rating (1-5) | Weight | Points (Rating x Weight) |
|---|---|---|---|
| Evidence of providing direction, displaying innovative ideas and staff development. Ability to make decisions and problem solve. | 2 | 20 | 40 |

**Comments:** Brittany follows through on doing coaching and 1-on-1 of her staff. Progress can be seen with the performance with Amanda and Becky throughout this past trimester. However, there appears to be no improvement with Jackie with her performance or results. Brittany worked with Jackie on outlining a plan for the mortgage area last Fall with key objectives to achieve as it went through until April. However, it was clear that those objectives were not going to be achieved well before April, yet we waited until April to do anything about it. There could have been changes and actions made sooner in the mortgage department instead of waiting. The reputation that Brittany must overcome is the inconsistency of her demeanor and tone when interacting with others. Sometimes it goes well and other times it isn't a positive experience. This has caused some team members to avoid going to Brittany for questions. For me, I have personally experienced 1-on-1's, emails, or when she has stopped by my office that have been stressful not knowing how she will react. This past trimester Brittany has brought up multiple times to Justin about leaving Horizon/looking for another job. At times these statements felt like threats and other times it came across as a strategy to try to make Justin make a certain decision that Brittany wanted. Either way, this is not how I would expect a senior manager to conduct themselves or communicate.

**Goal #1**

| | Rating (1-5) | Weight (Max total is 10) | Points (Rating x Weight) |
|---|---|---|---|
| Core Conversion | 4 | 5 | 20 |

**Comments:** Over the course of this past trimester there have been numerous items that have occurred with the core conversion. These include data validations, setup of various systems (ELA, EMA, Digital Banking, Synapsys), training, and much more. For the most part, the bulk of this work has gone well. There have been some areas where we could have improved, which would be to have our systems set up more completely prior to the training, which caused confusion with team members and test data cuts could have been smoother. Fortunately, we were able to get another set of test data cuts for EOM April to see if issues have been worked out.

**Goal #2**

| | Rating (1-5) | Weight (Max total is 10) | Points (Rating x Weight) |
|---|---|---|---|
| Clean-Up Data Files | 5 | 5 | 25 |

**Comments:** There were multiple sets of data that needed to be cleaned up for the core conversion. Some of these included ACH, business, and more. Brittany made sure that those responsible for the cleanup got those completed and she also tackled some of the cleanup items herself.

| | |
|---|---|
| **Employee Current Period Score**<br>**Sum all points/ 100** | 260/100 = 2.60% |

| Employee Year to Date Score | P1 = 2.60%, P2 =?.??%, P3 =?.??%: Avg: 2.60% |
|---|---|

**Overall Comments:** This past trimester was highly disappointing with Brittany's effort and results as I thought we were improving in key areas and relationships in trimester 3 2024. Most significant was the lack of role-modeling our culture effectively as a senior leader, not being able to resolve performance issues in her area, and issues with team member relationships. The inconsistent experiences when interacting with Brittany lead to many negative encounters that are not professional. The regression of interpersonal relationship skills outlined in this review and unprofessional interactions with Brittany during this past review period are particularly disappointing in light of the number of discussions and opportunities provided to show improvement in these areas. As a result, I made the decision to do an organization restructuring of our senior management team and Brittany doesn't align with the new senior management role based upon existing performance.

**Employee Development Plan**

**Employee Goals for Next Period. Must be quantitative, with detailed information.**

**Goal #1 Core Conversion** – Keep overseeing the core conversion until completion. Make sure staff are ready for the conversion and able to do their roles through adequate training. Maintain communication and updates with third parties to ensure all systems are ready for the conversion. After conversion, trouble shoot, and tackle resolving issues and keep a list of things that we need to be tackled moving forward.

**Goal #2**

**Employee Comments**

See attached comments

**Supervisor Signature:** Justin Howard **Date:** 5-29-25

With my signature, I attest I have received this performance appraisal from my supervisor.
I have had sufficient opportunity to provide my comments in the above area.

**Employee Signature:** [signature] acknowledged only **Date:** 5/29/25

This performance appraisal is not to be construed as an employee contract and does not alter the Employment-AT-Will relationship in any way,

# EXHIBIT 8

**Mazzeo, Jessica L. (Philadelphia)**

---

**From:** Long, Adam <[redacted]com>
**Sent:** Wednesday, April 30, 2025 8:56 AM
**To:** 'Jennifer Nachamkin'
**Subject:** RE: Brittany Baker - Responses to Offer of April 16, 2025

Good morning. I am following up on this matter. Please let me know when we will receive a response.

**Adam R. Long**
*Attorney, Labor & Employment Group*

McNees
**McNees Wallace & Nurick LLC**
100 Pine Street
Harrisburg, PA 17101
Tel: [redacted]
Email | Website

---

**From:** Jennifer Nachamkin
**Sent:** Wednesday, April 23, 2025 12:11 PM
**To:** Long, Adam
**Subject:** RE: Brittany Baker - Responses to Offer of April 16, 2025

[EXTERNAL]
Adam,

Ms. Baker has advised that she does not have time to discuss or develop a response today; she is in core-conversion data base meetings all day today, will spend this evening catching up on the regularly required work and has a doctor's appointment mid-morning. We will have some response to you as soon as practicable.

Jennifer

---

**From:** Long, Adam <[redacted]com>
**Sent:** Wednesday, April 23, 2025 11:40 AM
**To:** Jennifer Nachamkin <[redacted]com>
**Subject:** RE: Brittany Baker - Responses to Offer of April 16, 2025

That is correct. Horizon wants to have Ms. Baker's future employment status resolved as soon as possible and before it begins moving forward with the senior management restructuring and posting of positions as part of this restructuring.

**Adam R. Long**
*Attorney, Labor & Employment Group*

**McNees Wallace & Nurick LLC**
100 Pine Street
Harrisburg, PA 17101
Tel: [redacted]
Email | Website

**From:** Jennifer Nachamkin <[redacted]com>
**Sent:** Wednesday, April 23, 2025 11:12 AM
**To:** Long, Adam <[redacted]com>
**Cc:** Sherise M. McMichael <[redacted]com>
**Subject:** RE: Brittany Baker - Responses to Offer of April 16, 2025

[EXTERNAL]
Adam,

The finer work duties aside, please confirm so I am not misunderstanding: Horizon wants Ms. Baker to decide in April, whether to accept demotion or separation on or about July 25, with no change in salary or title until then?

Jennifer

**From:** Long, Adam <[redacted]com>
**Sent:** Wednesday, April 23, 2025 9:23 AM
**To:** Jennifer Nachamkin <[redacted]com>
**Subject:** RE: Brittany Baker - Responses to Offer of April 16, 2025

Good morning. As we discussed during our call yesterday, commercial lending will not report to the Director of Lending as part of the senior leadership restructuring. The Director of Lending will have the three direct reports listed in my 4/16 email.

Horizon is unwilling to increase the [redacted] annual salary for the Director of Lending position. Horizon came to that number by factoring in the annual increases that Ms. Baker likely would have received to her prior salary had she remained the Director of Lending.

If Ms. Baker takes the Director of Lending position, she will maintain her current job title and salary through 7/25. However, the transition of items will start happening before that date with Mr. Howard's direction and Ms. Baker's assistance. Ms. Baker's job title and salary change would not occur until the completion of the core conversion on 7/25. If Ms. Baker elects either the Director of Lending position or severance, she would retain her current job title and salary through 7/25 (assuming of course satisfactory performance and conduct through that date).

Please let me know if you have any questions or wish to discuss.

**Adam R. Long**
*Attorney, Labor & Employment Group*

**McNees Wallace & Nurick LLC**
100 Pine Street
Harrisburg, PA 17101
Tel: [redacted]
Email | Website

---

**From:** Sherise M. McMichael <[redacted]com>
**Sent:** Monday, April 21, 2025 11:56 AM
**To:** Long, Adam <[redacted]com>
**Cc:** Jennifer Nachamkin <[redacted]com>
**Subject:** Brittany Baker - Responses to Offer of April 16, 2025

[EXTERNAL]
Attached is correspondence addressed to you from Attorney Jennifer Nachamkin regarding the above matter.

*Sheri McMichael*

Legal Assistant
Strokoff & Cowden PC
224 Pine Street
Harrisburg, PA 17101
Email: [redacted]com
**Office #: 717-233-5353**
**Fax #: 717-233-5806**

**We have a new address!**

**Please update your contacts:**

**Strokoff & Cowden, P.C.**
**224 Pine Street**
**Harrisburg, PA 17101**

This electronic message contains information from the law firm of **Strokoff & Cowden, P.C.**, that may be **privileged** and **confidential**. The information is intended for the use of above-listed addressees only. If you are not an addressee, take note that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have mistakenly received this e-mail, please reply to me immediately or call (717) 233-5353.